## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| I.S., a minor by and through her mother and next friend, ANAIS DISLA; J.B., a minor by and through her parents and next friends, IBELYH DISLA and JOSE BRISTOL; I.M., a minor by and through her mother and next friend, ZULAYKA MCKINSTRY; A.S., a minor by and through her mother and next friend, CHANDERLIA SILVA, <br><br>     Plaintiffs, <br><br>  v. <br><br>BINGHAMTON CITY SCHOOL DISTRICT; BINGHAMTON BOARD OF EDUCATION; TIM SIMONDS, in his individual and official capacity; MICHELLE RALEIGH, in her individual and official capacity; MARY ELLEN EGGLESTON, in her individual and official capacity, <br><br>     Defendants. | 3:19-cv-513 (GTS/DEP) <br><br> _____ Civ. _____ (_____) <br><br> Jury Trial Demanded |

## COMPLAINT

### PRELIMINARY STATEMENT

Plaintiffs I.S., a minor by and through her mother and next friend, Anais Disla; J.B., a minor by and through her parents and next friends, Ibelyh Disla and Jose Bristol; I.M., a minor by and through her mother and next friend, Zulayka Mckinstry; and A.S., a minor by and through her mother and next friend, Chanderlia Silva (collectively "Plaintiffs"), bring this action against the Binghamton City School District, the Binghamton Board of Education, Tim Simonds, Michelle Raleigh, and Mary Ellen Eggleston (collectively "Defendants"), for the discriminatory, dehumanizing, and unlawful strip searches and other unreasonable searches of their daughters—four Black and Latina girls who were twelve years old at the time of the searches—in violation

of their federal statutory and constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, Title VI of the Civil Rights Act of 1964, the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, and all relevant implementing regulations.

On January 15, 2019, at East Middle School in Binghamton, New York, four twelve-year-old Black and Latina girls—I.S., J.B., I.M. and A.S. (collectively, "Student Plaintiffs")—were walking from the cafeteria towards their lunch activity and were laughing in the hallway when they were stopped by the school's principal, Tim Simonds. Principal Simonds and Assistant Principal Michelle Raleigh ordered and escorted the girls to the health office without providing any explanation. There, Principal Simonds and Assistant Principal Raleigh huddled and whispered with the school nurse, Mary Ellen Eggleston. Nurse Eggleston then searched each girl separately without ever saying why the girls were being searched, in one case directing the girl to remove her clothing down to her underwear and touching the girl inside of her bra.

School staff did not contact the girls' parents or provide the parents with any notice prior to conducting the searches and did not inquire about the girls' well-being before resorting to the demeaning strip searches. In addition, Nurse Eggleston, at times in the presence of Principal Simonds and Assistant Principal Raleigh, conducted vitals tests, searched each girl's belongings, and subjected each girl to humiliating and inappropriate comments about their bodies. Assistant Principal Raleigh also conducted searches of some of the girls' belongings. When the intrusive searches of each girl over the course of an hour failed to reveal any contraband or other evidence of wrongdoing, Principal Simonds sent A.S., I.M., and I.S. back to class as if nothing had happened, and gave J.B. an in-school suspension without explanation. Principal Simonds later

told the girls' parents that he sent them to the health office because he thought the girls were "hyper" and "giddy."

As the U.S. Supreme Court has recognized, strip searches of children at the hands of school officials cause trauma and long-term harm.[1] In this case, each girl has experienced and continues to experience psychological pain and mental anguish as a result of the unlawful, unjustified, and invasive searches of their bodies and belongings during a critical period in their development. Following January 15, each girl felt uncomfortable returning to school because their trust in school officials had been violated. They felt embarrassed, humiliated, and targeted for unwanted attention. For five to six days, they remained out of school entirely. During and after this time, each girl displayed signs of anxiety and depression. Their mothers repeatedly requested that the Binghamton City School District address the events on January 15 and allow their girls to attend West Middle School, the only other middle school in the District that is not an alternative school. Instead, the District assigned the girls to the District's alternative school— to which students who have committed serious disciplinary infractions are routinely assigned— where they remained for over two additional weeks. At the alternative school, the girls were kept isolated with limited classroom instruction time. Instead, the girls spent much of the day at the school listening to music and watching YouTube videos.

---

[1] *Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364, 375 (2009) (quoting Br. for Nat'l Ass'n of Social Workers, et al. as Amici Curiae 6-14; Irwin A. Hyman & Donna C. Perone, *The Other Side of School Violence: Educator Policies and Practices that May Contribute to Student Misbehavior*, 36 J. Sch. Psych. 7, 13 (1998); N.Y.C. Dep't. of Educ., Reg. No. A-432, 2 (2005)), https://www.schools.nyc.gov/docs/default-source/default-document-library/a-432-english; *Cornfield v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1316, 1321 (7th Cir. 1993) (citations omitted) ("[n]o one would seriously dispute that a nude search of a child is traumatic"); *Bellnier v. Lund,* 438 F. Supp. 47 (N.D.N.Y. 1977) (young children are especially susceptible to being traumatized by strip searches).

The laughter and giddiness of adolescent children are not objective facts giving rise to a reasonable suspicion justifying an intrusive search by school officials. The searches that occurred on January 15, 2019, at East Middle School, including the strip searches, vitals checks, and searches of the girls' personal belongings, fail to meet clearly established constitutional standards.

Troublingly, the facts in this case also support an inference that the Defendants were motivated by false race- and gender-based stereotypes in directing, facilitating, and conducting these unlawful searches. This inference of discrimination is supported by the lack of any objective facts supporting a reasonable suspicion of danger or wrongdoing, and by statements school officials made on and after January 15 that evince stereotypical views. First, each of the girls is either African American or Latina. They were targeted by the Principal for exhibiting conduct that would otherwise be regarded as typical for adolescent girls. Moreover, crude comments made about the physical maturity of one of the girls, and the suggestion that the mere presence of the girls provoked fear in school officials, suggest that familiar stereotypes were motivating factors in the conduct of the school officials. For example, Assistant Principal Raleigh stated in the school health office that she was afraid of the girls and told Nurse Eggleston—in front of the middle school girls—that she did not want to be left alone with them. Additionally, Nurse Eggleston told the girls that they were loud, disrespectful, and had "attitudes," evoking all too common stereotypes about Black and Latina girls. The well-recognized harm from being subjected to a strip search in school is compounded when students are treated unconstitutionally for reasons that are motivated by illicit race and gender biases.

Plaintiffs bring this civil rights action pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and

statutory anti-discrimination law. Plaintiffs seek redress for Defendants' deprivation, under color of state law, of Plaintiffs' rights under the Constitution and laws of the United States. Plaintiffs seek (1) a declaratory judgment that the searches and the subsequent events that occurred in this case were unconstitutional and a violation of the relevant civil rights laws; (2) an order enjoining Defendants from conducting strip searches at school in the future and enjoining Defendants from placing students at alternative schools without a disciplinary referral; (3) compensatory damages for the injuries caused by Defendants' unlawful conduct; (4) punitive damages assessed to deter such intentional or reckless deviations from well-settled federal law; and (5) other relief that the Court deems just and proper.

## JURISDICTION AND VENUE

1.      This action arises under the Fourth and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, Title VI of the Civil Rights Act, 42 U.S.C. § 2000d *et. seq.*, the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et. seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and 29 U.S.C. § 794.

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), as this action seeks redress for violations of Plaintiffs' rights under the U.S. Constitution and federal civil rights laws.

3.      This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the Northern District of New York.

## PARTIES

*Plaintiffs*

4.     Plaintiff Anais Disla is the mother of a thirteen-year-old Latina girl, I.S. I.S. is in the seventh grade at West Middle School, and at all relevant times has resided in Binghamton, New York.

5.     Plaintiffs Ibelyh Disla and Jose Bristol are the parents of a thirteen-year-old Latina girl, J.B. J.B. is in the seventh grade at West Middle School, and at all relevant times has resided in Binghamton, New York.

6.     Plaintiff Zulayka McKinstry is the mother of a twelve-year-old Black girl, I.M. I.M. is in the seventh grade at West Middle School, and at all relevant times has resided in Binghamton, New York.

7.     Plaintiff Chanderlia Silva is the mother of a thirteen-year-old Black girl, A.S. A.S. is in the seventh grade at West Middle School, and at all relevant times has resided in Binghamton, New York.

*Defendants*

8.     Defendant Mary Ellen Eggleston ("Nurse Eggleston") is (or was) at all times relevant herein a nurse at East Middle School in Binghamton, New York. She is sued in her individual capacity and official capacity.

9.     Defendant Tim Simonds ("Principal Simonds") is the principal at East Middle School in Binghamton, New York. The District delegates final policymaking authority regarding disciplinary issues and searches to the principal as an administrator of a school.[2] Principal

---

[2]     *See* Binghamton City School District Code of Conduct at 11 (2017), http://www.binghamtonschools.org/UserFiles/Servers/Server_512723/File/For%20Parents/Code %20of%20Conduct/BCSD%20Code%20of%20Conduct_7-26-17.pdf ("All Administrators have

Simonds, as principal of East Middle School, was the highest-ranking person in the school. By virtue of his position, he was directly responsible for discipline in his school and supervision over staff, including Nurse Eggleston and Assistant Principal Raleigh. He is sued in his individual capacity and official capacity.

10.   Defendant Michelle Raleigh ("Assistant Principal Raleigh") is an assistant principal at East Middle School in Binghamton, New York. The District delegates final policymaking authority regarding disciplinary issues and searches to the assistant principal as an administrator of a school.[3] She is sued in her individual capacity and official capacity.

11.   Defendants Nurse Eggleston, Assistant Principal Raleigh, and Principal Simonds (collectively the "Individual Defendants") participated in the unlawful acts described herein.

12.   Defendant Binghamton City School District (the "District") is a public school district in Broome County, New York, where East Middle School is located. The District receives federal financial assistance for its programs, services, and activities.

13.   Defendant Binghamton City Board of Education (the "Board" and collectively with the District the "School Defendants") has "in all respects the superintendence, management and control of the educational affairs of the District and … all the powers necessary to exercise these powers expressly granted to it by the laws of New York State and the Commissioner of Education."[4] Local public schools in the District are "maintained, developed and operated" by

---

the responsibility to: Create and implement policies and procedures that encourage safe and orderly schools for all students, school staff, and principals, to support active teaching and learning.").

[3] *Id.*

[4] Binghamton City School District By-Laws, 1.1 School District and Board of Education Legal Status and Authority at 1110 (2016),
http://bcsd1.ss14.sharpschool.com/UserFiles/Servers/Server_512723/File/Board%20Policies/Section%201000%20By%20Laws%20BOE.pdf.

the Board.[5] Under New York law, the Board has duties relating to generally setting up and maintaining the educational system, including establishing "rules and regulations concerning the order and discipline of the schools." N.Y. Educ. Law § 1709(2) (McKinney 2018).

## FACTS

*The January 15, 2019 Unlawful Searches*

14.     I.S., J.B., I.M., and A.S. are Black and Latina girls who, until the events of January 15, 2019, attended East Middle School in Binghamton, New York. On January 15, all of the girls were twelve years old.

15.     On January 15, 2019, Mr. Tim Simonds, the principal of East Middle School, stopped the girls in the hallway during their lunch break while the girls were walking from the cafeteria towards their lunch activity. Principal Simonds asked the girls where they were headed and told them that he had been looking for them. The girls laughed during this brief conversation with Principal Simonds, who then—along with Assistant Principal Michelle Raleigh—escorted them to the school's health office.

16.     Neither Principal Simonds nor Assistant Principal Raleigh, both of whom are white, explained to the girls why they were taken to the health office.

17.     The girls were held in the health office for approximately one hour. While in the health office, the girls witnessed Principal Simonds, Assistant Principal Raleigh, and Nurse Eggleston, who is also white, whispering to each other.

18.     Subsequently, starting with A.S., Nurse Eggleston brought each girl into the exam room in the health office for closed-door, separate searches and examinations without explaining

---

[5] Binghamton City School District By-Laws, 3.1 Power and Duties of the Board at 1310 (2016), http://bcsd1.ss14.sharpschool.com/UserFiles/Servers/Server_512723/File/Board %20Policies/Section%201000%20By%20Laws%20BOE.pdf.

to each girl the purpose of the searches and examination and without notifying or receiving consent from any of the girls' parents. Principal Simonds and Assistant Principal Raleigh observed Nurse Eggleston take each girl into the exam room. In some cases, the Assistant Principal entered the exam room during the closed-door searches and examination and participated in the search of a girl's belongings.

19.     Upon information and belief, Principal Simonds and Assistant Principal Raleigh instructed Nurse Eggleston to conduct these intrusive searches in violation of District policy and the law.

         a.     **A.S.**

20.     Once in the exam room, Nurse Eggleston closed the door and told A.S. to sit on the bed. While A.S. was on the bed, Nurse Eggleston used a blood pressure cuff to take her blood pressure on top of A.S.'s clothes. Nurse Eggleston then checked A.S.'s heart rate by putting a stethoscope under A.S.'s sweater and tested her pupils with a light. Nurse Eggleston then conducted a sobriety test that included, among other things, directing A.S. to stand on one foot and touch her nose. Nurse Eggleston then told A.S. to take off her sweater. A.S. unzipped her sweater to the middle of her chest, then zipped it back up and said "no." In response, Nurse Eggleston told A.S. that she herself (Nurse Eggleston) could not wear only a bra without a shirt underneath a sweater (like A.S. was wearing) because her own breasts are flabby.

21.     Nurse Eggleston then told A.S. to pull her pants down. After A.S. said "no," Nurse Eggleston used her hands to pat down the inner thigh area of A.S.'s pants.

22.     Assistant Principal Raleigh then entered the exam room and closed the door. She told A.S. to empty her pockets. A.S. removed lip gloss, a phone charger, and a pencil from her pockets. Assistant Principal Raleigh searched the lip gloss and found nothing. Assistant Principal

Raleigh then directed A.S. to take off her boots. A.S. took off her boots, and Assistant Principal Raleigh turned the boots upside down and shook them. Nothing came out of the boots.

23.     Assistant Principal Raleigh then searched A.S.'s phone by shaking it and trying to take it apart. Nothing came out of the phone. Assistant Principal Raleigh gave A.S. back her phone.

24.     A.S. was then permitted to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of A.S. or her belongings.

        **b.**      **I.M.**

25.     Next, I.M. was brought into the exam room. Nurse Eggleston closed the door and directed I.M. to sit on the bed, which I.M. did. Nurse Eggleston tested I.M.'s pupils with a light.

26.      Nurse Eggleston then directed I.M. to take off her sweatshirt. I.M. complied. Nurse Eggleston checked I.M's pulse by placing her fingers on I.M.'s wrist. I.M. had on a spaghetti strap tank top underneath the sweatshirt. Nurse Eggleston told I.M. that she herself could not wear a shirt like that, referring to I.M.'s tank top, because her own breasts were flabby. Nurse Eggleston was touching her own breasts (on top of her shirt) when she made this comment to I.M.

27.     I.M. was uncomfortable about Nurse Eggleston's references to her own breasts and responded by saying, "Oh." Nurse Eggleston then said to I.M. that the older you get, the less attractive you are. She further told I.M. that I.M.'s breasts were unusually large for her age.

28.     Nurse Eggleston then directed I.M. to pull the bottom of her tank top away from her body and shake. I.M. complied. She then directed I.M. to extend her arms out to the side. Once I.M. complied, Nurse Eggleston swiped the inside of I.M.'s bra near both the right and left

armpits with her index and middle fingers. Her index and middle fingers touched both the inside of I.M.'s bra and the sides of I.M.'s breasts.

29.     Nurse Eggleston then directed I.M. to pull down her pants. I.M. had on two pairs of pants: pajama pants and spandex leggings underneath. I.M. pulled her pajama pants down to her ankles. Nurse Eggleston then directed I.M. to shake her legs. I.M. complied. Nurse Eggleston then asked I.M. if she had anything else on her. I.M. replied that if she had anything, Nurse Eggleston would see it because the leggings were tight. Nurse Eggleston then directed I.M. to pull down her leggings. I.M. pulled her leggings down to her knees and, after viewing I.M. in her underwear, Nurse Eggleston indicated that I.M. was permitted to pull her leggings and pajama pants back up.

30.     Nurse Eggleston then conducted a sobriety test that included, among other things, directing I.M. to stand on one foot and touch her nose.

31.     Nurse Eggleston asked I.M. if she had a phone. I.M. responded that she had a phone and a purse in the main room where the other girls were waiting. Nurse Eggleston directed I.M. to get the phone and purse. Assistant Principal Raleigh and Principal Simonds were in the main room where the girls were waiting when I.M. went to get the phone and purse from that same room. I.M. retrieved her phone and purse and returned to the exam room where Nurse Eggleston was waiting.

32.     Nurse Eggleston then directed I.M. to remove her shoes and shake them. Before I.M. could remove her shoes, Assistant Principal Raleigh entered the exam room and also directed I.M. to remove her shoes. I.M. then removed her shoes and shook them, and nothing came out of the shoes.

33.     Nurse Eggleston emptied the contents of I.M.'s purse onto a table and searched the purse, as well as lip gloss and perfume that had been in the purse. Nurse Eggleston smelled I.M.'s phone, which did not have a case. Nurse Eggleston tried to take the back of the phone off to conduct a further search, but I.M. told her that the back did not come off without breaking the phone.

34.     Nurse Eggleston then permitted I.M. to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of I.M. or her belongings.

### c.     I.S.

35.     Next, I.S. was brought into the exam room and Nurse Eggleston closed the door. Nurse Eggleston told I.S. to sit on the bed and I.S. complied.

36.     Nurse Eggleston directed I.S. to take her arm out of her sweater. I.S., who was wearing a short-sleeved shirt underneath her sweater, eventually took off her entire sweater.

37.     Nurse Eggleston rubbed I.S.'s arm where I.S. has an eczema patch. She told I.S., in a disrespectful tone, that her eczema was bad and that I.S. needed to get it taken care of.

38.     Nurse Eggleston then conducted a sobriety test that included, among other things, directing I.S. to stand on one foot and touch her nose. Assistant Principal Raleigh then came into the exam room and directed I.S. to take off her shoes. I.S. complied. Assistant Principal Raleigh shook the shoes, and nothing fell out. Nurse Eggleston told I.S. to empty her pants pockets. After I.S. emptied her pants pockets, removing lip gloss and a few coins, Nurse Eggleston patted down I.S.'s pants pocket area and found nothing.

39.     I.S. was then permitted to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of I.S. or her belongings.

         **d.**     **J.B.**

40.     Finally, J.B. was brought into the exam room, and Nurse Eggleston closed the door. Nurse Eggleston told J.B. to sit on the bed and J.B. complied.

41.     J.B. asked to call her mother and also asked whether the school had called her mother. Nurse Eggleston told J.B. that the school had not called her mother.

42.     Nurse Eggleston then took J.B.'s pulse and blood pressure and checked J.B.'s pupils with a light. Next, Nurse Eggleston conducted a sobriety test that included, among other things, directing J.B. to stand on one foot and touch her nose.

43.     Nurse Eggleston then directed J.B. to take off her shoes. J.B. complied. Nurse Eggleston shook J.B.'s shoes, and nothing came out of the shoes.

44.     Nurse Eggleston told J.B. to take her top off. J.B. said "No, you don't have my mom's permission."

45.     Nurse Eggleston then asked J.B. if she had anything else, and J.B. said she had a sweater. Nurse Eggleston directed J.B. to get her sweater from the main area of the health office and come back. J.B. complied.

46.     Nurse Eggleston searched J.B.'s sweater and found J.B.'s phone, headphones, charger, and lip gloss. Nurse Eggleston then searched J.B.'s phone, headphones, charger, and lip gloss.

47.     J.B. was then permitted to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of J.B. or her belongings.

         **e.**     **Immediate Aftermath Following the Unlawful Searches**

48.     After each girl had been searched by Nurse Eggleston and Assistant Principal Raleigh in the exam room, all of the girls returned to the main area of the health office. They sat together and talked about what had happened.

13

49.     During that time, Nurse Eggleston told the girls to be quiet. When the girls were not sitting silently or when they asked why they were being held in her office, Nurse Eggleston told the girls that they were loud, disrespectful, and had "attitudes."

50.     At one point, a boy with an injury came into the health office where the girls were waiting. As Nurse Eggleston prepared to leave the health office with the boy, Assistant Principal Raleigh stated that she was scared to be left alone with the girls and could not be in a room alone with them. Nurse Eggleston did not leave the health office with the boy.  At this point, the girls still had not been told why they were searched or why they were being detained.

51.     Eventually, Nurse Eggleston told the girls to go to the main office, where Principal Simonds's office is located.

52.     Once in the main office, the girls waited for further instruction on what to do next. When Principal Simonds was available, they went into his office.

53.     During the meeting with Principal Simonds, J.B. nervously clicked open and closed a hand sanitizer that she was wearing on a lanyard around her neck. Principal Simonds asked J.B. if she was sniffing hand sanitizer. She responded, "Are you kidding? It's just hand sanitizer."

54.     I.M. and J.B. also explicitly requested to contact their parents during the meeting with Mr. Simonds, but Mr. Simonds denied their requests.

55.     Principal Simonds eventually sent A.S., I.M., and I.S. back to class.

56.     Principal Simonds sent J.B. to in-school suspension without explanation.

57.     Sometime thereafter, Principal Simonds contacted Ms. Ibelyh Disla, Ms. McKinstry, and Ms. Silva (the mothers of J.B., I.M., and A.S., respectively) to tell them that their daughters had been sent to the nurse's office for a vitals check because they were "hyper

and giddy." He did not contact Ms. Anais Disla (the mother of I.S.), and he did not inform any of the parents that their children had undergone a sobriety check and strip search at school that day.

58.    A.S. returned to East Middle School on January 16, 2019, but was afraid to return to school thereafter. She was humiliated by the way school officials treated her on January 15. She was also embarrassed by the attention that she received when she returned to school the next day on January 16 because she felt as if everyone knew what had happened to her and the other three girls.

59.    I.M. did not return to East Middle School after January 15 because she was humiliated by the way school officials treated her on January 15 and felt too unsafe to return.

60.    I.S. did not return to East Middle School after January 15 because she was humiliated by the way school officials treated her on January 15 and felt too unsafe to return.

61.    J.B. returned to East Middle School on January 16, but was afraid to return to school thereafter. She was humiliated by the way school officials treated her on January 15. She was also embarrassed by the attention she received when she returned to school the next day on January 16 because she felt as if everyone knew what had happened to her and the other three girls.

*Parental Follow-up*

62.    On January 16, 2019, Ms. Anais Disla, I.S.'s mother, and Ms. McKinstry, I.M.'s mother, separately went to East Middle School to speak with Principal Simonds to get an explanation and documentation of what had happened to their daughters the day before.

63.    Ms. Anais Disla asked for information about what happened to I.S., but Principal Simonds told her that documentation did not exist.

64.    Ms. McKinstry asked for an incident report documenting what happened to I.M. Principal Simonds told her that there was no incident report. When she insisted that she needed

15

documentation, Principal Simonds told Ms. McKinstry to wait while he typed up an incident report. In the meantime, he called the District Office. Two District employees—Michael Holly (Assistant Superintendent for Personnel and Administration) and David Thon (Director of Personnel)—subsequently arrived at the school and questioned I.M. about the events on January 15. I.M. recounted the events of that day to Mr. Holly and Mr. Thon.

65.    Principal Simonds typed a letter in the presence of the other District employees, but the letter did not mention that the girls had been strip searched. Instead, it stated that Principal Simonds and Assistant Principal Raleigh questioned the students just before 1 p.m. on January 15 and escorted them to the health office when they appeared to be "hyper" and "giddy."[6]

66.    Principal Simonds and Assistant Principal Raleigh were apologetic to Ms. Disla and Ms. McKinstry. According to both mothers, Principal Simonds and Assistant Principal Raleigh were almost in tears during their respective meetings with them on January 16. One of the District level personnel who were in the office, Assistant Superintendent Michael Holly, offered to pay for Ms. McKinstry's cab as she was leaving East Middle School, stating that it was the least they could do.

67.    During her visit to the school, Ms. McKinstry filed a police report with the school police officer, Officer Arthur Williams, Jr. The Binghamton Police Department Incident Report is attached hereto as Exhibit B. It states that Officer Williams had the following discussions with Principal Simonds on January 15:

> I then spoke with the Principal, Mr. Tim Simonds, who informed me on 15 Jan 2019, at about 1245 hours, that several students appeared to be under the influence of some unknown substance.

---

[6] *See* January 16, 2019 Letter from Principal Simonds, attached hereto as Exhibit A.

He ask, [sic] if there was any way I could observe the students and determine if they had taken any illegal substances. I informed Mr. Simonds, the only way to determine if those students are under any illegal substance was through a blood test. . . . I advised Mr. Simonds to call their parents, check their lockers, bags, and have them empty their pockets to ensure they don't have anything on them. After giving that information to Mr. Simonds, I left the nurses offices. The students was [sic] not interviewed by me. During the time I was observing those students, I. M[.] was in one of the rooms in the nurse[']s office[], with the door closed, with the nurse, Eggleston. I did not go into that room.

68.     On or about January 18, Mr. Thon called Ms. Anais Disla and informed her that the District was investigating what happened on January 15. He further informed Ms. Disla that the District needed statements from I.S. and J.B. (Ms. Anais Disla's daughter and niece, respectively).

69.     On January 18, Ms. Anais Disla, along with I.S. and J.B. met with Assistant Principal Raleigh and Mr. Thon at the Broome County Public Library in Binghamton. Mr. Thon questioned I.S. and J.B. separately about the January 15 incident.

70.     On or about January 24, Mr. Holly called Ms. Silva and informed her that an investigation was taking place and asked to meet with her to get her input on how to prevent an incident like the January 15 one from happening again. On or about January 25, Mr. Thon and Mr. Holly met with A.S. at Broome County Public Library in Binghamton and questioned A.S. about the January 15 incident.

_School Board Meeting and District Response_

71.     The District did nothing to address the families' concerns or facilitate the girls' transition back to school until the Board's meeting on January 22, 2019. By that time, I.S. and I.M. had missed five days of school and J.B. and A.S. had missed four days of school.

72.     While the January 15 incident was not officially on the agenda for the Board

meeting,[7] the girls' families and concerned members of the community showed up at the meeting and demanded that the Board address the incident. Ms. McKinstry, Ms. Silva, and J.B. each spoke about the January 15 searches at the Board meeting.

73.     Following the public outcry at the meeting, District Superintendent Tonia Thompson asked the four girls and the mothers in attendance (Ms. McKinstry, Ms. Silva, and Ms. Anais Disla) to speak with her in a private room, where they discussed the girls returning to a different school placement. Although Ms. McKinstry, Ms. Silva, and Ms. Anais Disla (who is also J.B.'s aunt) told Superintendent Thompson that they wanted the girls to be immediately transferred to West Middle School, the only other middle school in the District that is not an alternative school, the girls were instead assigned to Columbus School.

74.     Columbus School houses a New York State Boards of Cooperative Educational Services Alternative School and the District's central offices.[8]

75.     Following the Board meeting, the District issued statements on January 23, 24, and 29, 2019, relating to the January 15 searches. While the January 23 statement acknowledges that there were concerns about "the procedures and application of student searches,"[9] the January 24 statement denied that the strip searches occurred.[10] The January 29 statement again asserted:

---

[7] *See* Agenda for the January 22, 2019 School Board Meeting, attached hereto as Exhibit C.

[8] *See* Binghamton City School District, District-wide School Safety Plan (Mar. 4, 2014), http://bcsd1.ss14.sharpschool.com/UserFiles/Servers/Server_512723/File/About/Required%20N otifications/District%20Wide%20Safety%20Manual/2014%20District-wide%20Safety%20Manual%20-%20Final.pdf.

[9] *See* Statement of Binghamton City School District (Jan. 23, 2019), https://www.scribd.com/document/398427439/BCSD-Press-Release1-23-19-1#from_embed.

[10] *See* Statement of Binghamton City School District (Jan. 24, 2019), https://drive.google.com/file/d/1hI_HbYgZF12ipci0uALJAspHjzZ32N4_/view.

"It must be reiterated, we have no evidence that a strip search was conducted by administration."[11]

76.     On or about January 29, 2019, the sole African-American member of the Binghamton School Board, Korin Kirk, released a statement on Facebook in her individual capacity, stating that she believed the girls and that the January 15 incident is a "wakeup call," but also "one incident of many":

> If people think this situation was handled the best way possible by the Binghamton City School District, they are sadly mistaken.
> …
> Mistakes were made.
>
> Those who needed this incident as a wakeup call that there is more work to be done haven't been paying attention. This is one incident of many.
>
> I believe those girls.
>
> I believe those girls when they say they were harmed.
> …
> There is a massive divide in this city between the experiences of black and minority residents and non-black residents.

*Referral to Columbus School*

77.     On January 24, 2019, after being out of school for five to six days, the four girls began attending Columbus School. At Columbus, their school day lasted from 9:30 am until 1:30 pm. The girls were assigned to a classroom with two other middle school students who already were attending Columbus. All of the students at Columbus were told by school staff that they could not discuss why the girls were at Columbus and no longer attending their previous schools.

---

[11]     *See* Statement of Binghamton City School District (Jan. 29, 2019), https://drive.google.com/viewerng/viewer?url=https://assets.documentcloud.org/documents/5700424/Binghamton-City-School-District-Final-Statement.pdf.

78.     The classroom teacher at Columbus, Ms. Z., did not provide direct instruction, but rather supervised the students with work on their laptops. There were no books available in the classroom. In general, the girls worked on worksheet assignments using Google Classroom.

79.     There were insufficient assignments to last the girls until dismissal. After completing the computer assignments, typically within the first couple hours of the morning, the girls passed the remainder of the day by listening to music and watching videos on YouTube.

80.     The girls felt isolated while at Columbus because they had to be stationary all day and could not interact with other students outside their classroom. They were assigned to one classroom for the entire day, including the lunch period. Lunch was brought to the classroom on a cart.

81.     Although A.S. and I.S. have individualized education plans ("IEPs"), no accommodations were made for them during their time at Columbus. For example, A.S.'s IEP includes speech therapy, but the District did not provide speech therapy to A.S. at Columbus. I.S.'s IEP requires tutoring for her learning disability, but the District did not provide such services to I.S. at Columbus.

82.     On February 8, 2019, District officials, Ms. Karry Mullins (Assistant Superintendent for Instruction and Budget) and Ms. Deb Card (Director of Attendance and Pupil Services), and the District's counsel, Robert McKertich, held separate meetings with Ms. McKinstry, Ms. Silva, and Ms. Disla and their counsel about their request that the girls be enrolled at West Middle School. At these meetings, the District finally agreed to transfer the girls to West Middle School as of Monday February 11, 2019. The girls' first day at West Middle School was February 12, 2019, at which time nearly a month had passed since the unlawful January 15 searches.

*Psychological Harm and Mental Anguish*

83.    As a result of the unlawful January 15 searches and the events that followed, I.S., J.B., I.M., and A.S. each have suffered and will suffer humiliation and emotional distress.

84.    All of the parents have observed symptoms of anxiety, depression, and emotional distress in their daughters since the January 15 events, and agree that their daughters will need some form of therapy to address the harm that resulted from such traumatic experiences during a critical period in their development as adolescents.

      **a.**    **A.S.**

85.    The January 15 searches took such a toll on A.S. that her demeanor has changed substantially. While she used to play with her hair and makeup in the mirror, she would not even get dressed in the days immediately after the searches. For the first time in her life, A.S. also experienced panic attacks in the weeks following January 15, 2019. She continues to feel unsafe and unwelcome at school as a result of the events that occurred.

      **b.**    **I.M.**

86.     During the days she was out of school, I.M. slept all day and showed signs of depression. In the months after, she has cried uncontrollably during breakdowns that are surprising and concerning to her family. She is struggling to make sense of what happened to her, and she feels embarrassed by the attention she has received at school as a result of the January 15 searches.

      **c.**    **I.S.**

87.    I.S. became withdrawn and despondent following January 15, 2019. I.S.'s birthday was three days after the January 15 incident, and she did not want to do anything to celebrate. In addition, she no longer feels excited about school and has disengaged in the school-related activities that she used to enjoy.

###### d.  J.B.

88.  J.B. responded to the events of January 15, 2019, with sadness and anger. She has periods of time when she cries intensely and expresses frustration and pain. She feels distrustful of adults at school and avoids interacting with them as a result of the January 15 events.

*Official District Policies on Strip Searches*

89.  According to District policy, "A strip search is a search that requires a student to remove any or all of his/her clothing, other than an outer coat or jacket."[12]

90.  District policy provides that "Strip searches are intrusive in nature and are almost never justified."

91.  Further, District policy prohibits strip searches except "under exigent circumstances" when "school officials have highly credible evidence that such a search would prevent danger or yield evidence."

*Racially Disparate Treatment of Students in the District*

92.  As of the 2015-2016 school year, the District had 5,653 students across ten schools: one high school, two middle schools, and seven elementary schools.

93.  As of the 2015-2016 school year, the overall student enrollment in the District is 3.1% Asian, 26.1% Black, 12.9% Latino, 47.6% white, and 9.9% two or more races.[13]

94.  As of the 2015-2016 school year, at East Middle School, the overall student enrollment is 3.7% Asian, 30.3% Black, 14.5% Latino, 41.6% white, and 9.9% two or more

---

[12] Searches and Interrogations of Students, Binghamton City School District Policy No. 7330 (2016) ("District Policy"), http://bcsd1.ss14.sharpschool.com/UserFiles/ Servers/Server_512723/File/Board%20Policies/Section%207000%20Students%20updated%20fe bruary%202018.pdf.
[13] U.S. Dep't of Educ., *2015-16 Civil Rights Data Collection: Binghamton City School District* (2018), https://ocrdata.ed.gov/Page?t=d&eid=33289&syk=8&pid=2278.

races.[14] At West Middle School, the overall student enrollment is 4.7% Asian, 24.8% Black, 9.2% Latino, 51.9% white, and 8.7% two or races.[15]

95.     National studies have shown that Black and Latinx students do not misbehave more often than white students, but Black and Latinx students are more often disciplined and bear the brunt of harsh, exclusionary punishment.[16] Black and Latino boys are the most likely to be disciplined in school, but Black and Latina girls are also disproportionately suspended and expelled at higher rates than white girls and white boys.[17]

96.     District data on school discipline indicate that Black students make up 26.1% of students in the District, but in 2015 they accounted for 40.6% of all in-school suspensions and 39.3% of all out-of-school suspensions.

97.     Disproportionate punishments result in Black students missing valuable instructional time. In 2015, Black students in the District missed 1,627 days of school due to out-of-school suspensions—nearly half of the total number of days missed by students due to out-of-school suspensions across the entire District.

---

[14] U.S. Dep't of Educ., *2015-16 Civil Rights Data Collection: East Middle School* (2018), https://ocrdata.ed.gov/Page?t=s&eid=282402&syk=8&pid=2275.

[15] U.S. Dep't of Educ., *2015-16 Civil Rights Data Collection: West Middle School* (2018), https://ocrdata.ed.gov/Page?t=s&eid=282407&syk=8&pid=2275.

[16] *See* Russell Skiba, Ph.D. & Natasha T. Williams, *Are Black Kids Worse? Myths and Facts about Racial Differences in Behavior—A Summary of the Literature*, Equity Project at Ind. Univ. (Mar. 2014), http://www.indiana.edu/~atlantic/wp-content/uploads/2014/03/African American- DifferentialBehavior_031214.pdf.

[17] NAACP Legal Def. & Educ. Fund, Inc. ("LDF") & Nat'l Women's Law Ctr. ("NWLC"), *Unlocking Opportunity for African American Girls* at 18, 20 (2014), https://www.naacpldf.org/wp-content/uploads/Unlocking-Opportunity-for-African-American_Girls_0_Education.pdf; NWLC & Mexican Am. Legal Def. & Educ. Fund ("MALDEF"), *Listening to Latinas: Barriers to High School Graduation* at 15-16 (2009), https://www.maldef.org/wp-content/uploads/2018/08/listeningtolatinas.pdf.

98.     Black students in the District were transferred to alternative school at more than double the rate of all other students. In 2015, Black students represented half of all students with disabilities transferred to the alternative school in the District. Black students without disabilities fared even worse, constituting 60% of all students transferred to the alternative school—more than double their District-wide representation.

99.     Black and Latina girls are more likely to be subject to disparate discipline. Girls of color constitute 51% of girls in the District yet make up approximately 70.6% of all suspensions of girls in the District. While only 4.4% of white girls are suspended in the District, 12.4% of Black girls and 11.1% of Latina girls are subjected to the same punishment.[18]

100.    The hostile racial climate in the District is further evinced by other incidents of unjust discipline and physical violence against Black students that the District fails to address.

101.    A few months prior to the unlawful searches, on September 11, 2018, a Black 17-year-old Binghamton High School student, J.C., was assaulted and called a racial epithet by three white Binghamton High School staff members. The staff members pushed him, slammed him to the pavement, pushed his face into the ground as he pleaded that he could not breathe, and called him the n-word. This incident occurred after a confrontation that began off school grounds when J.C. used the "wrong doors" to exit a building.[19]

102.    On information and belief, the District did not punish the staff members who were involved in the September 11, 2018 incident.

---

[18] NWLC, *Suspensions for Girls of Color by School District (*May 9, 2017), https://nwlc.org/resources/2013-2014-suspensions-for-girls-of-color-by-school-district/   (NWLC calculations of CRDC *2013-14 Public Use Data File*) (search "Binghamton, New York" on interactive map).

[19] Ashley Biviano, *Binghamton High School student says staff assaulted him, used racial slur*, Binghamton Press & Sun-Bulletin (Sept. 28, 2018), https://www.pressconnects.com/story/news/local/2018/09/28/black-student-assaulted-bhs-staff-leaving-wrong-doors/1334218002/.

*Stereotypes About Black and Latina Girls*

103.   Research shows that stereotypical bias can lead adults at school to perceive Black and Latina girls as less innocent than white girls, and needing less nurturing, protection, and support.[20]

104.   Research further shows that when a Black girl is outspoken in the same way as a non-Black girl, educators may associate the Black girl's conduct with the racist stereotype of Black women as threatening, aggressive,[21] and having "attitudes." [22]

105.   Similarly, Latina girls are often stereotyped as being threatening, aggressive and "fiery."[23]

106.   Black and Latina girls are also more likely to be seen as older than their true age and more likely to be labeled sexually promiscuous by school staff.[24]

## FIRST CAUSE OF ACTION
## ALL PLAINTIFFS AGAINST ALL DEFENDANTS

### Violation of the Fourth Amendment to the United States Constitution
### Pursuant to 42 U.S.C. § 1983
### (Unlawful Searches)

107.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

108.   The U.S. Supreme Court has recognized that a school strip search and the associated "degradation its subject may reasonably feel" render "a search that intrusive in a

---

[20] *See, e.g.*, Rebecca Epstein, Jamilia J. Blake, & Thalia González, *Girlhood Interrupted: The Erasure of Black Girls' Childhood,* Georgetown Law Ctr. on Poverty & Inequality (2017), https://bit.ly/2OErYTg.

[21] Monique W. Morris, *Pushout: The Criminalization of Black Girls in Schools* 34 (New Press 2016).

[22] *See, e.g.,* Edward W. Morris, *"Ladies" or "Loudies"? Perceptions & Experiences of Black Girls in Classrooms*, 38 Youth & Soc'y 490, 511 (2007).

[23] NWLC, *Let Her Learn: Stopping School Pushout for Girls of Color* at 4-5 (2017), https://nwlc.org/wp-content/uploads/2017/04/final_nwlc_Gates_GirlsofColor.pdf.

[24] *Id.* at 3-4.

category of its own," thus requiring "its own specific suspicions" that evidence of danger or wrongdoing will be found in the area searched. *Safford*, 557 U.S. 364, 377 (2009). Under clearly established law, the strip search of a student is lawful only if it is (1) justified at inception, and (2) not "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 370 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985). The strip searches in this case satisfied neither requirement.

109.    The Defendants' searches of the four students were not justified at their inception. School officials did not have reasonable, individualized suspicion to justify any search whatsoever. Principal Simonds's claim that the four twelve-year-old girls appeared to be "hyper" and "giddy" did not create reasonable suspicion that the students were dangerous or hiding contraband.

110.    By searching the four students without the requisite particularized suspicion, the Defendants violated the students' constitutional rights.

111.    Even if reasonable suspicion had existed to initiate the searches (which it did not), "the content of the suspicion failed to match the degree of intrusion" that each of the four students experienced. *Id.* at 375.

112.    For each student, Nurse Eggleston began by conducting a physical test of some sort (blood pressure, heart rate, pulse, and a sobriety test). None of these tests showed anything out of the ordinary or provided any evidence supporting Principal Simonds's speculation that the girls were under the influence of some unknown substance. Yet, even after these physical tests, Nurse Eggleston ordered the students to remove their clothing, expose their bodies, and shake their bodies and certain articles of clothing. On information and belief, Nurse Eggleston took these actions under the direction of Principal Simonds and/or Assistant Principal Raleigh.

Moreover, both Nurse Eggleston and Assistant Principal Raleigh touched and searched the students' bodies and clothing. These searches were not "'reasonably related in scope to the circumstances which justified the interference,'" *id.* at 375 (quoting *T.L.O.*, 469 U.S. at 341), and therefore violated the students' constitutional rights.

113.   After checking A.S.'s blood pressure and eyes and conducting a sobriety test, and finding no evidence suggesting that A.S. was under the influence of an unknown substance, Nurse Eggleston still directed A.S. to remove her clothing and physically touched and searched A.S.'s body, finding nothing.

114.   After checking I.M.'s heartrate and eyes and finding no evidence that I.M. was under the influence of an unknown substance, Nurse Eggleston still directed I.M. to remove her clothing. After taking I.M.'s blood pressure and finding no evidence of wrongdoing, Nurse Eggleston (i) directed I.M. to remove additional layers of clothing down to her underwear and shake her body, and (ii) physically touched the inside of I.M.'s bra and the sides of her breasts, finding nothing.

115.   After checking I.S.'s blood pressure and heart rate and finding no evidence that I.S. was under the influence of an unknown substance, Nurse Eggleston still proceeded to physically touch I.S.'s body and conduct a sobriety test. Assistant Principal Raleigh then directed I.S. to remove and shake her shoes and physically patted down I.S.'s body around her pants pockets, finding nothing.

116.   After checking J.B.'s pulse and finding no evidence that J.B. was under the influence of an unknown substance, Nurse Eggleston still directed J.B. to remove articles of clothing and to shake her shoes, finding nothing.

117.    The Defendants did not obtain consent from, or provide prior notice to, any of the four students' parents to perform the searches.

118.    Thus, Defendants violated each Student Plaintiff's Fourth Amendment rights under clearly established U.S. Supreme Court precedent.

119.    In addition to conducting unlawful searches of each of the students, Nurse Eggleston and Assistant Principal Raleigh searched the girls' belongings.

120.    Under clearly established law, a school official must have some indication that a student is violating school rules or the law before searching a student's belongings. *T.L.O.*, 469 U.S. at 342. Further, a constitutionally permissible search must have the "necessary 'nexus' between the item searched for and the infraction under investigation." *T.L.O.*, 469 U.S. at 345 (internal quotation marks and citation omitted).

121.    Here, there was no individualized suspicion of a violation of a school rule or law that justified the searches of the girls' belongings. The only grounds for the searches were the fact that the girls were late for their lunch activity and mere speculation based on the group's laughter. Such routine, perfectly normal, adolescent conduct does not provide the individualized suspicion required under clearly established law to search a student's belongings.

122.    The violations of A.S., I.M., I.S., and J.B.'s constitutional rights on January 15, 2019, were caused by the actions and decisions of municipal officials with final decision-making authority over discipline and searches of students at East Middle School.

123.    The unlawful searches conducted by Nurse Eggleston and, at times, Assistant Principal Raleigh, occurred at the direction of Principal Simonds and Assistant Principal Raleigh.

124.    Principal Simonds and Assistant Principal Raleigh authorized, condoned, knowingly acquiesced to, and at times, directly participated in the unlawful searches conducted by Nurse Eggleston.

125.    Principal Simonds's and Assistant Principal Raleigh's authorization and knowledge of Nurse Eggleston's behavior and, at times, direct participation in the unlawful conduct, amounts to a custom or policy attributable to the District because Principal Simonds and Assistant Principal Raleigh have final decision-making authority over discipline and searches.

126.    Principal Simonds and Assistant Principal Raleigh acted as, and were authorized by the School Defendants to act as, final decision-makers as to whether and how to search the girls on January 15. Principal Simonds and Assistant Principal Raleigh possessed such authority that their decisions, actions, and inactions, on January 15 were effectively the official policy of the School Defendants.

127.    The violations of A.S., I.M., I.S., and J.B.'s constitutional rights on January 15, 2019 were also caused by the School Defendants' failure to train and supervise school staff on the Fourth Amendment's proscription on unreasonable searches.

128.    The School Defendants are responsible for supervising, training, and hiring staff at East Middle School, including Principal Simonds, Assistant Principal Raleigh, and Nurse Eggleston.

129.    The School Defendants knew to a degree of moral certitude that school district employees required guidance on when a search is or is not prohibited. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). This is shown by the fact that the District has a policy

addressing "Searches and Interrogations of Students" that specifies the conditions under which searches are permissible.

130.   The School Defendants knew that training or supervision would "make less difficult" the decision of how and when to conduct searches of students and the risk of employees mishandling the situation. *Id.* This is shown by the fact that the District policy on searches specified factors to be considered in determining whether reasonable suspicion exists to search a student, and steps an authorized school administrator should take when conducting a search if reasonable suspicion exists.

131.   The School Defendants knew that "the wrong choice [by a school employee] will frequently cause the deprivation of a citizen's constitutional rights." *Id.* This is shown by the fact that the District policy begins by recognizing that students have a Fourth Amendment right to be free from unreasonable searches.

132.   The District failed to train or supervise staff on how to conduct searches in a manner that does not violate the Constitution and does not subject them to race- or sex-based discrimination. While the District has a policy forbidding unlawful searches, on information and belief, the School and the District does not have a training program for staff on how and when to conduct searches of students.

133.   The School Defendants acted with deliberate indifference to the Student Plaintiffs' rights under the Fourth Amendment. The School Defendants made no meaningful attempt to prevent the constitutional violations that were likely to occur without training or supervision.

134.   By acting under color of state law to deprive Student Plaintiffs of their Fourth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

135.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their Fourth Amendment rights, and are entitled to declaratory relief, injunctive relief, damages, costs, and attorneys' fees.

### SECOND CAUSE OF ACTION
### ALL PLAINTIFFS AGAINST ALL DEFENDANTS

### Violation of the Fourteenth Amendment's Equal Protection Clause
### Pursuant to 42 U.S.C. § 1983
### (Intentional Discrimination)

136.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

137.    If a school official targets students for harsher treatment that is in any way motivated by prejudice or stereotype against a racial or ethnic group, that conduct constitutes intentional discrimination and violates the Fourteenth Amendment.

138.    "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

139.    Intentional discrimination need not require ill-will or racial animosity, but also includes stereotypes and biases about the traits of individuals of certain racial groups. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 561 (S.D.N.Y. 2013) ("The Equal Protection Clause does not permit race-based suspicion.").

140.    The evidence in this case supports an inference that the searches conducted by Defendants on January 15 were conducted at least, in part, because the Student Plaintiffs are Black and Latina girls, constituting discrimination based on their race.

141.    The inference that race or ethnicity was a motivating factor when the Individual Defendants conducted the searches is supported by racial disparities in discipline data at East

31

Middle School. For example, nearly 1 in 4 (23.1%) Black students enrolled in East Middle School received an out-of-school suspension, the highest proportion of any demographic.[25]

142.    The inference that race or ethnicity was a motivating factor when the Individual Defendants conducted the searches is evident from Principal Simonds's consideration of "hyper" and "giddy" behavior to be so suspicious when exhibited by four Black and Latina girls as to warrant such extreme measures as a strip search, rather than the innocent playfulness of children.

143.    The inference that race or ethnicity was a motivating factor is also supported by the statement of Assistant Principal Raleigh that she feared being alone with the girls.

144.    The inference that race or ethnicity was a motiving factor is also supported by Nurse Eggleston's description of the girls as loud, disrespectful, and having "attitudes."

145.    The violations of A.S., I.M., I.S., and J.B.'s constitutional rights under the Fourteenth Amendment were caused by (i) the actions and decisions of municipal officials with final decision-making authority over how and when to conduct searches of students at East Middle School, and (ii) the School Defendants' failure to train and supervise school staff on the Fourth Amendment's proscription on unreasonable searches.

146.    By acting under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

147.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their constitutional rights, and are entitled to declaratory relief, injunctive relief, damages, costs, and attorneys' fees.

---

[25] U.S. Dep't of Educ., *2015-16 Civil Rights Data Collection* (2018), https://ocrdata.ed.gov/Page?t=s&eid=282402&syk=8&pid=2344.

**THIRD CAUSE OF ACTION**
**ALL PLAINTIFFS AGAINST SCHOOL DEFENDANTS**

**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***
**(Intentional Discrimination)**

148.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

149.    Title VI of the Civil Rights Act of 1964 provides that recipients of Federal financial assistance may not discriminate on the basis of race, color, or national origin. 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance.").

150.    As a recipient of Federal financial assistance, the District, and all of its programs and activities, are subject to Title VI of the Civil Rights Act of 1964.

151.    Like the Fourteenth Amendment's Equal Protection Clause, Title VI bars intentional discrimination. *See Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607-08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292-93 (1985). A recipient's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular group therefore violates both the Fourteenth Amendment and Title VI. *See, e.g.*, *Batson v. Kentucky,* 476 U.S. 79, 104 (1986); 28 C.F.R. § 42.104(b).

152.    Courts have long recognized as actionable disparate treatment discrimination claims of biased treatment based on race and sex combined. *See, e.g.*, *Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980) (recognizing compound discrimination cases and observing that Black females are a "distinct protected subgroup for purposes of the prima facie case" under Title VII); *Lam v. Univ. of Haw.,* 40 F.3d 1551, 1562 (9th Cir. 1994) (recognizing that Asian women are subject to a set of stereotypes and assumptions shared neither by Asian men nor by white women that are actionable under Title VII). Indeed, as the Second

33

Circuit has recognized in the Title VII context, "'the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences,'" which include "stereotypes and assumptions not shared by all persons of that race or gender." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (quoting *Lam*, 40 F.3d at 1562). [26]

153.    The inference that school personnel took actions based on racial stereotyping is supported by data on school discipline in the District. Girls of color constitute 51% of girls in the District, but girls of color make up approximately 70.6% of all suspensions of girls in the District. While only 4.4% of white girls are suspended in the District, 12.4% of Black girls and 11.1% of Latina girls are subjected to the same punishment. [27]

154.    The inference that school personnel took actions based on racial stereotyping is supported by Principal Simonds's statement that he found the girls' "hyper" and "giddy" behavior to be so unusual as to be suspicious when exhibited by four Black and Latina girls, as opposed to the innocent playfulness of children.

155.    The inference that school personnel acted based on racial stereotyping is also supported by Nurse Eggleston's description of the girls as loud, disrespectful, and having attitudes, labels that evoke common stereotypes about Black and Latina girls.

156.    The inference that school personnel acted based on racial stereotyping is also supported by Nurse Eggleston's statement to I.M. that I.M had unusually large breasts, evincing that she viewed her as more mature than a twelve-year-old.

---

[26] Courts considering claims under Title VI look to Title VII cases for guidance. *See, e.g., N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995).

[27] NWLC calculations of U.S. Department of Education, Office of Civil Rights, CRDC, *2013-14 Public Use Data File*, http://ocrdata.ed.gov.

157.    Nurse Eggleston's conversations with both A.S. and I.M. about her own breasts and what is sexually attractive to others also indicated that she viewed A.S. and I.M. as more mature than their age. Both A.S. and I.M. felt uncomfortable during these conversations because they each sensed it was not age-appropriate, but Nurse Eggleston continued to speak to A.S. and I.M. as if they were not 12-year-olds, suggesting that she acted based on a stereotypical view of Black girls as older and more mature than white girls of similar age.

158.    Defendants' actions and omissions constitute a violation of Title VI.

159.    As a direct and proximate result of Defendants' actions and omissions, the Student Plaintiffs have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their statutory rights, and are entitled to declaratory relief, injunctive relief, damages, costs, and attorneys' fees.

## FOURTH CAUSE OF ACTION
## ON BEHALF OF I.S. AND A.S. AGAINST THE SCHOOL DEFENDANTS

### Violation of the Individuals with Disabilities Education Act

160.    The IDEA and its implementing regulations define a "child with a disability" as a child with, *inter alia*, a hearing impairment, a speech or language impairment, visual impairment, and other health impairment, or a specific learning disability, and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(a)(1).

161.    I.S. and A.S. require special education services under the IDEA and have IEPs.

162.    The IDEA requires specific procedural protections when a child with an IEP is removed from instruction for more than ten cumulative school days for disciplinary reasons. 20 U.S.C. § 1415(k)(l)(E). This includes the right to a Manifestation Determination Review ("MDR"). *Id.*

163.    The School Defendants assigned the girls to the alternative school in the District (Columbus) for over two weeks, rather than provide an appropriate school assignment, when the girls did not feel comfortable returning to the school where the unlawful January 15 searches occurred.

164.    Although the School Defendants informed Plaintiffs that the girls were not referred to Columbus for disciplinary reasons, but instead pursuant to another policy or practice through which the District assigns students to Columbus without making a disciplinary referral, the District's own Code of Conduct states that placement at the alternative school is a disciplinary sanction for Level 3 infractions.[28] Thus, any policy or practice of assigning students to Columbus constitutes a disciplinary sanction despite the absence of a disciplinary referral.

165.    I.S. and A.S. were referred to Columbus for over ten days without an MDR.

166.    Using the administrative procedures authorized by the IDEA would be futile in this case because Plaintiffs challenge the District's unlawful policy or practice through which the District assigns students to Columbus without making a disciplinary referral and therefore without conducting an MDR. Because the District denies there was a disciplinary referral, it also denies that there was a duty to conduct an MDR. Thus, any effort to exhaust claims through the administrative process is unnecessary and/or futile.

167.    School Defendants' actions and omissions constitute a violation of the IDEA.

---

[28]    *See* Binghamton City School District Code of Conduct 13, 44 (2017), http://www.binghamtonschools.org/UserFiles/Servers/Server_512723/File/For%20Parents/Code%20of%20Conduct/BCSD%20Code%20of%20Conduct_7-26-17.pdf.

168.     As a direct and proximate result of School Defendants' actions and omissions, Plaintiffs have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations under the IDEA, and A.S. and I.S. are entitled to declaratory relief, injunctive relief, costs, and attorneys' fees.

## FIFTH CAUSE OF ACTION
## ON BEHALF OF I.S. AND A.S. AGAINST THE SCHOOL DEFENDANTS

### Violation of Section 504 of the Rehabilitation Act

169.     Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States, as defined in section 760(2) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 87 Stat. 394, as amended, 29 U.S.C. § 794(a).

170.     I.S. and A.S. are individuals with disabilities who are "otherwise qualified" and thus eligible for relief under Section 504.

171.     School Defendants are subject to provisions of Section 504.

172.     Under the implementing regulations for Section 504, a school district must conduct a "re-evaluation" prior to any significant change in placement. 34 C.F.R. § 104.35(a). A significant change in placement includes exclusionary discipline for more than ten school days of transferring a student from one type of program to another.[29]

---

[29] *See* U.S. Dep't of Educ., Off. of Civil Rights, *Protecting Students with Disabilities, Frequently Asked Questions About Section 504 and the Education of Children with Disabilities*, https://www2.ed.gov/about/offices/list/ocr/504faq.html.

173.    The United States Department of Education Office of Civil Rights has interpreted the Section 504 regulations to mean that prior to a disciplinary removal of a student with a disability for ten school days, a district must conduct an MDR.[30]

174.    A.S. and I.S. experienced a disciplinary removal for more than ten days without an MDR.

175.    Exhaustion in this case is inappropriate because Plaintiffs challenge the District's policy or practice through which the District assigns students to Columbus without making a disciplinary referral and therefore without conducting an MDR.

176.    In committing these violations, School Defendants exercised gross misjudgment and acted in bad faith, and with deliberate or reckless indifference to I.S. and A.S.'s federally protected rights.

177.    School Defendants' actions and omissions constitute a violation of Section 504 under color of state law.

178.    As a direct and proximate result of School Defendants' actions and omissions, I.S. and A.S. have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations under Section 504, and I.S. and A.S. are entitled to declaratory relief, injunctive relief, damages, costs, and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court to:

---

[30] U.S. Dep't of Educ., Off. of Civil Rights, Letter of Finding re: OCR Docket # 15-14-1071 (Aug. 13, 2014); U.S. Dep't of Educ., Off. of Civil Rights, Letter of Finding re: OCR Complaint No. 11-13-1266 (Mar. 11, 2014).

1.      Declare that the Defendants' actions violated the Student Plaintiffs' rights as protected by the Fourth and Fourteenth Amendments to the Constitution of the United States, Title VI, the IDEA, and Section 504.

2.      Order all appropriate injunctive relief as warranted, including but not limited to:

     i.      Requiring Defendants to put in place policies and procedures to ensure that illegal and/or unconstitutional searches, including strip searches, do not occur in schools within the District;

     ii.      Requiring Defendants to end the policy or practice of assigning students to Columbus without making a disciplinary referral.

3.      Order the District to provide appropriate and regular counseling and/or other psychological services, as needed to remediate the psychological impact of the unlawful January 15 searches until each Student Plaintiff graduates from the District.

4.      Order the District to remove from the Student Plaintiffs' transcripts any absences during the time period when the Student Plaintiffs were absent from East Middle School after the unlawful searches and during the time when the Student Plaintiffs attended Columbus.

5.      Order the District to provide the Student Plaintiffs with a reasonable opportunity to complete makeup work and receive an appropriate grade for any assignments marked incomplete during the period between January 15, 2019 and February 12, 2019.

6.      Order the District to allow continued placement of Student Plaintiffs within West Middle School until their completion of middle school.

7.      Award Plaintiffs compensatory damages in an amount to be determined at trial, plus prejudgment interest.

8.      Award Plaintiffs punitive damages against all Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest.

9.      Award Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a, and 20 U.S.C. § 1415(i)(3)(B)(i)(I);

10.     Grant such other and further relief to Plaintiffs as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

DATED: April 29, 2019.

Respectfully Submitted,

/s/ Rachel M. Kleinman

Rachel M. Kleinman Bar No. 700824
Cara McClellan*
Kristen A. Johnson Bar No.  700920
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
rkleinman@naacpldf.org
cmcclellan@naacpldf.org
kjohnson@naacpldf.org

Jamie A. Levitt Bar No. 302285
Joshua Hill, Jr. Bar No. 700933
Chanwoo Park Bar No. 700932
Amanda Gayer Bar No. 700934
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 468-8000
Fax: (212) 468-7900
jlevitt@mofo.com
jhill@mofo.com
cpark@mofo.com
agayer@mofo.com

*Motion for Appearance Pro Hac Vice
forthcoming

*Counsel for Plaintiffs*