

National Office
40 Rector Street, 5th Floor
New York, NY 10006

T 212.965.2200
F 212.226.7592

Washington, D.C. Office
700 14th Street N.W., Ste. 600
Washington, D.C. 20005

T 202.682.1300
F 202.682.1312

www.naacpldf.org

MORRISON | FOERSTER

250 WEST 55TH STREET
NEW YORK, NY 10019-9601

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON FOERSTER LLP

BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG
KONG, LONDON, LOS ANGELES,
NEW YORK, NORTHERN
VIRGINIA, PALO ALTO, SAN
DIEGO, SAN FRANCISCO,
SHANGHAI, SINGAPORE, TOKYO,
WASHINGTON, D.C.

May 8, 2020

<u>Via ECF</u>

The Honorable Andrew T. Baxter
United States Magistrate Judge
Federal Building and U.S. Courthouse
P.O. Box 7396
Syracuse, NY 13261-7396

Re:   *I.S. et al. v. Binghamton City School District et al.*, No. 3:19-cv-00513-GTS-ATB

Dear Judge Baxter:

In this civil rights action, Plaintiffs, four twelve-year-old Black and Latina girls, were stopped by their middle school principal and taken to the health office where they were subjected to strip searches, touching of their bodies, vitals and sobriety tests, inappropriate comments, and searches of their belongings by school officials without cause and without their parents' consent. The only explanation the girls' parents received from the principal who oversaw the searches was that the girls appeared "hyper" and "giddy." (Dkt. 1 ¶ 57). Plaintiffs allege that their rights to be free from unlawful searches and racially discriminatory treatment were violated by school officials ("Individual Defendants") and as a result of the policies of, and intentional discrimination by, the Binghamton City School District ("District") and Binghamton Board of Education ("Board"; collectively, "Municipal Defendants"). (*Id*. ¶¶ 14-61, 107-159). After the searches ended, during which no evidence of wrongdoing was found, one of the girls was sent to the in-school suspension room. (*Id*. ¶ 56.) Eventually the District assigned the girls to the District's alternative school, where students who have committed serious disciplinary infractions are routinely assigned. (*Id*. ¶¶ 62-74.) Plaintiffs brought claims under, *inter alia*, the Fourth and Fourteenth Amendments to the U.S. Constitution, and Title VI of the Civil Rights Act of 1964. Plaintiffs submit this supplemental letter brief on (1) the discoverability of the District's raw student discipline data and (2) an unresolved discovery issue. The Court previously rejected Defendants' argument that Defendants are entitled to depose all Plaintiffs before Plaintiffs can depose any Defendants. (3/18/20 Tr. at 25:10-17.)

I.   **THE DISTRICT'S DISCIPLINE DATA IS DISCOVERABLE BECAUSE IT IS RELEVANT TO PLAINTIFFS' DISCRIMINATION AND UNLAWFUL SEARCH CLAIMS AND PROPORTIONAL TO THE NEEDS OF THE CASE**

Plaintiffs seek discovery of raw disciplinary data from the District in support of their claims (1) that they were subject to racial discrimination, (2) that their searches were without cause, and in

ny-1912931



MORRISON | FOERSTER

Page Two

fact motivated by racial bias, and (3) that the Municipal Defendants failed to adequately train and supervise those responsible for the searches of Plaintiffs. Specifically, Plaintiffs seek raw data about which students the District has disciplined in recent years in terms of their race, sex, and age, how harshly the District has disciplined these students, and why the District has disciplined them (referred to herein as "Discipline Data" or "Data")[1]. Plaintiffs claim that Defendants improperly searched them and subjected them to intentional discrimination. Since August 2019, in support of those claims, Plaintiffs have sought the Discipline Data, which could show whether the Defendants (1) disproportionately discipline students of color, (2) impose disproportionately harsh consequences on students of color for particular infractions, and (3) have a recent pattern of this disproportionate behavior. This information is highly probative of Plaintiffs' claims that Defendants' treatment of them was motivated by intentional racial discrimination and whether their searches were based on impermissible stereotyping.[2] The Data is also probative of Plaintiffs' claims that the Municipal Defendants failed to provide adequate training and supervision to subordinates to a degree that amounts to deliberate indifference. Plaintiffs are entitled to the Data under the governing broad discovery rules and relevant case law.

   A.  Rule 26(b) Authorizes Broad Discovery

The scope of discovery in a federal civil action is governed by Rule 26(b) of the Federal Rules of Civil Procedure. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering factors such as "the importance of the issues at stake in the action, . . . the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and

---

[1] The District admits that it maintains the following categories of Discipline Data using software called SchoolTool, which the District has used since 2014: Name, student identifier number, race, sex, school, grade level, the fact that the student has a disability generally, infraction, date of infraction, description of infraction, and consequence (referred to as "disposition"), referral to in school or out-of-school suspensions, and whether a student has been transferred to an alternative program, such as Columbus School, or to home-based instruction. (Dkt. 79-1 ¶¶ 6, 13-14.) Once Defendants identified these categories, Plaintiffs agreed to narrow their request to only those categories maintained by the District and emphasized that Plaintiffs are not asking the District to create any new records. Plaintiffs do not seek personally identifiable information that would violate the Federal Educational Rights and Privacy Act ("FERPA"), but instead have agreed to have personally identifiably information redacted. "FERPA permits Defendants to disclose students' education records to comply with a judicial order." *Ragusa v. Malverne Union Free Sch. Dist.*, 549 F. Supp. 2d 288, 293 (E.D.N.Y. 2008) ("[T]here is nothing in FERPA that would prohibit Defendants from releasing education records that had all 'personally identifiable information' redacted.")

[2] After months of shifting their position on Discipline Data, Defendants eventually claimed that to evaluate the Data's relevance Defendants needed Plaintiffs to identify, via interrogatory response, the forms of discipline that Defendants imposed on the girls. (*See* Dkt. 94 at 4-5.) In their interrogatories, Defendants did not define "discipline". Accordingly, in Plaintiffs' responses, served on April 13, 2020, Plaintiffs noted that Defendants failed to define "discipline," offered their own common-sense definition for purpose of responding ("Plaintiff interprets 'discipline' to refer to any actions or conduct by Defendants to manage, control, or punish student behavior"), and identified the forms of discipline that Plaintiffs contend Defendants imposed. More than three weeks later, on May 5, 2020, Defendants sent a letter that, *inter alia*, faulted Plaintiffs for using their own definition of "discipline," demanded Plaintiffs identify the basis for their definition, demanded Plaintiffs supplement their responses using the definition of discipline in the District's Code of Conduct, and requested that Plaintiffs supplement their responses by May 6, 2020. Defendants' positions are meritless, their demands unreasonable, and their letter a last-ditch, exhausted effort to delay by claiming that Plaintiffs must *again* justify the discoverability of the Data.

ny-1912931



whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "[T]he bounds of permissible discovery in a civil action are generally broad," and, "these bounds are not cabined by rules governing admissibility of evidence at trial." *T.H. by Shepherd v. City of Syracuse*, 2018 WL 3738945, at *2–3 (N.D.N.Y. Aug. 7, 2018).

Against this backdrop, courts in this Circuit have long recognized that civil rights actions and "[l]awsuits brought under 42 U.S.C. § 1983 require special attention to full disclosure . . . [and that t]he great weight of the policy in favor of discovery in civil rights actions supplements the normal presumption in favor of broad discovery." *Floyd v. City of N.Y*, 739 F. Supp. 2d 376, 381 n.21 (S.D.N.Y. 2010); *Inmates of Unit 14 v. Rebideau*, 102 F.R.D. 122, 128 (N.D.N.Y. 1984) ("Federal policy favors broad discovery in civil rights actions."); *Cox v. McClellan*, 174 F.R.D. 32, 34 (W.D.N.Y. 1997) ("actions alleging violations of § 1983 require especially generous discovery.").

    B.  The District's Discipline Data is Probative of Racially Discriminatory Intent

Evidence showing that the District disproportionately and more severely disciplines students of color compared to other students in the District, combined with other evidence supporting Plaintiffs' allegations of intentional discrimination[3], is highly probative of Plaintiffs' Title VI and Equal Protection claims. *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (Title VI "plaintiff must show, *inter alia*, [1] that the defendant discriminated against him on the basis of race . . . [2] that that discrimination was intentional . . . and [3] that the discrimination was a substantial or motivating factor for the defendant's actions"); *Catanzaro v. Weiden*, 140 F.3d 91, 100("To prevail on an equal protection claim, proof of racially discriminatory intent or purpose is required.").

Courts in this Circuit have routinely held that statistical evidence of racial disparities, with other circumstantial evidence, can establish an inference of intentional discrimination in a disparate treatment claim. *See Catanzaro*, 140 F.3d at 96 (statistical evidence of racial disparity, combined with other evidence, provided reasonable inference of systematic policy of racial discrimination).; *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir. 1990) ("an individual disparate treatment plaintiff may use statistical evidence"); *Ottaviani v. State Univ. of N.Y.*, 875 F.2d 365, 371 (2d Cir. 1989) (in disparate treatment actions, "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination"); *Caines v. City of N.Y.*, 2003 WL 151993 at *2 (S.D.N.Y. Jan. 21, 2003) (officer asserting discrimination by city and police department was entitled to discover evidence of whether minority officers were disproportionately selected for testing because data was relevant to intentional discrimination in other areas).

---

[3] Plaintiffs allege that an inference of intentional racial discrimination is further supported by Defendants' comments and actions (Dkt. 1 ¶¶ 100-02, 142, 144, 154-57) and limited public data that shows girls of color in the District are disproportionately punished (*id.* ¶¶ 92-99, 141, 153). *See Barmore v. Aidala*, 419 F. Supp. 2d 193, 199 (N.D.N.Y. 2005) (school officials would not be shielded from civil rights liability if punishment meted out to student was disproportionately severe compared to similarly situated non-African-American students, and if disparity was because of student's race); *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 594–95 (S.D.N.Y. 2011) (allegations of racial animus "may include identifying derogatory comments made by a defendant in plaintiffs' presence.").



MORRISON | FOERSTER

Page Four

The Discipline Data is also highly relevant to Plaintiffs' Fourth Amendment claims because any evidence that Defendants' searches were based on invalid considerations, such as racial stereotypes or other racial animus, goes to the legitimacy of the stop and subsequent search in the first instance. *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("[A] search may not be based on race or other improper consideration."); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 561 (S.D.N.Y. 2013) ("The Equal Protection Clause does not permit race-based suspicion.").

C. The District's Discipline Data is Probative of Deliberate Indifference and Causation

With regards to Plaintiffs' *Monell* claims[4] against the Municipal Defendants, the Discipline Data is also highly probative of deliberate indifference and causation. *Roe*, 542 F.3d at 36 (To prevail on 42 U.S.C. §1983 claim against municipality based on acts of public official, a plaintiff must prove: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."); *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 600 (N.D.N.Y. 2016) ("A school district may be held liable for inadequate training, supervision[,] or hiring where the failure to train, hire[,] or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact."). Plaintiffs allege that Defendants violated the girls' Fourth and Fourteenth Amendment rights as a result of the Municipal Defendants' failure to properly train and supervise District employees (Dkt. 1 ¶¶ 127-33, 145-47), and that the Municipal Defendants' deliberate indifference is evinced by, *inter alia*, "other incidents of unjust discipline and physical violence against Black students that the District fail[ed] to address" (*id.* ¶¶ 100-102) and by public data that shows the District disproportionately disciplined students of color in 2015-2016 (*id.* ¶¶ 92-99). Discovery of the Discipline Data in recent years is critical to showing that there is a pattern of unconstitutional behavior of which the Municipal Defendants were aware, including other incidents of Fourth Amendment and Equal Protection violations where District students were disciplined differently and/or received disproportionately severe punitive consequences due to their race and/or sex. *Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018) ("Official municipal policy includes not only the decisions of a government's lawmakers, but also the acts of its policymaking officials, and *practices* so persistent and widespread as to practically have the force of law.") (emphasis in original); *TH by Shepherd*, 2018 WL 3738945 at *5 ("[P]rior incidents and complaints regarding SPD officers, even those that are unsubstantiated, are relevant to plaintiff's [*Monell*] claims"). If the recent Data shows these types of repeated violations, then the District "may be liable even for its inaction if, in its failure to act, it exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates." *Outlaw*, 884 F.3d at 372. And if the Data reveal significant racial disparities, this could have put Municipal Defendants on notice of the need to provide supervision and training on how to discipline students in a nondiscriminatory manner. The Data should be produced for these additional reasons.

---

[4] Claims against a local government under 42 U.S.C. § 1983 are analyzed under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *N.Y. by Schneiderman v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 751 (N.D.N.Y. 2016) ("For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under *Monell*.").



    D.  Discovery of Discipline Data Since 2015 is Proportional to the Needs of the Case

Discovery of the Discipline Data is also proportional to the needs of the case. The District solely possesses the Data and recently proclaimed that it could produce it in two to three weeks. (Dkt. 88.)  As previously noted, Plaintiffs have already agreed to narrow their request to begin with the period when SchoolTool was used to maintain the Data (2015-2016 to the present), and the benefit of producing the Data outweighs the burden. (Dkt. 94.) The Data is critical to resolving factual allegations that each of the Defendants dispute – *e.g.*, that race was a motivating factor for searching the girls; that the discrimination was intentional; that Black and Latina girls are more likely to be subject to disparate discipline; that a hostile racial climate in the District is evinced by other incidents of unjust discipline; that racial disparities in the Data support an inference of intentional discrimination; and that the Municipal Defendants' actions and omissions caused the constitutional violations. (*See, e.g.*, Dkts. 1, 20-22, 29-30 at ¶¶ 99-102, 127, 133, 140-47, 153-59.) The Discipline Data is probative of these material factual disputes, which are central to resolving the constitutional and civil rights issues at the heart of this case about the rights of students to be free from racially discriminatory treatment in school.  Despite the probative and proportional nature of the Discipline Data, Defendants have refused to produce any Data to Plaintiffs. Refusing production is incompatible with Rule 26 and controlling Second Circuit law.

    II.     **DEFENDANTS HAVE FAILED TO CONDUCT A PROPER ESI SEARCH**

In response to RFPs served by Plaintiffs in August 2019, Defendants' counsel failed to conduct even the most basic ESI collection and production as is required under the Federal Rules. During a March 26, 2020 meet and confer, Defendants' counsel admitted they had not completed a search for ESI responsive to *any* of Plaintiffs' document requests and had instead relied solely on their clients' representations that they have identified and turned over relevant information. (Ex. 1, 4/14/20 Letter.) Such minimal steps fall well below an acceptable standard of document collection. *See Phoenix Four, Inc. v. Strategic Res. Corp.*, 2006 WL 1409413, at *5-6, 9 (S.D.N.Y. May 23, 2006) (holding that counsel's "duty is to search for *sources* of information" beyond "simply accept[ing] the defendants' representation" and imposing sanctions on counsel for ineffectual oversight, where counsel merely "asked the defendants for all electronic and hard copy documents"). Defendants have not produced a single text message. And except for (a) a series of emails from members of the public to  the District, (b) an email from District Superintendent Tonia Thompson to the Board, and (c) three emails addressing an unrelated incident involving a District employee, Defendants have not produced a single email or any other ESI communication relating to the allegations in the Complaint. Plaintiffs have repeatedly raised this deficiency with Defendants' counsel and asked counsel to confirm that they will conduct the basic ESI search and production required under the Federal Rules, which includes identifying, collecting, and producing responsive text messages, emails, and other ESI stored in Defendants' phones and emails that relate to the allegations in the Complaint. (Ex. 1; Ex. 2, 5/4/20 C. Park email.) Defendants have entirely ignored Plaintiffs' inquiries, forcing Plaintiffs to raise this issue with the Court. Defendants' counsel should be compelled to conduct a search of the individual Defendants' phones and emails (both personal and professional) and to produce all responsive emails, text messages, chats, SMS messages, MMS messages, and any other ESI relevant to the claims and defenses in the case within thirty days.

ny-1912931


Page Six

                                    MORRISON | FOERSTER

Respectfully submitted,

/s/ *Rachel Kleinman*
Rachel Kleinman, Esq.
Kristen A. Johnson, Esq.
Cara McClellan, Esq.
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street
New York, NY 10006

/s/ *Chanwoo Park*
Joshua Hill, Jr., Esq.
Jamie Levitt, Esq.
Chanwoo Park, Esq.
Amanda Gayer, Esq.
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019

*Counsel for Plaintiffs*

cc:    All Counsel of Record (via ECF)

ny-1912931