**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| I.S., a minor by and through her mother and next friend, ANAIS DISLA; J.B., a minor by and through her parents and next friends, IBELYH DISLA and JOSE BRISTOL; I.M., a minor by and through her mother and next friend, ZULAYKA MCKINSTRY; A.S., a minor by and through her mother and next friend, CHANDERLIA SILVA, <br><br> Plaintiffs, <br><br> v.v. <br><br> BINGHAMTON CITY SCHOOL DISTRICT; BINGHAMTON BOARD OF EDUCATION; TIM SIMONDS, in his individual capacity; MICHELLE RALEIGH, in her individual capacity; MARY ELLEN EGGLESTON, in her individual capacity, <br><br> Defendants. | Civil No. 3:19-cv-513-GTS-ATB <br><br> Hon. Glenn T. Suddaby <br><br> Jury Trial Demanded |

## FIRST AMENDED COMPLAINT

### PRELIMINARY STATEMENT

Plaintiffs I.S., a minor by and through her mother and next friend, Anais Disla; J.B., a

minor by and through her parents and next friends, Ibelyh Disla and Jose Bristol; I.M., a minor by

and through her mother and next friend, Zulayka Mckinstry; and A.S., a minor by and through her

mother and next friend, Chanderlia Silva (collectively "Plaintiffs"), bring this action against the

Binghamton City School District, the Binghamton Board of Education, Tim Simonds, Michelle

Raleigh, and Mary Ellen Eggleston (collectively "Defendants"), for the discriminatory,

dehumanizing, and unlawful strip searches and other unreasonable searches of their daughters—

four Black and Latina girls who were twelve years old at the time of the searches—in violation of

their federal statutory and constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, and Title VI of the Civil Rights Act of 1964.

On January 15, 2019, at East Middle School in Binghamton, New York, four twelve-year-old Black and Latina girls—I.S., J.B., I.M. and A.S. (collectively, "Student Plaintiffs")—were walking from the cafeteria towards their lunch activity and were laughing in the hallway when they were stopped by the school's principal, Tim Simonds. Principal Simonds and Assistant Principal Michelle Raleigh ordered and escorted the girls to the health office without providing any explanation. There, Principal Simonds and Assistant Principal Raleigh huddled and whispered with the school nurse, Mary Ellen Eggleston. Nurse Eggleston then searched each girl separately without ever saying why the girls were being searched, in one case directing the girl to remove her clothing down to her underwear and touching the girl inside of her bra.

School staff did not contact the girls' parents or provide the parents with any notice prior to conducting the searches and did not inquire about the girls' well-being before resorting to the demeaning strip searches. In addition, Nurse Eggleston, at times in the presence of Principal Simonds and Assistant Principal Raleigh, conducted vitals tests, searched each girl's belongings, and subjected each girl to humiliating and inappropriate comments about their bodies. Assistant Principal Raleigh also conducted searches of some of the girls' belongings. When the intrusive searches of each girl over the course of an hour failed to reveal any contraband or other evidence of wrongdoing, Principal Simonds sent A.S., I.M., and I.S. back to class as if nothing had happened, and gave J.B. an in-school suspension without explanation. Principal Simonds later told the girls' parents that he sent them to the health office because he thought the girls were "hyper" and "giddy."

As the U.S. Supreme Court has recognized, strip searches of children at the hands of school officials cause trauma and long-term harm.[1] In this case, each girl has experienced and continues to experience psychological pain and mental anguish as a result of the unlawful, unjustified, and invasive searches of their bodies and belongings during a critical period in their development. Following January 15, each girl felt uncomfortable returning to school because their trust in school officials had been violated. They felt embarrassed, humiliated, and targeted for unwanted attention. For five to six days, they remained out of school entirely. During and after this time, each girl displayed signs of anxiety and depression. Their mothers repeatedly requested that the Binghamton City School District address the events on January 15 and allow their girls to attend West Middle School, the only other middle school in the District that is not an alternative school. Instead, the District assigned the girls to the District's alternative school—to which students who have committed serious disciplinary infractions are routinely assigned—where they remained for over two additional weeks. At the alternative school, the girls were kept isolated with limited classroom instruction time. Instead, the girls spent much of the day at the school listening to music and watching YouTube videos.

The laughter and giddiness of adolescent children are not objective facts giving rise to a reasonable suspicion justifying an intrusive search by school officials. The searches that occurred

---

[1] *Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364, 375 (2009) (quoting Br. for Nat'l Ass'n of Social Workers, et al. as Amici Curiae 6-14; Irwin A. Hyman & Donna C. Perone, *The Other Side of School Violence: Educator Policies and Practices that May Contribute to Student Misbehavior*, 36 J. Sch. Psych. 7, 13 (1998); N.Y.C. Dep't. of Educ., Reg. No. A-432, 2 (2005)), https://www.schools.nyc.gov/docs/default-source/default-document-library/a-432-english; *Cornfield v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1316, 1321 (7th Cir. 1993) (citations omitted) ("[n]o one would seriously dispute that a nude search of a child is traumatic"); *Bellnier v. Lund,* 438 F. Supp. 47 (N.D.N.Y. 1977) (young children are especially susceptible to being traumatized by strip searches).

on January 15, 2019, at East Middle School, including the strip searches, vitals checks, and searches of the girls' personal belongings, fail to meet clearly established constitutional standards.

Troublingly, the facts in this case also support an inference that the Defendants were motivated by false race- and gender-based stereotypes in directing, facilitating, and conducting these unlawful searches. This inference of discrimination is supported by the lack of any objective facts supporting a reasonable suspicion of danger or wrongdoing, and by statements school officials made on and after January 15 that evince stereotypical views. First, each of the girls is either African American or Latina. They were targeted by the Principal for exhibiting conduct that would otherwise be regarded as typical for adolescent girls. Moreover, crude comments made about the physical maturity of one of the girls, and the suggestion that the mere presence of the girls provoked fear in school officials, suggest that familiar stereotypes were motivating factors in the conduct of the school officials. For example, Assistant Principal Raleigh stated in the school health office that she was afraid of the girls and told Nurse Eggleston—in front of the middle school girls—that she did not want to be left alone with them. Additionally, Nurse Eggleston told the girls that they were loud, disrespectful, and had "attitudes," evoking all too common stereotypes about Black and Latina girls. The well-recognized harm from being subjected to a strip search in school is compounded when students are treated unconstitutionally for reasons that are motivated by illicit race and gender biases.

Plaintiffs bring this civil rights action pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and statutory anti-discrimination law. Plaintiffs seek redress for Defendants' deprivation, under color of state law, of Plaintiffs' rights under the Constitution and laws of the United States. Plaintiffs seek (1) a declaratory judgment that the searches and the subsequent events that occurred in this case were

unconstitutional and a violation of the relevant civil rights laws; (2) an order enjoining Defendants from conducting strip searches at school in the future; (3) compensatory damages for the injuries caused by Defendants' unlawful conduct; (4) punitive damages assessed to deter such intentional or reckless deviations from well-settled federal law; and (5) other relief that the Court deems just and proper.

## JURISDICTION AND VENUE

1.      This action arises under the Fourth and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act , 42 U.S.C. § 2000d *et. seq.*.

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), as this action seeks redress for violations of Plaintiffs' rights under the U.S. Constitution and federal civil rights laws.

3.      This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the Northern District of New York.

ny-2032889

## PARTIES

*Plaintiffs*

4.      Plaintiff Anais Disla is the mother of a fourteen-year-old Latina girl, I.S. I.S. is in the ninth grade at Binghamton High School, and at all relevant times has resided in Binghamton, New York.

5.      Plaintiffs Ibelyh Disla and Jose Bristol are the parents of a fourteen-year-old Latina girl, J.B. J.B. is in the ninth grade at Binghamton High School, and at all relevant times has resided in Binghamton, New York.

6.      Plaintiff Zulayka McKinstry is the mother of a fourteen-year-old Black girl, I.M. I.M. is in the ninth grade at Binghamton High School, and at all relevant times has resided in Binghamton, New York.

7.      Plaintiff Chanderlia Silva is the mother of a fourteen-year-old Black girl, A.S. A.S. is in the ninth grade at Binghamton High School, and at all relevant times has resided in Binghamton, New York.

*Defendants*

8.      Defendant Mary Ellen Eggleston ("Nurse Eggleston") was at all times relevant herein a nurse at East Middle School in Binghamton, New York. She is sued in her individual capacity.

9.      Defendant Tim Simonds ("Principal Simonds") was at all times relevant herein the principal at East Middle School in Binghamton, New York. Under New York law, Principal Simonds is "the administrative and instructional leader of the school." N.Y. Educ. § 2590-i(1). The District delegates final policymaking authority regarding disciplinary issues and searches to the

principal as an administrator of a school.[2] Principal Simonds, as principal of East Middle School, was the highest-ranking person in the school. By virtue of his position, he was directly responsible for discipline in his school and supervision over staff, including Nurse Eggleston and Assistant Principal Raleigh. He is sued in his individual capacity.

10.     Defendant Michelle Raleigh ("Assistant Principal Raleigh") is an assistant principal at East Middle School in Binghamton, New York. The District delegates final policymaking authority regarding disciplinary issues and searches to the assistant principal as an administrator of a school.[3] She is sued in her individual capacity.

11.     Defendants Nurse Eggleston, Assistant Principal Raleigh, and Principal Simonds (collectively the "Individual Defendants") participated in the unlawful acts described herein.

12.     Defendant Binghamton City School District (the "District") is a public school district in Broome County, New York, where East Middle School is located. The District receives federal financial assistance for its programs, services, and activities.

13.     Defendant Binghamton City Board of Education (the "Board" and collectively with the District the "School Defendants") has "in all respects the superintendence, management and control of the educational affairs of the District and … all the powers necessary to exercise these powers expressly granted to it by the laws of New York State and the Commissioner of Education."[4] Local public schools in the District are "maintained, developed and operated" by the

---

[2]     *See* Binghamton City School District Code of Conduct at 11 (2017), http://www.binghamtonschools.org/UserFiles/Servers/Server_512723/File/For%20Parents/Code%20of%20Conduct/BCSD%20Code%20of%20Conduct_7-26-17.pdf ("All Administrators have the responsibility to: Create and implement policies and procedures that encourage safe and orderly schools for all students, school staff, and principals, to support active teaching and learning.").

[3] *Id.*

[4] Binghamton City School District By-Laws, 1.1 School District and Board of Education Legal Status and Authority at 1110 (2016),

Board.[5] Under New York law, the Board has duties relating to generally setting up and maintaining the educational system, including establishing "rules and regulations concerning the order and discipline of the schools." N.Y. Educ. Law § 1709(2) (McKinney 2018).

## FACTS

*The January 15, 2019 Unlawful Searches*

14.     I.S., J.B., I.M., and A.S. are Black and Latina girls who, until the events of January 15, 2019, attended East Middle School in Binghamton, New York. On January 15, all of the girls were twelve years old.

15.     On January 15, 2019, Mr. Tim Simonds, the principal of East Middle School, stopped the girls in the hallway during their lunch break while the girls were walking from the cafeteria towards their lunch activity. Principal Simonds asked the girls where they were headed and told them that he had been looking for them. The girls laughed during this brief conversation with Principal Simonds, who then—along with Assistant Principal Michelle Raleigh—escorted them to the school's health office.

16.     Neither Principal Simonds nor Assistant Principal Raleigh, both of whom are white, explained to the girls why they were taken to the health office.

17.     The girls were held in the health office for approximately one hour. While in the health office, the girls witnessed Principal Simonds, Assistant Principal Raleigh, and Nurse Eggleston, who is also white, whispering to each other.

---

http://bcsd1.ss14.sharpschool.com/UserFiles/Servers/Server_512723/File/Board%20Policies/Section%201000%20By%20Laws%20BOE.pdf.
    [5] Binghamton City School District By-Laws, 3.1 Power and Duties of the Board at 1310 (2016), http://bcsd1.ss14.sharpschool.com/UserFiles/Servers/Server_512723/File/Board%20Policies/Section%201000%20By%20Laws%20BOE.pdf.

18.     Subsequently, starting with A.S., Nurse Eggleston brought each girl into the exam room in the health office for closed-door, separate searches and examinations without explaining to each girl the purpose of the searches and examination and without notifying or receiving consent from any of the girls' parents. Principal Simonds and Assistant Principal Raleigh observed Nurse Eggleston take each girl into the exam room. In some cases, the Assistant Principal entered the exam room during the closed-door searches and examination and participated in the search of a girl's belongings.

19.     Upon information and belief, Principal Simonds and Assistant Principal Raleigh instructed Nurse Eggleston to conduct these intrusive searches in violation of District policy and the law.

    a.    **A.S.**

20.     Once in the exam room, Nurse Eggleston closed the door and told A.S. to sit on the bed. While A.S. was on the bed, Nurse Eggleston used a blood pressure cuff to take her blood pressure on top of A.S.'s clothes. Nurse Eggleston then checked A.S.'s heart rate by putting a stethoscope under A.S.'s sweater and tested her pupils with a light. Nurse Eggleston then conducted a sobriety test that included, among other things, directing A.S. to stand on one foot and touch her nose. Nurse Eggleston then told A.S. to take off her sweater. A.S. unzipped her sweater to the middle of her chest, then zipped it back up and said "no." In response, Nurse Eggleston told A.S. that she herself (Nurse Eggleston) could not wear only a bra without a shirt underneath a sweater (like A.S. was wearing) because her own breasts are flabby.

21.     Nurse Eggleston then told A.S. to pull her pants down. After A.S. said "no," Nurse Eggleston used her hands to pat down the inner thigh area of A.S.'s pants.

22.     Assistant Principal Raleigh then entered the exam room and closed the door. She told A.S. to empty her pockets. A.S. removed lip gloss, a phone charger, and a pencil from her

9

pockets. Assistant Principal Raleigh searched the lip gloss and found nothing. Assistant Principal Raleigh then directed A.S. to take off her boots. A.S. took off her boots, and Assistant Principal Raleigh turned the boots upside down and shook them. Nothing came out of the boots.

23.     Assistant Principal Raleigh then searched A.S.'s phone by shaking it and trying to take it apart. Nothing came out of the phone. Assistant Principal Raleigh gave A.S. back her phone.

24.     A.S. was then permitted to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of A.S. or her belongings.

**b.     I.M.**

25.     Next, I.M. was brought into the exam room. Nurse Eggleston closed the door and directed I.M. to sit on the bed, which I.M. did. Nurse Eggleston tested I.M.'s pupils with a light.

26.      Nurse Eggleston then directed I.M. to take off her sweatshirt. I.M. complied. Nurse Eggleston checked I.M's pulse by placing her fingers on I.M.'s wrist. I.M. had on a spaghetti strap tank top underneath the sweatshirt. Nurse Eggleston told I.M. that she herself could not wear a shirt like that, referring to I.M.'s tank top, because her own breasts were flabby. Nurse Eggleston was touching her own breasts (on top of her shirt) when she made this comment to I.M.

27.     I.M. was uncomfortable about Nurse Eggleston's references to her own breasts and responded by saying, "Oh." Nurse Eggleston then said to I.M. that the older you get, the less attractive you are. She further told I.M. that I.M.'s breasts were unusually large for her age.

28.     Nurse Eggleston then directed I.M. to pull the bottom of her tank top away from her body and shake. I.M. complied. She then directed I.M. to extend her arms out to the side. Once I.M. complied, Nurse Eggleston swiped the inside of I.M.'s bra near both the right and left armpits with her index and middle fingers. Her index and middle fingers touched both the inside of I.M.'s bra and the sides of I.M.'s breasts.

29.     Nurse Eggleston then directed I.M. to pull down her pants. I.M. had on two pairs of pants: pajama pants and spandex leggings underneath. I.M. pulled her pajama pants down to her ankles. Nurse Eggleston then directed I.M. to shake her legs. I.M. complied. Nurse Eggleston then asked I.M. if she had anything else on her. I.M. replied that if she had anything, Nurse Eggleston would see it because the leggings were tight. Nurse Eggleston then directed I.M. to pull down her leggings. I.M. pulled her leggings down to her knees and, after viewing I.M. in her underwear, Nurse Eggleston indicated that I.M. was permitted to pull her leggings and pajama pants back up.

30.     Nurse Eggleston then conducted a sobriety test that included, among other things, directing I.M. to stand on one foot and touch her nose.

31.     Nurse Eggleston asked I.M. if she had a phone. I.M. responded that she had a phone and a purse in the main room where the other girls were waiting. Nurse Eggleston directed I.M. to get the phone and purse. Assistant Principal Raleigh and Principal Simonds were in the main room where the girls were waiting when I.M. went to get the phone and purse from that same room. I.M. retrieved her phone and purse and returned to the exam room where Nurse Eggleston was waiting.

32.     Nurse Eggleston then directed I.M. to remove her shoes and shake them. Before I.M. could remove her shoes, Assistant Principal Raleigh entered the exam room and also directed I.M. to remove her shoes. I.M. then removed her shoes and shook them, and nothing came out of the shoes.

33.     Nurse Eggleston emptied the contents of I.M.'s purse onto a table and searched the purse, as well as lip gloss and perfume that had been in the purse. Nurse Eggleston smelled I.M.'s phone, which did not have a case. Nurse Eggleston tried to take the back of the phone off to conduct a further search, but I.M. told her that the back did not come off without breaking the phone.

34.     Nurse Eggleston then permitted I.M. to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of I.M. or her belongings.

       **c.**    **I.S.**

35.     Next, I.S. was brought into the exam room and Nurse Eggleston closed the door. Nurse Eggleston told I.S. to sit on the bed and I.S. complied.

36.     Nurse Eggleston directed I.S. to take her arm out of her sweater. I.S., who was wearing a short-sleeved shirt underneath her sweater, eventually took off her entire sweater.

37.     Nurse Eggleston rubbed I.S.'s arm where I.S. has an eczema patch. She told I.S., in a disrespectful tone, that her eczema was bad and that I.S. needed to get it taken care of.

38.     Nurse Eggleston then conducted a sobriety test that included, among other things, directing I.S. to stand on one foot and touch her nose. Assistant Principal Raleigh then came into the exam room and directed I.S. to take off her shoes. I.S. complied. Assistant Principal Raleigh shook the shoes, and nothing fell out. Nurse Eggleston told I.S. to empty her pants pockets. After I.S. emptied her pants pockets, removing lip gloss and a few coins, Nurse Eggleston patted down I.S.'s pants pocket area and found nothing.

39.     I.S. was then permitted to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of I.S. or her belongings.

       **d.**    **J.B.**

40.     Finally, J.B. was brought into the exam room, and Nurse Eggleston closed the door. Nurse Eggleston told J.B. to sit on the bed and J.B. complied.

41.     J.B. asked to call her mother and also asked whether the school had called her mother. Nurse Eggleston told J.B. that the school had not called her mother.

42.     Nurse Eggleston then took J.B.'s pulse and blood pressure and checked J.B.'s pupils with a light. Next, Nurse Eggleston conducted a sobriety test that included, among other things, directing J.B. to stand on one foot and touch her nose.

43.     Nurse Eggleston then directed J.B. to take off her shoes. J.B. complied. Nurse Eggleston shook J.B.'s shoes, and nothing came out of the shoes.

44.     Nurse Eggleston told J.B. to take her top off. J.B. said "No, you don't have my mom's permission."

45.     Nurse Eggleston then asked J.B. if she had anything else, and J.B. said she had a sweater. Nurse Eggleston directed J.B. to get her sweater from the main area of the health office and come back. J.B. complied.

46.     Nurse Eggleston searched J.B.'s sweater and found J.B.'s phone, headphones, charger, and lip gloss. Nurse Eggleston then searched J.B.'s phone, headphones, charger, and lip gloss.

47.     J.B. was then permitted to leave the exam room. No contraband or other evidence of wrongdoing was recovered during any of the searches of J.B. or her belongings.

### e.     Immediate Aftermath Following the Unlawful Searches

48.     After each girl had been searched by Nurse Eggleston and Assistant Principal Raleigh in the exam room, all of the girls returned to the main area of the health office. They sat together and talked about what had happened.

49.     During that time, Nurse Eggleston told the girls to be quiet. When the girls were not sitting silently or when they asked why they were being held in her office, Nurse Eggleston told the girls that they were loud, disrespectful, and had "attitudes."

50.     At one point, a boy with an injury came into the health office where the girls were waiting. As Nurse Eggleston prepared to leave the health office with the boy, Assistant Principal Raleigh stated that she was scared to be left alone with the girls and could not be in a room alone with them. Nurse Eggleston did not leave the health office with the boy.  At this point, the girls still had not been told why they were searched or why they were being detained.

51.     Eventually, Nurse Eggleston told the girls to go to the main office, where Principal Simonds's office is located.

52.     Once in the main office, the girls waited for further instruction on what to do next. When Principal Simonds was available, they went into his office.

53.     During the meeting with Principal Simonds, J.B. nervously clicked open and closed a hand sanitizer that she was wearing on a lanyard around her neck. Principal Simonds asked J.B. if she was sniffing hand sanitizer. She responded, "Are you kidding? It's just hand sanitizer."

54.     I.M. and J.B. also explicitly requested to contact their parents during the meeting with Mr. Simonds, but Mr. Simonds denied their requests.

55.     Principal Simonds eventually sent A.S., I.M., and I.S. back to class.

56.     Principal Simonds sent J.B. to in-school suspension without explanation.

57.     Sometime thereafter, Principal Simonds contacted Ms. Ibelyh Disla, Ms. McKinstry, and Ms. Silva (the mothers of J.B., I.M., and A.S., respectively) to tell them that their daughters had been sent to the nurse's office for a vitals check because they were "hyper and giddy." He did not contact Ms. Anais Disla (the mother of I.S.), and he did not inform any of the parents that their children had undergone a sobriety check and strip search at school that day.

58.     A.S. returned to East Middle School on January 16, 2019, but was afraid to return to school thereafter. She was humiliated by the way school officials treated her on January 15. She

14

was also embarrassed by the attention that she received when she returned to school the next day on January 16 because she felt as if everyone knew what had happened to her and the other three girls.

59.     I.M. did not return to East Middle School after January 15 because she was humiliated by the way school officials treated her on January 15 and felt too unsafe to return.

60.     I.S. did not return to East Middle School after January 15 because she was humiliated by the way school officials treated her on January 15 and felt too unsafe to return.

61.     J.B. returned to East Middle School on January 16, but was afraid to return to school thereafter. She was humiliated by the way school officials treated her on January 15. She was also embarrassed by the attention she received when she returned to school the next day on January 16 because she felt as if everyone knew what had happened to her and the other three girls.

*Parental Follow-up*

62.     On January 16, 2019, Ms. Anais Disla, I.S.'s mother, and Ms. McKinstry, I.M.'s mother, separately went to East Middle School to speak with Principal Simonds to get an explanation and documentation of what had happened to their daughters the day before.

63.     Ms. Anais Disla asked for information about what happened to I.S., but Principal Simonds told her that documentation did not exist.

64.     Ms. McKinstry asked for an incident report documenting what happened to I.M. Principal Simonds told her that there was no incident report. When she insisted that she needed documentation, Principal Simonds told Ms. McKinstry to wait while he typed up an incident report. In the meantime, he called the District Office. Two District employees—Michael Holly (Assistant Superintendent for Personnel and Administration) and David Thon (Director of Personnel)—subsequently arrived at the school and questioned I.M. about the events on January 15. I.M. recounted the events of that day to Mr. Holly and Mr. Thon.

15

65.     Principal Simonds typed a letter in the presence of the other District employees, but the letter did not mention that the girls had been strip searched. Instead, it stated that Principal Simonds and Assistant Principal Raleigh questioned the students just before 1 p.m. on January 15 and escorted them to the health office when they appeared to be "hyper" and "giddy."[6]

66.     Principal Simonds and Assistant Principal Raleigh were apologetic to Ms. Disla and Ms. McKinstry. According to both mothers, Principal Simonds and Assistant Principal Raleigh were almost in tears during their respective meetings with them on January 16. One of the District level personnel who were in the office, Assistant Superintendent Michael Holly, offered to pay for Ms. McKinstry's cab as she was leaving East Middle School, stating that it was the least they could do.

67.     During her visit to the school, Ms. McKinstry filed a police report with the school police officer, Officer Arthur Williams, Jr. The Binghamton Police Department Incident Report is attached hereto as Exhibit B. It states that Officer Williams had the following discussions with Principal Simonds on January 15:

> I then spoke with the Principal, Mr. Tim Simonds, who informed me on 15 Jan 2019, at about 1245 hours, that several students appeared to be under the influence of some unknown substance. He ask, [sic] if there was any way I could observe the students and determine if they had taken any illegal substances. I informed Mr. Simonds, the only way to determine if those students are under any illegal substance was through a blood test. . . . I advised Mr. Simonds to call their parents, check their lockers, bags, and have them empty their pockets to ensure they don't have anything on them. After giving that information to Mr. Simonds, I left the nurses offices. The students was [sic] not interviewed by me. During the time I was observing those students, I. M[.] was in one of the rooms in the nurse[']s office[], with the door closed, with the nurse, Eggleston. I did not go into that room.

---

[6] *See* January 16, 2019 Letter from Principal Simonds, attached hereto as Exhibit A.

68.     On or about January 18, Mr. Thon called Ms. Anais Disla and informed her that the District was investigating what happened on January 15. He further informed Ms. Disla that the District needed statements from I.S. and J.B. (Ms. Anais Disla's daughter and niece, respectively).

69.     On January 18, Ms. Anais Disla, along with I.S. and J.B. met with Assistant Principal Raleigh and Mr. Thon at the Broome County Public Library in Binghamton. Mr. Thon questioned I.S. and J.B. separately about the January 15 incident.

70.     On or about January 24, Mr. Holly called Ms. Silva and informed her that an investigation was taking place and asked to meet with her to get her input on how to prevent an incident like the January 15 one from happening again. On or about January 25, Mr. Thon and Mr. Holly met with A.S. at Broome County Public Library in Binghamton and questioned A.S. about the January 15 incident.

_School Board Meeting and District Response_

71.     The District did nothing to address the families' concerns or facilitate the girls' transition back to school until the Board's meeting on January 22, 2019. By that time, I.S. and I.M. had missed five days of school and J.B. and A.S. had missed four days of school.

72.     While the January 15 incident was not officially on the agenda for the Board meeting,[7] the girls' families and concerned members of the community showed up at the meeting and demanded that the Board address the incident. Ms. McKinstry, Ms. Silva, and J.B. each spoke about the January 15 searches at the Board meeting.

73.     Following the public outcry at the meeting, District Superintendent Tonia Thompson asked the four girls and the mothers in attendance (Ms. McKinstry, Ms. Silva, and Ms.

---

[7] _See_ Agenda for the January 22, 2019 School Board Meeting, attached hereto as Exhibit C.

Anais Disla) to speak with her in a private room, where they discussed the girls returning to a different school placement. Although Ms. McKinstry, Ms. Silva, and Ms. Anais Disla (who is also J.B.'s aunt) told Superintendent Thompson that they wanted the girls to be immediately transferred to West Middle School, the only other middle school in the District that is not an alternative school, the girls were instead assigned to Columbus School.

74.     Columbus School houses a New York State Boards of Cooperative Educational Services Alternative School and the District's central offices.[8]

75.     Following the Board meeting, the District issued statements on January 23, 24, and 29, 2019, relating to the January 15 searches. While the January 23 statement acknowledges that there were concerns about "the procedures and application of student searches,"[9] the January 24 statement denied that the strip searches occurred.[10] The January 29 statement again asserted: "It must be reiterated, we have no evidence that a strip search was conducted by administration."[11]

76.     On or about January 29, 2019, the sole African-American member of the Binghamton School Board, Korin Kirk, released a statement on Facebook in her individual capacity, stating that she believed the girls and that the January 15 incident is a "wakeup call," but also "one incident of many":

---

[8] *See* Binghamton City School District, District-wide School Safety Plan (Mar. 4, 2014), http://bcsd1.ss14.sharpschool.com/UserFiles/Servers/Server_512723/File/About/Required%20N otifications/District%20Wide%20Safety%20Manual/2014%20District-wide%20Safety%20Manual%20-%20Final.pdf.

[9] *See* Statement of Binghamton City School District (Jan. 23, 2019), https://www.scribd.com/document/398427439/BCSD-Press-Release1-23-19-1#from_embed.

[10] *See* Statement of Binghamton City School District (Jan. 24, 2019), https://drive.google.com/file/d/1hI_HbYgZF12ipci0uALJAspHjzZ32N4_/view.

[11] *See* Statement of Binghamton City School District (Jan. 29, 2019), https://drive.google.com/viewerng/viewer?url=https://assets.documentcloud.org/documents/5700 424/Binghamton-City-School-District-Final-Statement.pdf.

18

> If people think this situation was handled the best way possible by the Binghamton City School District, they are sadly mistaken.
>
> …
>
> Mistakes were made.
>
> Those who needed this incident as a wakeup call that there is more work to be done haven't been paying attention. This is one incident of many.
>
> I believe those girls.
>
> I believe those girls when they say they were harmed.
>
> …
>
> There is a massive divide in this city between the experiences of black and minority residents and non-black residents.

### *Referral to Columbus School*

77.     On January 24, 2019, after being out of school for five to six days, the four girls began attending Columbus School. At Columbus, their school day lasted from 9:30 am until 1:30 pm. The girls were assigned to a classroom with two other middle school students who already were attending Columbus. All of the students at Columbus were told by school staff that they could not discuss why the girls were at Columbus and no longer attending their previous schools.

78.     The classroom teacher at Columbus, Ms. Z., did not provide direct instruction, but rather supervised the students with work on their laptops. There were no books available in the classroom. In general, the girls worked on worksheet assignments using Google Classroom.

79.     There were insufficient assignments to last the girls until dismissal. After completing the computer assignments, typically within the first couple hours of the morning, the girls passed the remainder of the day by listening to music and watching videos on YouTube.

80.     The girls felt isolated while at Columbus because they had to be stationary all day and could not interact with other students outside their classroom. They were assigned to one

classroom for the entire day, including the lunch period. Lunch was brought to the classroom on a cart.

81.    Although A.S. and I.S. have individualized education plans ("IEPs"), no accommodations were made for them during their time at Columbus. For example, A.S.'s IEP includes speech therapy, but the District did not provide speech therapy to A.S. at Columbus. I.S.'s IEP requires tutoring for her learning disability, but the District did not provide such services to I.S. at Columbus.

82.    On February 8, 2019, District officials, Ms. Karry Mullins (Assistant Superintendent for Instruction and Budget) and Ms. Deb Card (Director of Attendance and Pupil Services), and the District's counsel, Robert McKertich, held separate meetings with Ms. McKinstry, Ms. Silva, and Ms. Disla and their counsel about their request that the girls be enrolled at West Middle School. At these meetings, the District finally agreed to transfer the girls to West Middle School as of Monday February 11, 2019. The girls' first day at West Middle School was February 12, 2019, at which time nearly a month had passed since the unlawful January 15 searches.

*Psychological Harm and Mental Anguish*

83.    As a result of the unlawful January 15 searches and the events that followed, I.S., J.B., I.M., and A.S. each have suffered and will suffer humiliation and emotional distress.

84.    All of the parents have observed symptoms of anxiety, depression, and emotional distress in their daughters since the January 15 events, and agree that their daughters will need some form of therapy to address the harm that resulted from such traumatic experiences during a critical period in their development as adolescents.

     **a.**    **A.S.**

20

85.     The January 15 searches took such a toll on A.S. that her demeanor has changed substantially. While she used to play with her hair and makeup in the mirror, she would not even get dressed in the days immediately after the searches. For the first time in her life, A.S. also experienced panic attacks in the weeks following January 15, 2019. She continues to feel unsafe and unwelcome at school as a result of the events that occurred.

          **b.**       **I.M.**

86.      During the days she was out of school, I.M. slept all day and showed signs of depression. In the months after, she cried uncontrollably during breakdowns that are surprising and concerning to her family. She is struggling to make sense of what happened to her, and she feels embarrassed by the attention she has received at school as a result of the January 15 searches.

          **c.**       **I.S.**

87.     I.S. became withdrawn and despondent following January 15, 2019. I.S.'s birthday was three days after the January 15 incident, and she did not want to do anything to celebrate. In addition, she no longer feels excited about school and has disengaged in the school-related activities that she used to enjoy.

          **d.**       **J.B.**

88.     J.B. responded to the events of January 15, 2019, with sadness and anger. She has periods of time when she cries intensely and expresses frustration and pain. She feels distrustful of adults at school and avoids interacting with them as a result of the January 15 events.

*District Policies and Trainings*

89.     The District has a policy addressing "Searches and Interrogations of Students" that specifies the conditions under which searches are permissible. The policy acknowledges that "[s]tudents are protected by the Constitution from unreasonable searches and seizures" and

specifies factors to be considered in determining whether reasonable suspicion exists to search a student, and steps an authorized school administrator should take when conducting a search if reasonable suspicion exists.[12]

90.     According to District policy, "A strip search is a search that requires a student to remove any or all of his/her clothing, other than an outer coat or jacket."

91.     District policy provides that "Strip searches are intrusive in nature and are almost never justified."

92.     Further, District policy prohibits strip searches except "under exigent circumstances" when "school officials have highly credible evidence that such a search would prevent danger or yield evidence."

93.     Although the District has a policy forbidding unlawful searches, on information and belief, the School and the District do nothing to train staff on how to correctly implement this policy and how to determine reasonable suspicion using appropriate factors while avoiding impermissible factors such as race.

94.     On information and belief, the School and District conduct no training of staff related to students' Fourth Amendment rights or students' right not to be subjected to race- and sex-based discrimination in the administration of searches.

95.     On information and belief, the School and District conduct no training of staff related to students' Fourteenth Amendment rights or students' right not to be subjected to race- and sex-based discrimination.

---

[12] Searches and Interrogations of Students, Binghamton City School District Policy No. 7330 (2016) ("District Policy 7330"), http://bcsd1.ss14.sharpschool.com/UserFiles/ Servers/Server_512723/File/Board%20Policies/Section%207000%20Students%20updated%20fe bruary%202018.pdf.

96.     On information and belief, the School and District conduct no training of staff addressing how to avoid racial bias in the administration of student discipline.

97.     Michael Holly, who has been the Assistant Superintendent of the District since August 2017 and is currently serving as Acting Principal at East Middle School, testified at his deposition in this case on December 10, 2020 that he could not recall ever having received training regarding student searches during the course of his employment with the District, nor was he aware of any required trainings in the District regarding the constitutional rights of students, or student substance abuse for District employees.

98.     David Thon, who was Director of Personnel in the District from August 2016 to September 2020, testified at his deposition in this case on December 11, 2020 that he could not identify any training that the District conducts for staff that addresses how to avoid racial bias in the administration of student discipline.

99.     In response to Plaintiffs' requests for all training materials regarding the Fourth Amendment, including how and when to conduct searches of students, the only materials that the District identified were the District's Code of Conduct, the District Policy 7330, and a document titled "Journey to Responsiveness Focus on Culture: Foundation Day One" by Dr. Sharroky Hollie that contains no information about the Fourth Amendment or how and when to conduct searches of students.  *See* 11/25/19 Defendant District's Response to Request for Production No. 5 (Dkt. 67-1 at 13).

100.     In response to Plaintiffs' requests for all training materials regarding race and/or ethnicity, including all training regarding racial discrimination and implicit bias, the only document that the District identified was the District's Code of Conduct.  *See* 11/25/19 Defendant District's Response to Request for Production No. 7 (Dkt. 67-1 at 14-15).

101.    By failing to provide any training at all to staff regarding the District Policy 7330 and the constitutional rights of students, subjects which are both complicated and nuanced, it is highly predictable that school administrators such as the Defendants would run afoul of both District Policy 7330 and the Constitution. This complete lack of training amounts to deliberate indifference.

*Racially Disparate Treatment of Students in the District*

102.    As of the 2017-2018 school year, the most recent year for which enrollment and disciplinary data from the District is publicly available through the U.S. Department of Education's Civil Rights Data Collection (CRDC), the District had 5,353 students across ten schools: one high school, two middle schools, and seven elementary schools.[13]

103.    As of the 2017-2018 school year, the overall student enrollment in the District was 3.2% Asian, 27.2% Black, 14.8% Latino, 43.5% white, and 10.8% two or more races.[14]

104.    As of the 2017-2018 school year, at East Middle School, the overall student enrollment was 3.1% Asian, 31.7% Black, 20.1% Latino, 33.7% white, and 11.1% two or more races.[15] At West Middle School, the overall student enrollment was 4.2% Asian, 26.7% Black, 10.4% Latino, 48.3% white, and 9.9% two or races.[16]

105.    National studies have shown that Black and Latinx students do not misbehave more often than white students, but Black and Latinx students are more often disciplined and bear the

---

[13] U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Binghamton City School District* (2018), https://ocrdata.ed.gov/profile/9/district/33289/summary.
[14] *Id.*
[15] U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: East Middle School* (2018), https://ocrdata.ed.gov/profile/9/school/282402/summary.
[16] U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: West Middle School* (2018), https://ocrdata.ed.gov/profile/9/school/282407/summary.

brunt of harsh, exclusionary punishment.[17] Black and Latino boys are the most likely to be disciplined in school, but Black and Latina girls are also disproportionately suspended and expelled at higher rates than white girls and white boys.[18] The documented disparate treatment of Black and Latino students, including Black and Latina girls, that occurs at the national level also occurs at the local level in the District and in the District's two middle schools, East Middle School and West Middle School.

106.    Black and Latino students in the District were overrepresented in every category of discipline reported to the CRDC for the 2017-2018 school year compared to their respective proportion of the total student population in the District.[19]  In the 2017-2018 school year, Black students represented 27.2% of students in the District, but received 43.6% of in-school suspensions, 46.6% of out-of-school suspensions, and 58.3% of expulsions.  Latino students represented 14.8% of students in the District, but received 16.4% of in-school suspensions, 15.4% of out-of-school suspensions, and 16.7% of expulsions. On information and belief, the District does not report data about student searches to the Department of Education as part of the CRDC. The most recent publicly available disciplinary data from the District, which is available through the 2017-2018 CRDC, does not include data on student searches in the District.

---

[17] *See* Russell Skiba, Ph.D. & Natasha T. Williams, *Are Black Kids Worse? Myths and Facts about Racial Differences in Behavior—A Summary of the Literature*, Equity Project at Ind. Univ. (Mar. 2014), http://www.indiana.edu/~atlantic/wp-content/uploads/2014/03/African American- DifferentialBehavior_031214.pdf.

[18] NAACP Legal Def. & Educ. Fund, Inc. ("LDF") & Nat'l Women's Law Ctr. ("NWLC"), *Unlocking Opportunity for African American Girls* at 18, 20 (2014), https://www.naacpldf.org/wp-content/uploads/Unlocking-Opportunity-for-African-American_Girls_0_Education.pdf;   NWLC & Mexican Am. Legal Def. & Educ. Fund ("MALDEF"), *Listening to Latinas: Barriers to High School   Graduation*   at   15-16   (2009),   https://www.maldef.org/wp-content/uploads/2018/08/listeningtolatinas.pdf.

[19] U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Binghamton City School District,* Discipline Report (2018),
https://ocrdata.ed.gov/profile/9/district/33289/disciplinereport.

107.    The discipline data for the 2017-2018, 2018-2019, and 2019-2020 school years from the District's middle schools ("2017-2020 Discipline Data"), which was produced by the District in this action and which includes data on student searches in the District's middle schools, shows that in the District's middle schools, Black and Latino students were more likely to receive disciplinary sanctions than white middle school students during this time period.

108.    During the 2017-2018, 2018-2019, and 2019-2020 school years, Black and Latino, and multiracial students in the District's middle schools were significantly more likely to be searched than white middle school students. Specifically, although Black, Latino, or multiracial students constituted only 54-55% of the District's middle school student population from 2017 to 2020, seven out of the eight instances (i.e., 87%) of a documented search in a District middle school between 2017-2020 involved the search of a Black, Latino, or multiracial student.  Although Black and Latino students constituted only 42-44% of the District's middle school student population from 2017 to 2020, six out of the eight instances (i.e., 75%) of a documented search in a District middle school between 2017-2020 involved the search of a Black or Latino student.

109.    Black male students in the District's middle schools were almost 2 to 2 ½ times more likely to receive an out-of-school suspension than white male students in 2017-2018 and 2018-2019, and Black female middle school students were 2 ½ times more likely to receive an out-of-school suspension than white female students during that same period. *See* 10/15/20 Jamilia J. Blake Addendum Report ("Blake Addendum")[20] at 1. In addition, Hispanic male students in the District's middle schools were twice as likely as white male students to receive an out-of-school suspension in both years and Hispanic female students in the District's middle schools were almost

---

[20] The Blake Addendum is being filed contemporaneously as Exhibit 3 to the December 14, 2020 Declaration of Cara McClellan in Support of Plaintiffs' Motion to Amend.

twice as likely as white female students to receive an out-of-school suspension in 2017-2018 and over 2 ½ more likely than white female students to receive an out-of-school suspension in 2018-2019. *Id.*

110.   In 2017-2018, Black female students in the District's middle schools were three times as likely as white female students to receive an in-school suspension and in 2018-2019, Black female students in the District's middle schools were 1 ½ times as likely as white female students to receive an in-school suspension.

111.   The New York State Attorney General's ("NYAG") Office is currently investigating the District for racially discriminatory administration of school discipline. *See* September 18, 2020 Status Conference Transcript at 10:12-21 (Defendants' counsel acknowledged awareness of the investigation by the New York State Attorney General's Office into racially discriminatory discipline in the District). Although this investigation is ongoing, it shows that the NYAG's Office determined that information about racial disparities in the District's recent administration of student discipline and punishment warrants an investigation based on the NYAG Office's authority to investigate violations of Title VI.

112.   Disproportionate punishments result in Black students missing valuable instructional time. In 2017-2018, Black students in the District missed 532 days of school due to out-of-school suspensions—more than half of the total number of days missed by students due to out-of-school suspensions across the entire District.

113.   In 2017-2018, Black students in the District were transferred to an alternative school at rates far higher than the rates of all other students. In 2017-2018, Black students without disabilities comprised 26.4% of all students without disabilities in the District, but represented half

of all students without disabilities transferred to the alternative school in the District.[21] Black students with disabilities fared even worse, comprising 29.6% of all students with disabilities in the District, but constituting 100% of students with disabilities transferred to the alternative school in the District.[22]

114.    The hostile racial climate in the District is further evinced by other incidents of unjust discipline and physical violence against Black students that the District fails to address.

115.    A few months prior to the unlawful searches, on September 11, 2018, a Black 17-year-old Binghamton High School student, J.C., was assaulted and called a racial epithet by three white Binghamton High School staff members. The staff members pushed him, slammed him to the pavement, pushed his face into the ground as he pleaded that he could not breathe, and called him the n-word. This incident occurred after a confrontation that began off school grounds when J.C. used the "wrong doors" to exit a building.[23]

116.    On information and belief, the District did not punish the staff members who were involved in the September 11, 2018 incident.

---

[21]

https://ocrdata.ed.gov/profile/9/district/33289/discipline/transferredtoanalternativeschoolwithout disabilities

[22]

https://ocrdata.ed.gov/profile/9/district/33289/discipline/transferredtoanalternativeschoolwithdisa bilities

[23] Ashley Biviano, *Binghamton High School student says staff assaulted him, used racial slur*, Binghamton Press & Sun-Bulletin (Sept. 28, 2018), https://www.pressconnects.com/story /news/local/2018/09/28/black-student-assaulted-bhs-staff-leaving-wrong-doors/1334218002/.

ny-2032889

*Stereotypes About Black and Latina Girls*

117.    Research shows that stereotypical bias can lead adults at school to perceive Black and Latina girls as less innocent than white girls, and needing less nurturing, protection, and support.[24]

118.    Research further shows that when a Black girl is outspoken in the same way as a non-Black girl, educators may associate the Black girl's conduct with the racist stereotype of Black women as threatening, aggressive,[25] and having "attitudes."[26]

119.    Similarly, Latina girls are often stereotyped as being threatening, aggressive and "fiery."[27]

120.    Black and Latina girls are also more likely to be seen as older than their true age and more likely to be labeled sexually promiscuous by school staff.[28]

## FIRST CAUSE OF ACTION
## ALL PLAINTIFFS AGAINST ALL DEFENDANTS

**Violation of the Fourth Amendment to the United States Constitution
Pursuant to 42 U.S.C. § 1983
(Unlawful Searches)**

121.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

122.    The U.S. Supreme Court has recognized that a school strip search and the associated "degradation its subject may reasonably feel" render "a search that intrusive in a category of its

---

[24] *See, e.g.*, Rebecca Epstein, Jamilia J. Blake, & Thalia González, *Girlhood Interrupted: The Erasure of Black Girls' Childhood,* Georgetown Law Ctr. on Poverty & Inequality (2017), https://bit.ly/2OErYTg.

[25] Monique W. Morris, *Pushout: The Criminalization of Black Girls in Schools* 34 (New Press 2016).

[26] *See, e.g.,* Edward W. Morris, *"Ladies" or "Loudies"? Perceptions & Experiences of Black Girls in Classrooms*, 38 Youth & Soc'y 490, 511 (2007).

[27] NWLC, *Let Her Learn: Stopping School Pushout for Girls of Color* at 4-5 (2017), https://nwlc.org/wp-content/uploads/2017/04/final_nwlc_Gates_GirlsofColor.pdf.

[28] *Id.* at 3-4.

own," thus requiring "its own specific suspicions" that evidence of danger or wrongdoing will be found in the area searched. *Safford*, 557 U.S. 364, 377 (2009). Under clearly established law, the strip search of a student is lawful only if it is (1) justified at inception, and (2) not "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 370 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985). The strip searches in this case satisfied neither requirement.

123.    The Defendants' searches of the four students were not justified at their inception. School officials did not have reasonable, individualized suspicion to justify any search whatsoever. Principal Simonds's claim that the four twelve-year-old girls appeared to be "hyper" and "giddy" did not create reasonable suspicion that the students were dangerous or hiding contraband.

124.    By searching the four students without the requisite particularized suspicion, the Defendants violated the students' constitutional rights.

125.    Even if reasonable suspicion had existed to initiate the searches (which it did not), "the content of the suspicion failed to match the degree of intrusion" that each of the four students experienced. *Id.* at 375.

126.    For each student, Nurse Eggleston began by conducting a physical test of some sort (blood pressure, heart rate, pulse, and a sobriety test). None of these tests showed anything out of the ordinary or provided any evidence supporting Principal Simonds's speculation that the girls were under the influence of some unknown substance. Yet, even after these physical tests, Nurse Eggleston ordered the students to remove their clothing, expose their bodies, and shake their bodies and certain articles of clothing. On information and belief, Nurse Eggleston took these actions under the direction of Principal Simonds and/or Assistant Principal Raleigh. Moreover, both Nurse Eggleston and Assistant Principal Raleigh touched and searched the students' bodies and clothing.

These searches were not "'reasonably related in scope to the circumstances which justified the interference,'" *id.* at 375 (quoting *T.L.O.*, 469 U.S. at 341), and therefore violated the students' constitutional rights.

127.    After checking A.S.'s blood pressure and eyes and conducting a sobriety test, and finding no evidence suggesting that A.S. was under the influence of an unknown substance, Nurse Eggleston still directed A.S. to remove her clothing and physically touched and searched A.S.'s body, finding nothing.

128.    After checking I.M.'s heartrate and eyes and finding no evidence that I.M. was under the influence of an unknown substance, Nurse Eggleston still directed I.M. to remove her clothing. After taking I.M.'s blood pressure and finding no evidence of wrongdoing, Nurse Eggleston (i) directed I.M. to remove additional layers of clothing down to her underwear and shake her body, and (ii) physically touched the inside of I.M.'s bra and the sides of her breasts, finding nothing.

129.    After checking I.S.'s blood pressure and heart rate and finding no evidence that I.S. was under the influence of an unknown substance, Nurse Eggleston still proceeded to physically touch I.S.'s body and conduct a sobriety test. Assistant Principal Raleigh then directed I.S. to remove and shake her shoes and physically patted down I.S.'s body around her pants pockets, finding nothing.

130.    After checking J.B.'s pulse and finding no evidence that J.B. was under the influence of an unknown substance, Nurse Eggleston still directed J.B. to remove articles of clothing and to shake her shoes, finding nothing.

131.    The Defendants did not obtain consent from, or provide prior notice to, any of the four students' parents to perform the searches.

132.    Thus, Defendants violated each Student Plaintiff's Fourth Amendment rights under clearly established U.S. Supreme Court precedent.

133.    In addition to conducting unlawful searches of each of the students, Nurse Eggleston and Assistant Principal Raleigh searched the girls' belongings.

134.    Under clearly established law, a school official must have some indication that a student is violating school rules or the law before searching a student's belongings. *T.L.O.*, 469 U.S. at 342. Further, a constitutionally permissible search must have the "necessary 'nexus' between the item searched for and the infraction under investigation." *T.L.O.*, 469 U.S. at 345 (internal quotation marks and citation omitted).

135.    Here, there was no individualized suspicion of a violation of a school rule or law that justified the searches of the girls' belongings. The only grounds for the searches were the fact that the girls were late for their lunch activity and mere speculation based on the group's laughter. Such routine, perfectly normal, adolescent conduct does not provide the individualized suspicion required under clearly established law to search a student's belongings.

136.    The violations of A.S., I.M., I.S., and J.B.'s constitutional rights on January 15, 2019, were caused by the actions and decisions of municipal officials with final decision-making authority over discipline and searches of students at East Middle School.

137.    Under New York law a "principal shall be the administrative and instructional leader of the school." N.Y. Educ. § 2590-i(1). Principal Simonds is the highest-ranking policymaker at East Middle School with respect to decisions about discipline and searches.

138.    The unlawful searches conducted by Nurse Eggleston and, at times, Assistant Principal Raleigh, occurred at the direction of Principal Simonds and Assistant Principal Raleigh.

139.    Principal Simonds and Assistant Principal Raleigh authorized, condoned, knowingly acquiesced to, and at times, directly participated in the unlawful searches conducted by Nurse Eggleston.

140.    Principal Simonds's and Assistant Principal Raleigh's authorization and knowledge of Nurse Eggleston's behavior and, at times, direct participation in the unlawful conduct, amounts to a custom or policy attributable to the District because Principal Simonds and Assistant Principal Raleigh have final decision-making authority over discipline and searches.

141.    Principal Simonds and Assistant Principal Raleigh acted as, and were authorized by the School Defendants to act as, final decision-makers as to whether and how to search the girls on January 15. Principal Simonds and Assistant Principal Raleigh possessed such authority that their decisions, actions, and inactions, on January 15 were effectively the official policy of the School Defendants.

142.    The violations of A.S., I.M., I.S., and J.B.'s constitutional rights on January 15, 2019 were also caused by the School Defendants' failure to train and supervise school staff on the Fourth Amendment's proscription on unreasonable searches.

143.    The School Defendants are responsible for supervising, training, and hiring staff at East Middle School, including Principal Simonds, Assistant Principal Raleigh, and Nurse Eggleston.

144.    The School Defendants knew to a degree of moral certitude that school district employees required guidance on when a search is or is not prohibited. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). This is shown by the fact that the District has a policy addressing "Searches and Interrogations of Students" that specifies the conditions under which searches are permissible.

145.    The School Defendants knew that training or supervision would "make less difficult" the decision of how and when to conduct searches of students and the risk of employees mishandling the situation. *Id.* This is shown by the fact that the District policy on searches specified factors to be considered in determining whether reasonable suspicion exists to search a student, and steps an authorized school administrator should take when conducting a search if reasonable suspicion exists.

146.    The School Defendants knew that "the wrong choice [by a school employee] will frequently cause the deprivation of a citizen's constitutional rights." *Id.* This is shown by the fact that the District policy begins by recognizing that students have a Fourth Amendment right to be free from unreasonable searches.

147.    The District failed to train or supervise staff on how to conduct searches in a manner that does not violate the Constitution and does not subject them to race- or sex-based discrimination. While the District has a policy forbidding unlawful searches, District Policy 7330, on information and belief, the School and the District do nothing to train staff on how to correctly implement District Policy 7330 and how to determine reasonable suspicion using appropriate factors while avoiding impermissible factors such as race. On information and belief, the School and District conduct no training of staff related to students' Fourth Amendment rights or students' right not to be subjected to race- and sex-based discrimination in the administration of searches. On information and belief, the School and District conduct no training of staff addressing how to avoid racial bias in the administration of student discipline.

148.    The School Defendants acted with deliberate indifference to the Student Plaintiffs' rights under the Fourth Amendment. The 2017-2020 Discipline Data demonstrates racial disparities in the administration of discipline and searches at District middle schools from 2017-

2020, supporting an inference that race was a motivating factor in determining whether to search a middle school student in the District during this period. The racial disparities in the 2017-2020 Discipline Data show a recent history of District staff improperly implementing District Policy 7330 in a manner that risked conducting unreasonable searches and searches of students that were improperly motivated by race in violation of students' Fourth Amendment rights. Despite this history, since at least 2017, the District has failed to conduct any training for staff on the District search policy and students' Fourth Amendment rights, evincing a conscious disregard of those rights. The School Defendants made no meaningful attempt to prevent the constitutional violations that were a known or obvious consequence of a lack of training or supervision.

149.   By acting under color of state law to deprive Student Plaintiffs of their Fourth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

150.   As a direct and proximate result of Defendants' actions and omissions, Plaintiffs have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their Fourth Amendment rights, and are entitled to declaratory relief, injunctive relief, damages, costs, and attorneys' fees.

### SECOND CAUSE OF ACTION
### ALL PLAINTIFFS AGAINST ALL DEFENDANTS

### Violation of the Fourteenth Amendment's Equal Protection Clause
### Pursuant to 42 U.S.C. § 1983
### (Intentional Discrimination)

151.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

152.   If a school official targets students for harsher treatment that is in any way motivated by prejudice or stereotype against a racial or ethnic group, that conduct constitutes intentional discrimination and violates the Fourteenth Amendment.

ny-2032889

153.   "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

154.   Intentional discrimination need not require ill-will or racial animosity, but also includes stereotypes and biases about the traits of individuals of certain racial groups. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 561 (S.D.N.Y. 2013) ("The Equal Protection Clause does not permit race-based suspicion.").

155.   The evidence in this case supports an inference that the searches conducted by Defendants on January 15 were conducted at least, in part, because the Student Plaintiffs are Black and Latina girls, constituting discrimination based on their race.

156.   The inference that race or ethnicity was a motivating factor when the Individual Defendants conducted the searches is supported by racial disparities in recent search and discipline data from the District's Middle Schools.

157.   Although Black, Latino, or multiracial students constituted only 54-55% of the District's middle school student population from 2017 to 2020, seven out of the eight instances (i.e., 87%) of a documented search in a District middle school between 2017-2020 involved the search of a Black, Latino, or multiracial student.  Although Black and Latino students constituted only 42-44% of the District's middle school student population from 2017 to 2020, six out of the eight instances (i.e., 75%) of a documented search in a District middle school between 2017-2020 involved the search of a Black or Latino student.

158.   In 2017-2018 and 2018-2019, Black female middle school students' risk for the receipt of out-of-school suspension was 2½ times that of white female middle school students in the District across both years. **Blake Addendum at 1.** In 2017-2018, Hispanic female middle school

students' risk for the receipt of out-of-school suspension was twice that of white female middle school students in the District, and in 2018-2019, Hispanic female middle school students' risk for the receipt of out-of-school suspension was more than 2½ times that of white female middle school students in the District during the same period. *Id.*

159.    The inference that race or ethnicity was a motivating factor when the Individual Defendants conducted the searches is evident from Principal Simonds's consideration of "hyper" and "giddy" behavior to be so suspicious when exhibited by four Black and Latina girls as to warrant such extreme measures as a strip search, even though "hyper" and "giddy" behavior is developmentally appropriate among adolescents of all races.  Blake Report (Dkt. 116-4) at 5-6.

160.    The inference that race or ethnicity was a motivating factor is also supported by the statement of Assistant Principal Raleigh that she feared being alone with the girls. The Student Plaintiffs did not exhibit any acts or statements of aggression or violence that would reasonably give rise to feelings of fear or perception of a threat.  Indeed, while in the health office, the Minor Plaintiffs were laughing and talking among themselves in a manner typical of adolescents. Given the absence of any objective or legitimate reason that the Student Plaintiffs' behavior would give rise to fear, it is apparent that Assistant Principal Raleigh's fear of being left alone with the Student Plaintiffs was imagined and thus predicated on stereotypes of Black girls as hostile and menacing. *Id.* at 7-9.

161.    The inference that race or ethnicity was a motiving factor is also supported by Nurse Eggleston's description of the girls as loud, disrespectful, and having "attitudes." Nurse Eggleston's characterization of the Student Plaintiffs is consistent with research showing that Black girls are more likely than white girls to be disciplined for being defiant and disruptive, and

this disparate treatment is based on racial stereotyping of Black women as hostile and angry. *Id.* at 11-12.

162.    Nurse Eggleston's conversations with both A.S. and I.M. about her own breasts and what is sexually attractive to others also indicated that she viewed A.S. and I.M. as more mature than their age, thus hypersexualizing the Student Plaintiffs.  Such hypersexualization is based on racial stereotypes of Black women's and girl's bodies being viewed as problematic and deviant from the bodies of white women and girls.  *Id.* at 7.  There is no circumstance under which an adult can appropriately make such comments to adolescents, and the inappropriateness of such behavior by an adult is heightened in the context of a school employee speaking to adolescent students. Indeed, both A.S. and I.M. felt uncomfortable during these conversations because they each sensed it was not age-appropriate, but Nurse Eggleston continued to speak to A.S. and I.M. as if they were not 12-year-olds, suggesting that she also acted based on a stereotypical view of Black girls as older and more mature than white girls of similar age. *Id.*

163.    The violations of A.S., I.M., I.S., and J.B.'s constitutional rights under the Fourteenth Amendment were caused by (i) the actions and decisions of municipal officials with final decision-making authority over how and when to conduct searches of students at East Middle School, and (ii) the School Defendants' failure to train and supervise school staff on the Fourth Amendment's proscription on unreasonable searches.

164.    The violations of A.S., I.M., I.S., and J.B.'s constitutional rights on January 15, 2019, were caused by the actions and decisions of municipal officials with final decision-making authority over discipline and searches of students at East Middle School.

165.    Under New York law a "principal shall be the administrative and instructional leader of the school." N.Y. Educ. § 2590-i(1).

166.    Principal Simonds is the highest-ranking policymaker at East Middle School with respect to decisions about discipline and searches.

167.    Principal Simonds is the highest-ranking policymaker at East Middle School with respect to decisions about treating students differently on the basis of race.

168.    The 2017-2020 Discipline Data showing that Black and Latino students are disproportionately subject to searches and discipline supports an inference that race was a factor in Principal Simonds's decision to have A.S., I.M., I.S., and J.B searched.

169.    The unlawful searches conducted by Nurse Eggleston and, at times, Assistant Principal Raleigh, occurred at the direction of Principal Simonds and Assistant Principal Raleigh.

170.    Principal Simonds and Assistant Principal Raleigh authorized, condoned, knowingly acquiesced to, and at times, directly participated in the unlawful searches conducted by Nurse Eggleston.

171.    Principal Simonds's and Assistant Principal Raleigh's authorization and knowledge of Nurse Eggleston's behavior and, at times, direct participation in the unlawful conduct, amounts to a custom or policy attributable to the District because Principal Simonds and Assistant Principal Raleigh have final decision-making authority over discipline and searches.

172.    Principal Simonds and Assistant Principal Raleigh acted as, and were authorized by the School Defendants to act as, final decision-makers as to whether and how to search the girls on January 15. Principal Simonds and Assistant Principal Raleigh possessed such authority that their decisions, actions, and inactions, on January 15 were effectively the official policy of the School Defendants.

173.    The School Defendants are responsible for supervising, training, and hiring staff at East Middle School, including Principal Simonds, Assistant Principal Raleigh, and Nurse Eggleston.

174.    The School Defendants knew to a degree of moral certitude that school district employees required guidance on when a search is or is not prohibited. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). This is shown by the fact that the District has a policy addressing "Searches and Interrogations of Students" that specifies the conditions under which searches are permissible.

175.    The School Defendants knew that training or supervision would "make less difficult" the decision of how and when to conduct searches of students and the risk of employees mishandling the situation. *Id.* This is shown by the fact that the District policy on searches specified factors to be considered in determining whether reasonable suspicion exists to search a student, and steps an authorized school administrator should take when conducting a search if reasonable suspicion exists.

176.    The School Defendants knew that "the wrong choice [by a school employee] will frequently cause the deprivation of a citizen's constitutional rights." *Id.* This is shown by the fact that the District policy begins by recognizing that students have a Fourth Amendment right to be free from unreasonable searches.

177.    The District failed to train or supervise staff on how to conduct searches in a manner that does not violate the Constitution and does not subject them to race- or sex-based discrimination. While the District has a policy forbidding unlawful searches, on information and belief, the School and the District do nothing to train staff on how to correctly implement this policy and how and when to conduct searches of students. On information and belief, the School

and District conduct no training of staff related to students' Fourth Amendment rights or students' right not to be subjected to race- and sex-based discrimination. On information and belief, the School and District conduct no training of staff addressing how to avoid racial bias in the administration of student discipline.

178.    The School Defendants acted with deliberate indifference to the Student Plaintiffs' equal protection rights under the Fourteenth Amendment. The 2017-2020 Discipline Data demonstrates racial disparities in the administration of discipline and searches at District middle schools from 2017-2020, supporting an inference that race was a motivating factor in determining whether to search a middle school student in the District during this period. The racial disparities in the 2017-2020 Discipline Data show a recent history of District staff improperly implementing District Policy 7330 in a manner that risked conducting unreasonable searches and searches that were improperly motivated by race in violation of students' Fourteenth Amendment rights. Despite this history, since at least 2017, the District has failed to conduct any training for staff on the District search policy and students' Fourteenth Amendment rights, evincing a conscious disregard of those rights. The School Defendants made no meaningful attempt to prevent the constitutional violations that were a known or obvious consequence of a lack of training or supervision.

179.    By acting under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

180.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their constitutional rights, and are entitled to declaratory relief, injunctive relief, damages, costs, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**ALL PLAINTIFFS AGAINST SCHOOL DEFENDANTS**

**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d** *et seq.*
**(Intentional Discrimination)**

181.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

182.    Title VI of the Civil Rights Act of 1964 provides that recipients of Federal financial assistance may not discriminate on the basis of race, color, or national origin. 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance.").

183.    As a recipient of Federal financial assistance, the District, and all of its programs and activities, are subject to Title VI of the Civil Rights Act of 1964.

184.    Like the Fourteenth Amendment's Equal Protection Clause, Title VI bars intentional discrimination. *See Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607-08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292-93 (1985). A recipient's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular group therefore violates both the Fourteenth Amendment and Title VI. *See, e.g.*, *Batson v. Kentucky,* 476 U.S. 79, 104 (1986); 28 C.F.R. § 42.104(b).

185.    Courts have long recognized as actionable disparate treatment discrimination claims of biased treatment based on race and sex combined. *See, e.g.*, *Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980) (recognizing compound discrimination cases and observing that Black females are a "distinct protected subgroup for purposes of the prima facie case" under Title VII); *Lam v. Univ. of Haw.,* 40 F.3d 1551, 1562 (9th Cir. 1994) (recognizing that Asian women are subject to a set of stereotypes and assumptions shared neither by Asian men nor by white women that are actionable under Title VII). Indeed, as the Second Circuit has recognized

42

in the Title VII context, "'the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences,'" which include "stereotypes and assumptions not shared by all persons of that race or gender." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (quoting *Lam*, 40 F.3d at 1562). [29]

186.    The inference that school personnel took actions based on racial stereotyping is supported by recent data on school discipline and student searches in the District.

187.    Although Black, Latino, or multiracial students constituted only 54-55% of the District's middle school student population from 2017 to 2020, seven out of the eight instances (i.e., 87%) of a documented search in a District middle school between 2017-2020 involved the search of a Black, Latino, or multiracial student.  Although Black and Latino students constituted only 42-44% of the District's middle school student population from 2017 to 2020, six out of the eight instances (i.e., 75%) of a documented search in a District middle school between 2017-2020 involved the search of a Black or Latino student.

188.    In 2017-2018 and 2018-2019, Black female middle school students' risk for the receipt of out-of-school suspension was 2½ times that of white female middle school students in the District across both years. *See* Blake Addendum at 1. In 2017-2018, Hispanic female middle school students' risk for the receipt of out-of-school suspension was twice that of white female middle school students in the District, and in 2018-2019, Hispanic female middle school students' risk for the receipt of out-of-school suspension was more than 2½ times that of white female middle school students in the District during the same period. *Id.*

189.    The inference that school personnel took actions based on racial stereotyping is

---

[29] Courts considering claims under Title VI look to Title VII cases for guidance. *See, e.g., N.Y. Urban League, Inc. v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995).

supported by Principal Simonds's statement that he found the girls' "hyper" and "giddy" behavior to be so unusual as to be suspicious when exhibited by four Black and Latina girls, even though "hyper" and "giddy" behavior is developmentally appropriate among adolescents of all races. Blake Report (Dkt. 116-4) at 5-6.

190.    The inference that school personnel took actions based on racial stereotyping is supported by Assistant Principal Raleigh's statement that she was afraid of the girls and did not want to be left alone with them.  The Student Plaintiffs did not exhibit any acts or statements of aggression or violence that would reasonably give rise to feelings of fear or perception of a threat. Indeed, while in the health office, the Student Plaintiffs were laughing and talking among themselves in a manner typical of adolescents. Given the absence of any objective or legitimate reason that the Student Plaintiffs ' behavior would give rise to fear, it is apparent that Assistant Principal Raleigh's fear of being left alone with the Student Plaintiffs  was imagined and thus predicated on stereotypes of Black girls as hostile and menacing.  *Id.* at 7-9.

191.    The inference that school personnel acted based on racial stereotyping is also supported by Nurse Eggleston's description of the girls as loud, disrespectful, and having attitudes, labels that evoke common stereotypes about Black and Latina girls. Nurse Eggleston's characterization of the Student Plaintiffs is consistent with the research, which shows that Black girls are more likely than white girls to be disciplined for being defiant and disruptive, and this disparate treatment is based on racial stereotyping of Black women as hostile and angry. *Id.* at 11-12.

192.    The inference that school personnel acted based on racial stereotyping is also supported by Nurse Eggleston's statement to I.M. that I.M had unusually large breasts, evincing that she viewed her as more mature than a twelve-year-old.

193.     Nurse Eggleston's conversations with both A.S. and I.M. about her own breasts and what is sexually attractive to others also indicated that she viewed A.S. and I.M. as more mature than their age, thus hypersexualizing the Student Plaintiffs.  Such hypersexualization is based on racial stereotypes of Black women's and girls' bodies being viewed as problematic and deviant from the bodies of white women and girls.  *Id.* at 7.  There is no circumstance under which an adult can appropriately make such comments to adolescents, and the inappropriateness of such behavior by an adult is heightened in the context of a school employee speaking to adolescent students. Indeed, both A.S. and I.M. felt uncomfortable during these conversations because they each sensed it was not age-appropriate, but Nurse Eggleston continued to speak to A.S. and I.M. as if they were not 12-year-olds, suggesting that she also acted based on a stereotypical view of Black girls as older and more mature than white girls of similar age. *Id.*

194.     Defendants' actions and omissions constitute a violation of Title VI.

195.     As a direct and proximate result of Defendants' actions and omissions, the Student Plaintiffs have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their statutory rights, and are entitled to declaratory relief, injunctive relief, damages, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court to:

1.     Declare that the Defendants' actions violated the Student Plaintiffs' rights as protected by the Fourth and Fourteenth Amendments to the Constitution of the United States, and Title VI.

2.     Order all appropriate injunctive relief as warranted, including but not limited to:

i.      Requiring Defendants to put in place policies and procedures to ensure that illegal and/or unconstitutional searches, including strip searches, do not occur in schools within the District;

3.      Order the District to provide appropriate and regular counseling and/or other psychological services, as needed to remediate the psychological impact of the unlawful January 15 searches until each Student Plaintiff graduates from the District.

4.      Order the District to remove from the Student Plaintiffs' transcripts any absences during the time period when the Student Plaintiffs were absent from East Middle School after the unlawful searches and during the time when the Student Plaintiffs attended Columbus.

5.      Award Plaintiffs compensatory damages in an amount to be determined at trial, plus prejudgment interest.

6.      Award Plaintiffs punitive damages against all Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest.

7.      Award Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a, and 20 U.S.C. § 1415(i)(3)(B)(i)(I);

8.      Grant such other and further relief to Plaintiffs as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

DATED: December 14, 2020.

Respectfully Submitted,

/s/ Cara McClellan
Rachel M. Kleinman Bar No. 700824
Cara McClellan (admitted *pro hac vice*)
Kristen A. Johnson Bar No.  700920
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
rkleinman@naacpldf.org
cmcclellan@naacpldf.org
kjohnson@naacpldf.org

Jamie A. Levitt Bar No. 302285
Joshua Hill, Jr. Bar No. 700933
Chanwoo Park Bar No. 700932
Amanda Gayer Bar No. 700934
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 468-8000
Fax: (212) 468-7900
jlevitt@mofo.com
jhill@mofo.com
cpark@mofo.com
agayer@mofo.com

*Counsel for Plaintiffs*

# EXHIBIT A



# Binghamton City School District

East Middle School
167 E. Frederick Street
Binghamton, NY 13904
(607) 762-8300

January 16, 2019

Zulayka McKinstry
331 Conklin Avenue #1
Binghamton, NY 13903

Dear Ms. McKinstry:

Thank you for coming in today to address a concern that you had concerning the event on January 15th. Here are the details as I understand them.

Just before 1:00 pm, Asst. Principal Michelle Raleigh, asked for my assistance in locating four female students who went missing during the lunch hour and did not report to their lunch activity. I encountered the students in the second floor hallway near the health office. I called Ms. Raleigh, she joined me at the location and we began to question the students.

During our questioning, I observed that the students were acting differently than their usual presentation. The female students were disproportionately hyper and giddy for the situation. They laughed at statements that would not traditionally seem funny, and seemed to have lost sense of time.

I shared my concern with Ms. Raleigh about my observations, and she also agreed that the students were exhibiting behavior that was different from their normal presentation.

My concern for their well-being led to my determination that the students should be Escorted into the Health Office.

This is still under investigation, we don't know all of the facts that have occurred and making relevant inquiries.

Sincerely,

Tim Simonds
Principal

*Providing A Rich Environment for Quality Learning*

# EXHIBIT B

| 1. Agency | | 2. Division/Precinct | New York State | 3. ORI | | 4. ☒ Orig | 5. Case No. | 6. Class Code |
|---|---|---|---|---|---|---|---|---|
| Binghamton Police | | | INCIDENT REPORT | NY 0030100 | | ☐ Supp | 19-2189 | |

| 7. Report Day | 8. Date | 9. Report Time | Occurred On/From: | 10. Day | 11. Date | 12. Time | Occurred To: | 13. Day | 14. Date | 15. Time |
|---|---|---|---|---|---|---|---|---|---|---|
| We | 01/16/2019 | 1124 | | Tu | 01/15/2019 | 1230 | | Tu | 01/15/2019 | 1315 |

| 16. Incident Type | 17. Business Name | 18. Weapon(s) | A |
|---|---|---|---|
| Juvenile Complaint | East Middle School | N/A | |

| 19. Incident Address (Street No., Street Name, Bldg. No., Apt. No.) | 20. City, State, Zip ( ☒ C ☐ T ☐ V) | 21. Location Code | B |
|---|---|---|---|
| 167 E. Frederick Street | Binghamton, NY | 0401 | |

| 22. OFF. NO. | LAW | SECTION | SUB | CL | CAT | DEG | ATT | NAME OF OFFENSE | CTS | 23. No. of Victims |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | Mis | | C | | | 1 |
| 2. | | | | | Vio | | A | | | 24. No. of Suspects |
| 3. | | | | | Vio | | C | | | 1 |

25. Person Type: CO = Complainant  OT = Other  PI = Person Interviewed  PR = Person Reporting  WI = Witness  NI = Not Interviewed  VI = Victim  26. Victim also complainant ☐ Y ☐ N

| TYPE/NO. | NAME (LAST, FIRST, MIDDLE, TITLE) | Date of Birth | STREET NO, STREET NAME (BLDG NO., APT NO., CITY, STATE, ZIP) | TELEPHONE NO. | |
|---|---|---|---|---|---|
| CO | ███████████ | | | | F |
| PR | McKinstry, Zulayka | | | | G |
| NI | Eggleston, Maryellen | | | | H |

| 27. Date of Birth | 28. Age | 29. Sex | 30. Race | 30. Ethnic | 32. Handicap | 33. Residence Status | I |
|---|---|---|---|---|---|---|---|
| ███████████ | 12 | ☐ M ☒ F ☐ U | ☐ White ☒ Black ☐ Other ☐ Indian ☐ Asian ☐ Unk. | ☐ Hispanic ☐ Unk. ☒ Non-Hispanic | ☐ Yes ☒ No | ☒ Resident ☐ Tourist ☐ Commuter ☐ Military ☐ Term. Res.- Foreign Nat. ☐ Student ☐ Other ☐ Homeless ☐ Unk. | J |

34. Victim DID receive information on Victim's Rights and Services pursuant to New York State Law ☐ YES ☒ NO

| 35. Type/No. | 36. Name (Last, First, Middle) | 37. Alias/Nickname/Maiden Name (Last, First, Middle) | 38. Apparent Condition | K |
|---|---|---|---|---|
| NI | Eggleston, Maryellen | | ☐ Impaired Drugs ☐ Mental Dis. ☒ Unk. ☐ Impaired Alco. ☐ Inj./Ill ☒ App. Norm | |

| 39. Address (Street No., Street Name, Bldg. No., Apt. No., City, State, Zip) | 40. Phone No. | 41. Social Security No. | L |
|---|---|---|---|
| | ☐ Home ☒ Work | | |

| 42. Date of Birth | 43. Age | 44. Sex | 45. Race | 46. Ethnic | 47. Skin | 48. Occupation | M |
|---|---|---|---|---|---|---|---|
| | | ☐ M ☐ F ☐ U | ☒ White ☐ Black ☐ Other ☐ Indian ☐ Asian ☐ Unk. | ☐ Hispanic ☐ Unk. ☒ Non-Hispanic | ☒ Light ☐ Dark ☐ Unk. ☐ Medium ☐ Other | East Middle School Nurse | |

| 49. Height | 50. Weight | 51. Hair | 52. Eyes | 53. Glasses | 54. Build | 55. Employer/School | 56. Address | N |
|---|---|---|---|---|---|---|---|---|
| | | | | ☐ Yes ☐ Contacts ☒ No | ☒ Small ☐ Large ☐ Medium | East Middle School | 167 E. Frederick Street | |

| 57. Scars/Marks/Tattoos (Describe) | 58. Misc. | 1 |
|---|---|---|

| 59. Victim or Suspect No. | Property Status | Property Type | Quantity/Measure | Make or Drug Type | Model | Serial No. | Description | Value | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 2 |
| | | | | | | | | | 3 |
| | | | | | | | | | 4 |

| 60. Vehicle Status | 61. License Plate No. | Full ☐ Partial ☐ | 62. State | 63. Exp. Yr. | 64. Plate Type | 65. Value | 5 |
|---|---|---|---|---|---|---|---|
| 66. Veh. Yr. | 67. Make | | 68. Model | 69. Style | 70. VIN | | 6 |
| 71. Color(s) | 72. Towed By: To: | | | | 73. Vehicle Notes | | 7 |

| 74. | | 8 |
|---|---|---|

On Wednesday, 16Jan2019, at about 1124 hours, while detailed at East Middle School SRO, in the School District, City of Binghamton, a parent, Zulayka McKinstry informed me that she wanted to pursue charges against the School Nurse, Maryellen Eggleston for inappropriate touching and comments towards her daughter, ███████████ student of East Middle School, during an apparent vitals check in the Nurses offices on Tuesday, 15Jan2019, at about 1230 hours. Z. McKinstry explained that ███████████ was told to take off her sweater and pants, to where she only had on a bra and underwear, at which time, the Nurse, Eggleston is being accused of placing to fingers on each side of ███████████ bra, and instructed her to lift the bottom portion of her bra to ensure nothing was in her bra.

| 9 |
| 10 |
| 11 |
| 12 |
| 13 |

| 75. Inquiries (Check all that apply) | 76. NYSPIN Message No. | Reporting Officer's Name (Print) | B. Use cover sheet |
|---|---|---|---|
| ☐ DMV ☐ Want/Warrant ☐ Scofflaw ☐ Crim. History ☐ Stolen Property ☐ Other | | ARTHUR WILLIAMS JR | 85. |
| 78. Reporting Officer Signature (Include Rank) | 79. ID No. 355 | 80. Supervisor's Signature (Include Rank) | 81. ID No. 214 | Page 1 of 2 |
| 82. Status ☐ Open ☒ Closed (If Closed, check box below) ☐ Unfounded ☒ Victim Refused to Coop. ☐ Arrest ☐ Pros Declined ☐ Warrant Advised ☐ CGI ☐ Juv.- No Custody ☐ Arrest - Juv ☐ Offender Dead ☐ Extrad. Decline ☐ Unk. | | 83. Status Date 01/18/19 | 84. Notified/TOT 0 | Pages |

DCJS-3205 (1/09)  "FALSE STATEMENTS ARE PUNISHABLE AS A CRIME, PURSUANT TO THE NEW YORK STATE PENAL LAW."

# CITY OF BINGHAMTON POLICE DEPT.
38 HAWLEY STREET BINGHAMTON, NY 13901  (607) 723-5321  Page 1 of 2

| INCIDENT LOCATION | TIME | CODE | CASE NUMBER | DATE |
|---|---|---|---|---|
| 167 E. Frederick Street | 1124 | | 19-2189 | 01/16/2019 |

Z. McKinstry, also explained that a comment was made regarding her daughters chest area, she was told that Eggleston said that ████████ was "flabby." Z. McKinstry was very upset regarding the above information, given by ████████ and Z. McKinstry wanted Eggleston arrested for inappropriate touching and comments towards ██████ chest area. I did not talk to ████████ at any time.

I then spoke with the Principal, Mr. Tim Simonds, who informed me on Tuesday, 15Jan2019, at about 1245 hours, that several students appeared to be under the influence of some unknown substance. He ask, if there was any way I could observe the students and determine if they had taken any illegal substances. I informed Mr. Simonds, the only way to determine if those students are under any illegal substance was through a blood test. He ask, if I could just view the students and get my professional opinion regarding their behavior, due to the fact I am aware of most of the students in the school. I observed the students from the doorway of the Nurses office waiting room area. It did appear the student were acting abnormal with a lot of giggling, and various conversation, and the fact that they had been sitting in the nurses office for more than 30 minutes did not bother them was odd for those students because they are usually very upset by being stuck in one area and being questioned by the principal, especially during lunch. I advised Mr. Simonds to call their parents, check their lockers, bags, and have them empty their pockets to ensure they don't have anything on them. After giving that information to Mr. Simonds, I left the nurses office. The students was not interviewed by me. During the time I was observing those students, ████████ was in one of the rooms in the nurses offices, with the door closed, with the nurse, Eggleston. I did not go into that room.

Mr. Simonds informed me that Eggleston wanted to take ████████ vital, and she had on a large sweater where her blood pressure could not be taken properly. She had to take off her sweater in order for her blood pressure to be taken. She did not have on a shirt under the sweater, so she was told to take it off. ████████ took off the sweater and her blood pressure was taken. Once completed, her sweater was put back on. Only Eggleston and ████████ was in this room during that time. The assistant principal, Michelle Religh, came into the room once her sweater was back on, and Mrs. Religh ask ████████ to take off her shoes to ensure she did not have any contraband in her shoes. Mr. Simonds expressed, that was all that happen in that room, told to him by Eggleston. I did not talk to Eggleston regarding this incident.

I was informed that the School District was going to investigate this incident.
I informed Z. McKinstry that a police report would be completed.
I will forward this report to Detectives.
Nothing further at this time.

Ofc. Arthur Williams Jr 355 BPD/SRO

| OFFICER'S NAME, RANK, & I.D. | | APPROVED BY | |
|---|---|---|---|
| Arthur Williams Jr 355 | | | 01/18/1 |

SUPPLEMENTARY POLICE REPORT

# EXHIBIT C

Agenda
**Regular Board Meeting**
Board of Education, Binghamton, New York
Tuesday, January 22, 2019

**6:00 p.m.**      **Worksession** – The purpose of this meeting is for the Board of Education to consider convening in Executive Session to discuss specific matters which may include current and proposed employment of particular persons, collective bargaining negotiations, and pending litigation.

**7:00 p.m.**      **Regular Board Meeting** – Resolutions will be considered on employment, treasurer's report, donations, tuition, tax settlements, and any other matter that comes before the Board at that time.

**Call to Order**      Roll Call

**Pledge of Allegiance**

**Recognition**      Coolidge student band (Beth Shanfelt)

1.  **Approval of Minutes** (White)
    A.  Worksession and Regular Meeting of December 18, 2018

2.  **Financial Report** (Green)

3.  **Unfinished Business**
    A.  Update on guidance plan at secondary schools (Deb Card)
    B.  Update on IB/AP course offerings (Kevin Richman, Dawne Anne Adams)

4.  **Special Reports**
    A.  2019-2020 BOCES Admin and Capital Budgets (John Harvey)
    B.  Overview of Financial Status (Cynthia Wambold)

5.  **Correspondence for Action** (Goldenrod)

6.  **Public Comments on G Resolutions** – Time Limited (3 min)

7.  **New Business**
    A.  Superintendent's Recommendations (Blue)

8.  **Board Action**

9.  **Privilege of the Floor** – Time Limited (3 min)

10.  **Updates from Superintendent**

11.  **Agenda Items for Next Meeting** (February 26, 2019)
    A.  5 year budget projection; academic interventions (ELA / math)

12.  **Adjournment**

**Upcoming Board Meetings**: *2/26/2019; 3/19/2019; 4/9/2019; 5/14/2019 (regular meeting/budget hearing); 5/21/2019 (election); 5/22/2019 (certify vote, Wed, 8 p.m.); 6/18/2019*

I Pledge Allegiance to the flag of the United States of America
and to the Republic for which it stands,
one Nation under God, indivisible, with liberty and justice for all.

### Board Member Participation in "Public Comment"

During the public comment section(s) of the meeting, board members will listen to comments, but <u>only the president, as the designated spokesperson, may respond if a response if necessary</u> or s/he may defer to others.  Those responses are limited to:

- Correcting misstatements of fact presented by the speaker.

- Referring the speaker to applicable board policy which relates to his or her comments.

- The president may add the item on a future board agenda for discussion if not listed on the current board agenda.

- Members of the public will be cautioned that personnel matters and individual student matters are not proper subjects for public comment.  If the speaker's comments reflect a complaint about personnel, the president will prohibit the speaker from continuing and refer him/her to the appropriate complaint policy.

The board must bear in mind that generally persons who speak during public comment have First Amendment rights, though these rights can be conditioned based upon the subject matter. The board should seek legal advice before disallowing a speaker's contribution to public comment based solely on the viewpoint expressed.