UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

I.S., a minor by and through her mother and
next friend Anais Disla; J.B., a minor by and
through her parents and next friends Ibelyh
Disla and Jose Bristol; I.M., a minor by and
through her mother and next friend Zulayka
McKinstry; and A.S., a minor by and through
her mother and next friend Chanderlia Silva,

                       Plaintiffs,
                                                        3:19-CV-0513
v.                                                      (GTS/MJK)

BINGHAMTON CITY SCHOOL DISTRICT;
BINGHAMTON BOARD OF EDUCATION;
TIM SIMONDS, in his individual and official
capacity; MICHELLE RALEIGH, in her
individual and official capacity; and MARY ELLEN
EGGLESTON, in her individual and official
capacity,

                       Defendants.
_____

APPEARANCES:                              OF COUNSEL:

MORRISON & FOERSTER LLP                   MICHAEL J. DeSTEFANO, ESQ.
   Counsel for Plaintiffs                 HAIMAVATHI V. MARLIER, ESQ.
250 West 55th Street                      JAMIE A. LEVITT, ESQ.
New York, NY 10019

NAACP LEGAL DEFENSE & EDU. FUND, INC.     RACHEL KLEINMAN, ESQ.
   Co-counsel for Plaintiff               ANNE OREDEKO, ESQ.
40 Rector Street, 5th Floor               KATRINA FELDKAMP, ESQ.
New York, NY 10006

700 14th Street NW, Suite 6000            ANUJA DIWAKAR THATTE, ESQ.
Washington DC 20005                       JENNIFER A. HOLMES, ESQ.

GRITTIS LEGAL CLINC                       CARA McCLELLAN, ESQ.
   Co-counsel for Plaintiff
3501 Sansom Street
Philadelphia, PA 19104

WEAVER MANCUSO BRIGHTMAN PLLC          SHANNON T. O'CONNOR, ESQ.
   Counsel for Defendants
16 Oswego Street, Suite 2
Baldwinsville, NY 13207

150 Allens Creek Road, Suite 240          ANNA M. PATTON, ESQ.
Rochester, NY 14618          ERIN ELIZABETH ELMOUJI, ESQ.
                                                 JOHN A. MANCUSO, ESQ.

GOLDBERG SEGALLA LAW FIRM          ASHLEY K. BOISVERT, ESQ.
   Co-counsel for Defendants
5786 Widewaters Parkway
Syracuse, NY 13214

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this civil rights action pursuant to the Fourth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, filed by the above-listed minor Plaintiffs and their parents (collectively "Plaintiffs") against the Binghamton City School District, Binghamton Board of Education, (the "School Defendants"), Principal Tim Simonds, Assistant Principal Michelle Raleigh, and school nurse Mary Ellen Eggleston (collectively the "Defendants"), are the following four motions: (1) Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56; (2) Plaintiffs' cross-motion for partial summary judgment pursuant to Fed. R. Civ. P. 56; (3) Plaintiffs' motion to preclude or limit the testimony of Defendants' expert witness Dr. Robert Demerath; and (4) Defendants' motion to preclude or limit the expert testimony of Plaintiffs' expert witnesses Dr. Jamilia Blake and Dr. Sarah Vinson. (Dkt. Nos. 270, 272, 273, 295.)   For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part, Plaintiffs' cross-motion for partial

2

summary judgment is denied, Plaintiffs' motion to preclude Defendants' expert is granted in part and denied in part, and Defendants' motion to preclude Plaintiffs' expert testimony is granted in part and denied in part.

## I.     RELEVANT BACKGROUND

### A.     Procedural History

Plaintiffs opened this action by filing a Complaint on April 29, 2019.   (Dkt. No. 1.)   On October 1, 2019, Defendants filed a combined motion to dismiss for lack of subject-matter jurisdiction and for judgment on the pleadings.   (Dkt. No. 44.)   This Court granted that motion in part and denied it in part on September 14, 2020.   (Dkt. No. 117.)   Specifically, the Court found that, although it did have subject-matter jurisdiction over the claims asserted by Plaintiffs pursuant to the Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act, those claims should nonetheless be dismissed with prejudice because Plaintiffs had failed to state a claim upon which relief could be granted.   (*Id.* at 12-21.)   As to Plaintiffs' claims that they were subjected to unconstitutional searches by Defendants, the Court dismissed those claims to the extent that they allege that A.S. and J.B. were subjected to a strip search,[1]  but did not dismiss the claims of those Plaintiffs to the extent they allege a less-intrusive

---

[1]      Granted, the "So Ordered" paragraph of the Decision and Order does not expressly state that the dismissal of the strip-search claims of A.S. and J.B. was with prejudice.   (Dkt. No. 117, at 47.)   However, the Court's analysis of this claim included the assessment that "given the breadth and detail of Plaintiffs' Complaint (which was crafted with the assistance of counsel, is forty-one pages in length and has fifty pages of attachments), the Court finds that the above-described defects in Plaintiffs' Complaint are substantive in nature, such that better pleading would not cure them" (indicating that no amendment would be allowed).   (*Id.* at 26.)   In any event, because of the unequivocal language of Fed. R. Civ. P. 41(b), a dismissal that is silent was to whether it is with or without prejudice is on the merits and thus with prejudice. *See* Fed. R. Civ. P. 41(b) ("Unless the dismissal order states otherwise, . . . any dismissal not under this [Rule 41]--except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits."); *cf. Kern v. Hettinger*, 303 F.2d 333 (2d Cir. 1962) ("[I]n the view of the unequivocal language of Rule 41(b), and the absence of

search was performed.   (*Id.* at 21-36.)   As a part of the analysis of that claim, the Court

concluded that Plaintiffs had plausibly alleged involvement by the individual Defendants as well

as a basis for the assertion of *Monell* liability against the School Defendants.   (*Id.*)   The Court

also dismissed without prejudice to renewal Plaintiffs' claims of intentional discrimination

pursuant to the Equal Protection Clause and Title VI on the basis that the statistics and data

relied on by Plaintiffs to show an inference of discrimination predated the relevant events by

three or four years and did not specifically address disparate treatment in the decision to conduct

searches of students, and because the other allegations regarding the individual Defendants (i.e.,

that Defendant Simonds noted the minor Plaintiffs were "hyper and giddy," that Defendant

Eggleston made comments about some of their bodies and attitudes, and that Defendant Raleigh

expressed fear of being left alone with them) were insufficient to plausibly suggest that the

decision to search Plaintiffs was racially motivated.   (*Id.* at 36-45.)   The Court lastly dismissed

with prejudice the claims against the individual Defendants in their official capacities, finding

those to be duplicative of the claims against the School Defendants.   (*Id.* at 45-47.)

Plaintiffs filed a motion for reconsideration of that decision on September 28, 2020,

focusing primarily on the Court's finding that Plaintiffs had not plausibly alleged that A.S. had

been subjected to a strip search.   (Dkt. No. 121.)   The Court denied that motion on November

13, 2020, finding that the Complaint did not explicitly state any facts that A.S.'s action of

---

the words 'without prejudice' [in the order of dismissal on defendants' motion for summary
judgment], we must and do decide that [a] dismissal [that is silent as to whether it is with or
without prejudice is] on the merits and that it [is] intended to be on the merits."); *see, e.g., See
Shockley v. Vermont State Colleges*, 793 F.2d 478, 488-81 (2d Cir. 1986) (relying on a Sixth
Circuit case for the point of law that a "court may presume an adjudication on the merits where
district court fails to specify otherwise [even where the plaintiff is *pro se*]"); *Stern v. Gen. Elec.
Co.,* 942 F.2d 472, 477, n.7 (2d Cir. 1991) (relying on a Fourth Circuit case for the point of law
that "A district court's dismissal under rule 12(b)(6) is, of course, with prejudice unless it
specifically orders dismissal without prejudice").

4

unzipping her sweater to the middle of her chest before zipping it back up revealed her bra and the skin of her torso to Defendant Eggleston's view despite Defendant Eggleston's alleged later comments about A.S. wearing only a bra, particularly in light of the fact that Defendant Eggleston would have plausibly known that A.S. was wearing only a bra underneath her sweater from previously, as Plaintiffs alleged, placing a stethoscope underneath A.S.'s sweatshirt when checking her vitals.   (Dkt. No. 138.)   The Court further clarified that the relevant consideration is whether the actions alleged could constitute a strip search under the standards of the Fourth Amendment, not the School District's own policy.   (*Id.*)

### B.   Plaintiffs' Amended Complaint

On December 14, 2020, Plaintiffs filed a motion to amend the Complaint, which was granted on January 20, 2021.   (Dkt. Nos. 156, 163.)

Generally, in their Amended Complaint, Plaintiffs assert three claims.   (Dkt. No. 163.) First, Plaintiffs claim that all Defendants violated their Fourth Amendment right to be free from unlawful searches by subjecting the minor Plaintiffs to searches of their persons and belongings, variously including vital sign checks and sobriety tests, removal of clothing, shaking or pat-searching of their bodies and belongings, and, as to I.M. specifically, searching the inside of her bra and touching the sides of her breasts ("First Claim").   (*Id.* at ¶¶ 121-50.)   As part of this claim, Plaintiffs argue that the actions of the individual Defendants constituted the official policy of the School Defendants, that the alleged violation of the minor Plaintiffs' Fourth Amendment rights was the result of a failure to train or supervise school staff, and that the School Defendants acted with deliberate indifference to the rights of the minor Plaintiffs.   (*Id.*)

Second, Plaintiffs claim that all Defendants violated their Fourteenth Amendment right to

equal protection under the law by subjecting them to searches based on prejudices and stereotypes related to the minor Plaintiffs' races and gender, which they allege is shown by (1) disparate rates of searches and out-of-school suspensions between White students and students who are Black, Latina, or multiracial, (2) Defendant Simonds' perception that the minor Plaintiffs' "giddy" and "hyper" behavior suggested drug use, (3) Defendant Raleigh's alleged statement that she was afraid to be alone with the minor Plaintiffs, and (4) Defendant Eggleston's description of the minor Plaintiffs as loud, disrespectful, and having attitudes along with her alleged statements to A.S. and I.M. about their breasts ("Second Claim").   (*Id.* at ¶¶ 151-80.) As part of this claim, Plaintiffs again assert that the actions of the individual Defendants constituted the official policy of the School Defendants, that the alleged violation was a result of a failure to train or supervise, and that the School Defendants acted with deliberate indifference to the rights of the minor Plaintiffs.   (*Id.*)

Third, Plaintiffs claim that the School Defendants violated Title VI by intentionally discriminating against them on the basis of race, color, or national origin, in combination with their gender ("Third Claim").   (*Id.* at ¶¶ 181-95.)

### C.   Undisputed Material Facts on Defendant's Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are

essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Given the unusual complexity and volume of the evidence and factual issues in this case, the Court will not set forth the undisputed material facts at the beginning of this Decision and Order (as it would ordinarily do), but will discuss the relevant undisputed material facts when analyzing each of Plaintiffs' claims in the context of the parties' arguments.

### D.     Parties' Arguments on Defendants' Motion for Summary Judgment

#### 1.     Defendants' Memorandum of Law

Generally, in their motion for summary judgment, Defendants assert seven arguments. (Dkt. No. 273, Attach. 14.)   First, as to Plaintiffs' First Claim, Defendants argue that they did not conduct a search as contemplated by the Fourth Amendment (and certainly not a strip search), but rather that Defendant Eggleston's actions in taking the minor Plaintiffs' vital signs and conducting neurological function testing was a health assessment for the purposes of determining the health and well-being of the minor Plaintiffs.   (*Id.* at 15-23.)

Second, Defendants argue that, if a search was conducted by any of the individual Defendants, their conduct complied with the Fourth Amendment because the search was both justified at the inception and reasonably related in scope to the circumstances that provided justification.  (*Id.* at 24-52.)   Specifically, Defendants argue that the search was justified at the inception based on the following facts known to Defendants Simonds and Raleigh in particular at the relevant time: (1) ███████████████████████████████████████ ████████████████████████████████████████; (2) the minor Plaintiffs were walking towards the gymnasium when they left the lunchroom, which was where a ███████████████████████████████████████ ██████; (3) there was a known problem of students in the District, including at East Middle School, making and using a drink containing cough syrup and/or codeine on school grounds during the 2018-2019 school year; (4) administrators were unaware of where the minor Plaintiffs had been or what they had been doing for a period of time after they left the lunchroom; (5) the minor Plaintiffs were acting abnormally when Defendants Simonds and Raleigh found them, including being off-balance, stumbling, falling, propping themselves on walls, laughing or being "giddy" in a manner inappropriate to the situation, acting in ways that were atypical for their normal demeanors, and, as to A.S. in particular, ████████████████████; and (6) the minor Plaintiffs were of an age when drug use can be a valid concern.  (*Id.* at 24-44.) Defendants further argue that the scope of the search conducted was reasonably related to the purpose of the search and not excessively intrusive because assessment of vital signs, urinalysis, blood tests, and searches of shoes, bags, pockets and outer clothing have all been found to be reasonable where there is a sufficient suspicion that a student is engaging in drug use, and that

even more invasive searches can be warranted if the suspicion is strong enough.   (*Id.* at 44-52.)

Third, Defendants argue that the minor Plaintiffs were not intentionally treated differently based on any impermissible consideration of their race and/or gender.   (*Id.* at 52.)   More specifically, Defendants argue that, although the minor Plaintiffs were investigated for possible misconduct, they have stipulated that they were not subject to any discipline or disciplinary referral related to that investigation (and, as a result, any attempt to compare themselves with other students in the School District at large who were disciplined is inapposite and insufficient), and that, nonetheless, the data relied upon by Plaintiffs' expert does not contain sufficient information to show that the relevant students who were searched were similarly situated to the minor Plaintiffs other than as to their race and/or gender.   (*Id.* at 52-59.)   Defendants further argue that, as to the individual Defendants, Plaintiffs have not provided an example of a similarly situated student that those Defendants treated in a different manner.   (*Id.* at 56-57.)   Defendants similarly argue that Plaintiffs cannot show that discriminatory purpose was a motivating factor behind Defendants' choice to search the minor Plaintiffs because they have offered nothing but their own belief that certain alleged actions or comments by the individual Defendants are evidence of discriminatory intent.   (*Id.* at 59-64.)   More specifically, Defendants argue that (1) the minor Plaintiffs themselves have presented inconsistent testimony regarding whether either Defendant Raleigh or Defendant Eggleston made a comment that she was afraid to be left alone with the minor Plaintiffs; (2) there is no evidence to support the assertions that Defendants' analysis of the impropriety of the minor Plaintiffs' conduct in the hallway and in the health office was based on racial or gender stereotypes, particularly because the video evidence corroborates the minor Plaintiffs' behavior in the hallway; (3) a comment allegedly made by Defendant

Eggleston about I.M.'s breasts is not only disputed, but is insufficient to constitute evidence of discriminatory intent; and (4) Defendant Eggleston's alleged comments that the minor Plaintiffs were loud, disrespectful, and had attitudes in response to their conduct in the health office are not indicative of discrimination based on race or gender stereotypes because her assessment is corroborated by the testimony of other individuals present in the health office, including the minor Plaintiffs themselves.   (*Id.*)   Further, as to the School District and the data and conclusions provided by Plaintiffs' expert, the sample size of the expert's statistics is not sufficiently expansive to permit the Court to draw an inference of discrimination.   (*Id.* at 64-66.) Lastly as to this claim, Defendants argue that Plaintiffs cannot assert an equal protection claim under an alternative class-of-one theory because such a claim has been found to be improper in cases where the relevant decision is subjective and individualized, as it was here.   (*Id.* at 67-70.)

Fourth, Defendants argue that Plaintiffs' Third Claim for intentional discrimination by the School Defendants fails as a matter of law because, as already argued, Plaintiffs have not shown a similarly situated comparator and have not even alleged facts plausibly suggesting actual knowledge by the School Defendants of any discrimination, and Title VI nonetheless does not create a private cause of action for disparate impact claims.   (*Id.* at 70-74.)

Fifth, Defendants argue that Defendants Simonds, Raleigh, and Eggleston are all entitled to qualified immunity on the First and Second Claims because their actions did not violate any clearly established law, and it was objectively reasonable for them to believe that their conduct complied with the reasonableness standard.   (*Id.* at 74-80.)

Sixth, Defendants argue that, in the alternative, the Court should apply the standard in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), and *Scott v. Harris*, 550 U.S. 372

(2007), to find the minor Plaintiffs' testimony insufficient to create any genuine dispute of material fact to the extent it is inconsistent with the video evidence in this case because their testimony is contradictory and incomplete.   (*Id.* at 80-87.)

Seventh, Defendants argue that Plaintiffs' *Monell* and Section 1983 claims regarding failure to train should be dismissed.   (*Id.* at 87-93.)   More specifically, Defendants argue that the School Defendants cannot be held legally responsible merely for being the supervisors of individuals engaged in unconstitutional actions, that decisions made by a school principal do not give rise to *Monell* liability unless they also represent the final policy of the municipality (which they do not here), and that Plaintiffs have not shown that the relevant Defendants acted with deliberate indifference given the undisputed evidence that the School Defendants provided training to staff on search policy and procedure.   (*Id.*)

## 2.   Plaintiffs' Opposition Memorandum of Law and Cross-Motion for Summary Judgment

Generally, in opposition to Defendants' motion for summary judgment, Plaintiffs assert seven arguments.   (Dkt. No. 295, Attach. 1.)   First, Plaintiffs argue that the undisputed facts establish that the minor Plaintiffs were subjected to a search by the individual Defendants because, even to the extent that actions of Defendant Eggleston and Defendant Raleigh were health-related, they were still motivated by an intent to determine if the minor Plaintiffs were engaged in activity that violated the Code of Conduct (i.e., drug use), not purely out of concern for the minor Plaintiffs' health.   (*Id.* at 9-14.)

Second, Plaintiffs argue that, as to the First Claim, the record demonstrates that the searches of each of the minor Plaintiffs were unreasonable in particular because they were not justified at the inception.   (*Id.* at 14-59.)   More specifically, Plaintiffs argue that the minor

11

Plaintiffs were missing for only approximately seven minutes between when Defendant Raleigh last saw them near the lunchroom and when Defendant Simonds found them in the hall, and that they were behaving in a manner not unusual for twelve-year-old girls with their friends in a school hallway and also not in a manner that was consistent with the symptoms of consumption of "purple drink" that were put forward in the evidence.  (*Id.*)   Plaintiffs assert that not only should Defendants' motion for summary judgment be denied as to this issue, but also that summary judgment should be granted to Plaintiffs given that no reasonable factfinder could conclude that the search was justified at the inception.

Third, Plaintiffs argue that, also as to the First Claim, even if the searches were justified at the inception, the scope of such searches was not justified.   (*Id.* at 20- 21, 30-34, 37-38, 42-44, 46, 50-51, 53-54, 58-59.)   Plaintiffs characterize the searches of the minor Plaintiffs as follows: (1) A.S. was subjected to a vitals check, a field sobriety test, a search of her shoes and pockets and their contents, instructions to remove her clothing, and a pat down, and she also unzipped her sweater halfway down before zipping it back again when she felt uncomfortable; (2) I.M. was subjected to a vitals check, a field sobriety test, a search of her shoes and pockets, a pat down of her body, and instructions to remove her clothing, as well as a physical search of the band of her bra under her armpits and contact with the sides of her breasts, and removal of both her outer pants and her leggings; (3) I.S. was subjected to a vitals check, a field sobriety test, a search of her pockets, shoes and items, a pat down, and instructions to remove her sweater; and (4) J.B. was subjected to a vitals check, a field sobriety test, and a search of her shoes.   (*Id.*) Plaintiffs argue that the searches were not reasonable in scope because, if the Defendants were concerned that the minor Plaintiffs had ingested or were carrying "purple drink," it was not

reasonable for them to search anywhere other than where something the size of a bottle or ingredients of that substance could be located, and they did not have sufficient belief to justify a strip search of any of the minor Plaintiffs.   (*Id.* at 32, 43-44.)

Fourth, Plaintiffs argue that, as to the Second Claim, there is at least a genuine dispute of material fact as to whether Plaintiffs were discriminated against based on their race or ethnicity. (*Id.* at 59-66.)   More specifically, Plaintiffs argue that they have provided statistical evidence, expert reports, and testimonial evidence that raises a genuine dispute as to whether Defendants were motivated at least in part by the minor Plaintiffs' race or ethnicity, because such evidence shows that the School District had a pattern of searching or disciplining Black and Latino students at higher rates than White students, that Defendants acted in ways that implicate typical forms of racial bias and stereotypes of Black and Latina women and girls, and that the individual Defendants made statements that accord with such racial biases and stereotypes.   (*Id.*) Plaintiffs argue that this evidence is sufficiently reliable, and constitutes evidence of similarly situated individuals given that all of the relevant students in the expert's data set were searched on suspicion of drug use or possession.   (*Id.*)

Fifth, Plaintiffs argue that there are genuine disputes of material fact remaining regarding the liability of the School Defendants under *Monell* and Section 1983.   (*Id.* at 67-70.)   More specifically, Plaintiffs argue that Defendants Simonds and Raleigh are final policymakers regarding searches at East Middle School because they had the ultimate authority to determine whether a student should be searched, and that liability should be imputed to the School Defendants on the basis of such policy.   (*Id.* at 67-70.)

Sixth, Plaintiffs argue that the individual Defendants are not entitled to qualified

immunity, because they violated clearly established law indicating not only that a search of a school student must be reasonable, but also that it must be based on more than just "suspicious" behavior without further specific evidence, such as a credible tip or accusation or identifiable signs and symptoms of the use of "purple drink."   (*Id.* at 70-73.)   Plaintiffs also argue that, as to Defendant Eggleston, only administrators were authorized to conduct searches under the School District's rules, and that, because Defendant Eggleston was not an administrator, she acted outside the scope of her authority when searching the minor Plaintiffs.   (*Id.*)

Seventh, Plaintiffs argue that the evidentiary standards applied in *Jeffreys* and *Scott* do not apply because not only are many of the facts that Defendants seek to repress irrelevant given that they address circumstances of which Defendants had no knowledge at the time they decided to conduct the search (i.e., what the minor Plaintiffs were doing between the time they left the lunchroom and when Defendant Simonds found them), but the ones that are relevant are not clearly or blatantly contradicted by the video.   (*Id.* at 73-75.)

### 3.   Defendants' Reply Memorandum of Law

Generally, in their reply to Plaintiffs' opposition, Defendants assert eight arguments. (Dkt. No. 309, Attach. 3.)   First, as to the First Claim, Defendants argue that Defendant Eggleston's performance of a health assessment did not trigger the protections of the Fourth Amendment because such actions did not constitute a search.   (*Id.* 8-12.)

Second, also as to the First Claim, Defendants argue that the searches conducted by Defendant Raleigh were justified at the inception, because they were based on reasonable suspicion that the minor Plaintiffs might be under the influence of a prohibited substance when the totality of the circumstances are considered given the fact their whereabouts were unknown

for a period of nearly ten minutes, there was a documented concern regarding the use of "purple drink" by students in the School District and East Middle School, and Defendants witnessed various unusual and concerning behaviors including a ████████████████, personality changes, laughter that was inappropriate to the situation, falling, and fidgeting-type behaviors.  (*Id.* at 12-25.)

Third, also as to the First Claim, Defendants argue that the search was reasonable in scope.  (*Id.* at 25-35.)   Defendants highlight that any strip search allegations as to A.S. and J.B. have already been dismissed by the Court, and the only search allegations remaining related to those two Plaintiffs are for a less invasive investigatory search.  (*Id.* at 25.)   As to I.M., Defendants argue that, although she has asserted facts that conflict with the testimony of Defendants Eggleston and Raleigh regarding the search, it is undisputed that she was wearing a tank top even after she removed her sweater, her report that she was patted down is contradicted by her sworn interrogatory response, she has provided inconsistent testimony regarding the removal of her pants and leggings, and she has not asserted that Defendant Raleigh did anything more than direct I.M. to empty her pockets, remove her shoes, retrieve her bag and empty the contents of that bag, and then inspect the items produced.  (*Id.* at 25-28.)   As to A.S., Defendants argue that the search was limited to a check of her vital signs, a neurological assessment, and emptying her pockets and shoes, and that the alleged pat down and requests to unzip her sweatshirt are not substantiated.  (*Id.* at 28-32.)   As to I.S., Defendants argue that the search was limited to a check of her vital signs, a neurological assessment, and search of her pockets and shoes, and that any other allegations, such as that Defendant Eggleston told her to remove her sweater or patted her down, are not substantiated or credible.  (*Id.* at 32-33.)

Lastly, as to J.B., Defendants argue that the search was limited to a check of her vital signs and a check of her eyes; she admits she was not asked to remove any clothing and was made to briefly remove her shoes and shake them.   (*Id.* at 33-35.)

Fourth, as to the Second Claim, Defendants argue that Plaintiffs have failed to raise a genuine dispute of material fact regarding whether Defendants engaged in intentional discrimination because they have failed to establish a prima facie case for their equal protection claim.[2]   (*Id.* at 35-43.)   More specifically, Defendants argue that Plaintiffs have not shown any similarly situated comparator because the statistics presented by Plaintiffs' expert are flawed and insufficient, and newly asserted comparator White students that were allegedly treated less harshly by Defendant Simonds upon being suspected of substance use were not students at East Middle School, were actually searched more thoroughly by Defendant Simonds in those instances given that he did not directly search, or order searches of, the minor Plaintiffs, and the relevant instances related to those students occurred anywhere between 2006 and 2012, well before the events in this case.   (*Id.* at 37-38, 41-43.)   On the issue of evidence of bias, Defendants argue that, contrary to Plaintiffs' arguments, Defendant Raleigh's concern that all of the minor Plaintiffs ███████████████████████████████████ was not based on racial stereotypes of Black and Latina girls as violent, but on her awareness that ████████ ████████████████████████████████████████████████████████████████ ████████████████████   (*Id.* at 38-39.)   They further argue that the Defendants' various descriptions of Plaintiffs' behavior are not evidence of bias, but an accurate depiction that is

---

[2]    As part of this argument, Defendants argue that Plaintiffs failed to oppose their argument regarding the invalidity of a class-of-one theory as to an equal protection claim, and their argument regarding the Third Claim against the School Defendants.   Defendants rightly point out that Plaintiffs do not directly address either of these arguments in their opposition memorandum of law.

corroborated by the minor Plaintiffs' own testimony.   (*Id.* at 39-40.)

Fifth, Defendants argue that Plaintiffs' *Monell* claim fails as a matter of law because Plaintiffs cannot show that Defendant Simonds was a final policymaker pursuant to the Second Circuit's decision in *Agosto v. New York City Dept. of Edu.*, 982 F.3d 86 (2d Cir. 2020), and the New York State Education Law, which places policymaking authority with the chancellor (or superintendent) rather than a principal or assistant principal.   (*Id.* at 43-47.)   Defendants also argue that, given their failure to argue it on this motion, Plaintiffs have waived their failure-to-train theory related to this claim.   (*Id.* at 43-44.)

Sixth, Defendants argue that Plaintiffs have not adequately challenged their assertion that qualified immunity applies for the individual Defendants, because they have failed to adduce any clearly established law that would preclude that defense in this case.   (*Id.* at 47-52.)   More specifically, Defendants argue as follows: (1) Defendant Eggleston is entitled to qualified immunity because she did not act outside the scope of her authority but merely performed a health assessment, and in any event the law related to searches by school nurses is so unsettled that there is no clearly established law on this point; (2) Plaintiffs' framing of the right as "the right to be free from unreasonable searches" is impermissibly broad; (3) Defendant Simonds did not directly participate in the searches and did not order Defendant Eggleston to conduct an investigatory search, and there was no clearly established law that stopping students in the hallway to inquire about their whereabouts, escorting them to the health office to be examined, and conferring with the assistant principal regarding a limited search for substances based on observations of abnormal behavior violates the Fourth Amendment; and (4) Defendant Raleigh's conducting a search of the minor Plaintiffs' shoes and belongings was objectively reasonable

17

based on the circumstances and there was no clearly established law to indicate that such actions violate the Fourth Amendment.   (*Id.*)

Seventh, Defendants argue that the Court may properly apply the principles of *Jeffreys* and *Scott* in this case because Plaintiffs have admitted that any facts shown by the video evidence are undisputed, and they are therefore not entitled to any inference in their favor as to what the video shows, and their accounts of certain events, including their own behavior in the hallway, are contradicted by the video.   (*Id.* at 52.)

Eighth, Defendants argue that Plaintiffs' cross-motion for summary judgment is both untimely because it was filed well after the November 30, 2022, deadline for dispositive motions, and nonetheless fails to meet their burden on the one element of Plaintiffs' First Claim for which they seek judgment.   (*Id.* at 53-56.)

###    E.    Parties' Arguments on Plaintiffs' Motion to Exclude Expert Testimony

####          1.    Plaintiffs' Memorandum of Law

Generally, in their motion to exclude (from consideration both of the parties' cross-motions for summary judgment and at trial) the testimony of Dr. Robert Demerath, Plaintiffs make three arguments.   (Dkt. No. 270, Attach. 1.)   First, Plaintiffs argue that his opinions regarding the minor Plaintiffs' credibility are inadmissible because they are irrelevant, not helpful to the factfinder, and unfairly prejudicial.   (*Id.* at 23-27.)   They further argue that all opinions contained in Dr. Demerath's report that flow from his credibility assessment of the minor Plaintiffs also must be excluded.   (*Id.*)

Second, Plaintiffs argue that Dr. Demerath's conclusions are unreliable because they are not based on any articulable methodology and rest on a speculation.   (*Id.* at 27-32.)

Specifically, Plaintiffs argue that the testing Dr. Demerath conducted provides only a snapshot of the minor Plaintiffs' functioning years removed from the January 15, 2019, incident and, even combined with his review of records, does not provide any support for his conclusion that the minor Plaintiffs' mental health concerns were caused by factors other than Defendants' conduct. (*Id.* at 28-31.)   They further argue that he does not include the scaled scores related to those tests and in fact does not base his conclusions on the scaled scores, but on an inappropriate assessment of the raw data.   (*Id.*)   Moreover, they argue that many of his conclusions are entirely speculative and lack any discernable foundation or valid explanation.   (*Id.* at 31-32.)

Third, Plaintiffs argue that Dr. Demerath is unqualified to render opinions on matters related to racial discrimination, because (a) he has admitted that he has no specialized knowledge, training, or expertise related to racial discrimination and has not been produced as an expert in such topic, and (b) he also lacks any expertise related to statistical analysis to rebut Dr. Blake's report and has not conducted any statistical analyses of his own to support his opinions regarding Dr. Blake's conclusions.   (*Id.* at 32-36.)

## 2.      Defendants' Opposition Memorandum of Law

In opposition to Plaintiffs' motion, Defendants make six arguments.   (Dkt. No. 290, Attach. 22.)   First, Defendants argue that Dr. Demerath is qualified by his education and experience to provide the relevant testimony regarding the Plaintiffs' claims of psychological harm and mental anguish and to rebut Dr. Blake's opinion.   (*Id.* at 19-24.)

Second, Defendants argue that Plaintiffs' challenges to Dr. Demerath's testimony and opinions go to the weight rather than the admissibility of his expert testimony and therefore are improper, because they take issue with his conclusions rather than his methodology for arriving

19

at those conclusions, and because they are incorrect that Dr. Demerath did not interpret scaled scores when writing his expert report.   (*Id.* at 25-27.)

Third, Defendants argue that Dr. Demerath should be permitted to opine on whether the minor Plaintiffs are reliable, because such opinions are the product of his evaluations of the minor Plaintiffs and not, as Plaintiffs argue, opinions as to credibility.   (*Id.* at 27-31.)

Fourth, Defendants argue that Plaintiffs' argument that Dr. Demerath is not qualified to testify regarding issues of racial bias is without merit, because Dr. Demerath has not been offered as an expert on that topic and, to the extent that he has made some comments in his report related to such issues, he has research and other professional experience that make him qualified to opine on racial bias to the limited extent necessary to contextualize the data and his opinions.   (*Id.* at 31-32.)

Fifth, Defendants argue that Dr. Demerath's testimony and reports are reliable because they rest on an accepted methodology that involved reviewing relevant records, analyzing generally accepted test questionnaires completed by the minor Plaintiffs and their guardians, and conducting examinations of the minor Plaintiffs and their guardians via videoconferencing software, all of which is standard practice used by psychologists.   (*Id.* at 34-43.)

Sixth, Defendants argue that Dr. Demerath's testimony will assist the trier of fact in determining whether the minor Plaintiffs suffered mental anguish as a result of the events that occurred on January 15, 2019, and the presentation of his testimony will not be unduly prejudicial to Plaintiffs (*Id.* at 44-45.)

### 3.    Plaintiffs' Reply Memorandum of Law

Generally, in reply to Defendants' opposition, Plaintiffs make four arguments.   (Dkt. No.

306.)   First, Plaintiffs argue that Dr. Demerath's opinions and testimony related to the minor Plaintiffs' credibility must be excluded as an improper use of expert testimony.   (*Id.* at 5-9.)

Second, Plaintiffs argue that their challenges to Dr. Demerath's methodology and conclusions go to the admissibility of his testimony because, although he may have used generally accepted evaluations and tests, there is no explanation as to how such evaluations and tests or his review of records informed or support his conclusions.   (*Id.* at 10.)

Third, Plaintiffs argue that Dr. Demerath is unqualified to testify regarding racial bias and discrimination or to rebut Dr. Blake's testimony, noting that Defendants have conceded that Dr. Demerath was not offered as an expert on such matters and that his general experience in the areas of either racial bias or the use of statistics to analyze racial discrimination is insufficient to qualify him to render any opinions on those matters.   (*Id.* at 11-13.)

Fourth, Plaintiffs argue that Dr. Demerath's failure to consider the impact of the events on January 15, 2019, on the minor Plaintiffs' mental states renders his testimony unreliable, because a differential diagnosis evaluation such as he applied requires that the expert must not only rule out some causes of the relevant alleged symptoms, but must also rule out the specific possibility that is asserted to be the cause, and Dr. Demerath does not rule out the events of January 15, 2019, as a potential cause of the minor Plaintiffs' mental health symptoms.   (*Id.* at 13-14.)

### F.      Parties' Arguments on Defendants' Motion to Exclude Expert Testimony

#### 1.      Defendants' Memorandum of Law

Generally, in their motion to exclude (from consideration both of the parties' cross-motions for summary judgment and at trial) the expert testimony of Dr. Jamilia Blake and

21

Dr. Sarah Vinson, Defendants make two arguments.   (Dkt. No. 272.)   First, Defendants argue that Dr. Blake fails to satisfy any of the four elements required of expert testimony under Fed. R. Evid. 702.   (*Id.* at 14-31.)   They specifically argue that her experience and proposed testimony are deficient in the following four respects: (a) she lacks scientific, technical or other specialized knowledge that will assist a trier or fact; (b) her testimony is not based on sufficient facts or data because the information she relied upon is both incomplete and misrepresentative; (c) her testimony is not the product of reliable principles and methods; and (d) she failed to apply the principles and methods to the facts of the case in a reliable manner.   (*Id.*)

Second, Defendants argue that Dr. Vinson's proposed testimony should be excluded because it is not the product of reliable principles and methods, given that she failed to review any of the minor Plaintiffs' medical records before conducting her evaluations and did not perform any further evaluations after reviewing those records.   (*Id.* at 32-33.)

### 2.      Plaintiffs' Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiffs make two arguments.   (Dkt. No. 292.)   First, Plaintiffs argue that Dr. Vinson is a qualified expert who used and applied recognized methods when rendering her opinions, and her testimony will be helpful to a trier of fact.   (*Id.* at 9-16.)   Specifically, Plaintiffs argue that her opinions were based on a review of medical literature, a review of Plaintiffs' medical and school records, and a thorough mental status examination, and that she applied reliable principles because she (a) conducted in-person psychiatric evaluations of the minor Plaintiffs, (b) considered alternative sources of their trauma, and (c) extensively reviewed Plaintiffs' records and peer-reviewed literature in a manner that is consistent with well-recognized, accepted, and reliable methodologies.   (*Id.*)

Second, Plaintiffs argue that Dr. Blake's opinion meets all the requirements for admissibility under Fed. R. Evid. 702. (*Id.* at 16-34.) Specifically, Plaintiffs argue that (a) Dr. Blake has relevant experience, education, and expertise in evaluating disparate educational experiences and outcomes for Black and Latina girls in primary schools that will be helpful to the trier of fact related to Plaintiffs' equal protection and Title VI claims, (b) her opinions as to both her review of the literature and her statistics are based on sufficient facts and data, and (c) her use of empirical literature and statistical disproportionality assessments are reliable methodologies and she properly applied those to the facts of this case. (*Id.*)

### 3.    Defendants' Reply Memorandum of Law

Generally, in reply, Defendants argue that Dr. Blake's conclusions are the product of unreliable methodologies that were improperly applied to the facts of the case for the following reasons: (a) the fact that her statistical analysis has been peer-reviewed is only one factor in the analysis and other courts have found use of a similar "risk-ratio" method to be deficient; (b) her conclusions are not supported by her analysis and are based on a selective review of the relevant data; (c) her application of the methodology does not consider any of the objective factors for discipline used by New York state public schools; and (d) her analysis does not account for alternative explanations, and the numbers she reported for both school enrollment and searches are not consistent with the numbers actually contained within the relevant data on which she purported to rely. (Dkt. No. 307.)

## II.    GOVERNING LEGAL STANDARDS

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as

a matter of law."   Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]."   *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3]   As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."   *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ.

P. 56(a), (c), (e).[4]

     Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute.

     Of course, when a non-movant willfully fails to respond to a motion for summary

---

[3]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to
create a genuine issue of fact."   *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)
[citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than
simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[4]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to
the movant's Statement of Material Facts, which admits or denies each of the movant's factual
assertions in matching number paragraphs, and supports any denials with a specific citation to
the record where the factual issue arises.   N.D.N.Y. L. R. 7.1(a)(3).

judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[5]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[6]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument

---

[5]       Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[6]       *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.     ANALYSIS

### A.     Whether Summary Judgment Is Appropriate on Plaintiff's First Claim

After careful consideration, the Court answers this question in the affirmative as to the Fourth Amendment claims asserted by I.S., J.B., and A.S. (such that summary judgment should be granted to Defendants on those Plaintiffs' claims), but in the negative as to the Fourth Amendment claim asserted by I.M.

The "[Fourth] Amendment's prohibition against unreasonable searches and seizures applies to searches conducted by public school officials." *New Jersey v. T.L.O.,* 469 U.S. 325, 333 (1985).   However, it is well settled that, "'while children assuredly do not shed their constitutional rights . . . at the schoolhouse gate, . . . the nature of those rights is what is appropriate for children in school.'" *Morse v. Frederick,* 127 S.Ct. 2618, 2627 (2007) (quoting *Veronica Sch. Dist. 47J v. Acton,* 515 U.S. 646, 655-56 [1995] [internal quotations omitted]) (omissions in original).   Thus, "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O.,* 469 U.S. at 340. Specifically, "school officials need not obtain a warrant before searching a student who is under their authority." *Id.*

A Fourth Amendment search or seizure is reasonable if it was (1) justified at its inception, and (2) reasonably related in scope to the circumstances with justified the seizure in the first place.   *T.L.O.,* 469 U.S. at 341-42.   "Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school," while "[s]uch a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction."   *Id.*

This standard of reasonableness "stops short of probable cause," and is instead a "reasonable suspicion" standard.   *Safford Unified School Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009).   The knowledge requirement can therefore be described as "a moderate chance of finding evidence of wrongdoing," as opposed to the "fair probability" or "substantial chance" standard applicable in other law enforcement contexts.   *Redding*, 557 U.S. at 371.   In determining whether a search is justified in both the inception and the extent, a court can look to the degree to which known facts imply prohibited conduct, the specificity of the information received, and the reliability of the source, but such factors do not "rigidly control" and the relevant standards are 'fluid concepts that take their substantive content from the particular contexts' in which they are being assessed."

The Second Circuit has explicitly extended the standard outlined in *T.L.O.* to strip searches, but has found that a high level of suspicion is required before such an intrusive search can be conducted.   *Phaneuf v. Fraikin*, 448 F.3d 591, 596 (2d Cir. 2006).

### 1.    Whether a Search Was Conducted

The Fourth Amendment is not triggered unless a search or seizure has occurred.   Some courts within the Second Circuit have held that assessments conducted for medical purposes are not searches under the Fourth Amendment; however, those cases also recognize that medical assessments conducted for investigative purposes are considered searches.   *See, e.g., Masciotta v. Clarkstown Cent. Sch. Dist.*, 136 F. Supp. 3d 527, 538-39 (S.D.N.Y. 2015) (collecting cases).

Defendants argue, as an initial matter, that no search occurred because the examination by Defendant Eggleston was a health assessment of the safety and wellbeing of the minor Plaintiffs, not an investigative search.   (Dkt. No. 273, Attach. 14, at 15-23.)   It is true that at least a portion of the actions performed by Defendant Eggleston, such as checking the minor Plaintiffs' eyes and pulse and performing a neurological examination, appear directed toward the permissible purpose of conducting a medical evaluation to determine whether the minor Plaintiffs may have ingested a substance and whether any medical intervention might be necessary and appropriate.   It is undisputed, however, that, in addition to the examination performed by Defendant Eggleston, Defendant Raleigh had every minor Plaintiff (with the exception of J.B.) take off their shoes and empty their pockets or bags, actions that do not reasonably have a health-related purpose.   Defendants have not presented any argument as to why a search for items in the minor Plaintiffs' shoes or pockets was necessary for assessing their health and well-being, and the cases they cite, which address the performance of medical procedures such as urine or blood tests, x-rays, removal of clothes to address a flea infestation, or a visual examination of a student's genitals to address complaints of symptoms in that area, do not contemplate such actions.   (Dkt. No. 273, Attach. 14, at 16-18.)   Further, beyond the

28

undisputed actions of requiring the minor Plaintiffs to take off their shoes and empty their pockets (with the exception of J.B.), there are also a number of relevant disputed facts that even more strongly suggest a search occurred in conjunction with any permissible health assessment Defendant Eggleston conducted: J.B. testified that she was directed to take off her shoes and shake them (although this is not corroborated by either Defendant Eggleston or Defendant Raleigh); I.M. testified that Defendant Eggleston directed her to pull the bottom of her tank top away from her body and shake it, that she was patted down along her arms, legs, and torso, that she was directed to take off her sweatshirt and pull down both her outer sweatpants and then her leggings (requests with which she complied), and that Defendant Eggleston touched under her bra band by her armpits and along the side of her breasts; I.S. testified that Defendant Eggleston patted her body down during the exam; and A.S. testified that Defendant Eggleston asked her to unzip her sweater, which she did briefly before closing it again, and that she was patted down along her whole body.   (Exh. EE, at 243-50; Exh. GG, at 183, 213-42; Exh. II, at 128-39; Exh. KK, at 273-79, 292, 207-98, 342-43.)   Thus, in addition to the fact that the undisputed actions of Defendant Raleigh in requiring the minor Plaintiffs (with the exception of J.B.) to take off their shoes and empty their pockets or purses appear sufficient to constitute a search beyond what was required for any permissible health-assessment purposes, there are other actions that are sufficient to create a genuine dispute of material fact as to whether the actions of both Defendant Eggleston and Defendant Raleigh with all of the minor Plaintiffs constituted searches that are subject to the Fourth Amendment.

### 2.     Whether the Searches Were Justified at the Inception

Because the Court has found that the minor Plaintiffs were searched, or that at the very

least there is a genuine dispute of material fact regarding whether such searches occurred, the next inquiry is whether those searches were justified at the inception.   As was discussed above, this is subject to a reasonable suspicion standard that is lower than probable cause.   *Redding*, 557 U.S. at 370.   In determining whether a search was justified at its inception, such assessment "necessarily requires us to base our determination on only those facts known to the school officials prior to the search."   *Phaneuf*, 448 F.3d at 597.

In this case there is testimony regarding what Defendants Simonds, Raleigh, and Eggleston observed, as well as video evidence from the school's hallway security cameras that shows the minor Plaintiffs at relevant times during which those sources observed them before they were sent into the nurse's office.   In instances where a video indisputably establishes certain facts, contrary evidence is insufficient to create a genuine dispute of material fact and may be disregarded.   *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (noting that, while it is not the duty of a district court to weigh the credibility of the parties on a summary judgment motion, a court may disregard a version of events that is based solely on the party's own contradictory and incomplete testimony so long as there is no evidence in the record upon which a reasonable factfinder could find in the party's favor).   The Court's analysis will therefore start with what the video evidence shows.

Footage from Camera 31 shows Defendant Simonds arriving at the corner by that camera and first seeing the minor Plaintiffs at approximately 12:58:52.   At that moment, one of the

30

minor Plaintiffs (I.S.) is laying on her back approximately in the middle of the hallway with her legs up in the air.   He stands in place, appearing to use his radio while observing I.S. roll over to stand up; another of the minor Plaintiffs (A.S.) moves in front of I.S. and begins to walk towards Defendant Simonds.   Once I.S. is standing, all four of the minor Plaintiffs begin to walk in the direction of Defendant Simonds.   As they approach, Defendant Simonds beckons them with his hand and then begins to walk down the other hall, still watching the minor Plaintiffs.   Defendant Simonds steps out of the frame of the camera, and although A.S. is still in his line of sight as she walks in the opposite direction towards the D stairwell, the other three minor Plaintiffs are further down the other hallway and would not have been visible to him at this time.   Those three minor Plaintiffs appear to be talking and laughing, with an instance of I.M. appearing to lean slightly against the wall while J.B. comes up behind her.   I.M. walks into an alcove while J.B. and I.S. watch her, appearing to be laughing.   J.B. follows I.M. into the alcove and neither are visible for a moment until I.M. emerges back into the hallway, again appearing to be laughing. While that is occurring, A.S. is walking in the direction Defendant Simonds had gone, and I.S. is walking off to the side of J.B. and I.M., looking in the direction where Defendant Simonds had gone.   J.B. emerges from the alcove, smiling or laughing while looking in the direction of I.S., before following A.S. and I.M. out of view of the camera in the direction Defendant Simonds had gone.   While J.B. is exiting from view of the camera, I.S. leans over, placing her left hand on her left knee; I.S. stands bent over for multiple seconds before the camera footage ends.

Footage from Camera 30 begins at 12:59:18, approximately the time when A.S. had turned around to walk towards Defendant Simonds after walking into the D stairwell; none of the other minor Plaintiffs would be visible to Defendant Simonds from his vantage point at that time.

This is also approximately the time that Defendant Raleigh appears to have seen the minor Plaintiffs (starting with only A.S. at this point), as she can be seen walking towards Defendant Simonds from the other side of the hallway.   Defendant Simonds watches as A.S. walks toward him; A.S. is looking over towards the other minor Plaintiffs who are still down the other hallway. He watches A.S. walk forward past the hallway she had come from, but then take a few steps backward to again watch I.M. and J.B. (who are not yet visible on the camera).   She turns back toward Defendant Simonds and begins walking in his direction, but again looks back at I.M. and J.B. while walking.   Defendant Simons watches I.M., I.S., and J.B. emerge into view. Defendant Raleigh reaches Defendant Simonds at approximately the same time as I.M. and A.S., while J.B. is slightly farther behind them and over towards the right wall and I.S. is leaning forward holding her left leg.   As Defendant Raleigh appears to speak with A.S. and I.M., J.B. continues to walk along the right wall, looking away from Defendants Simonds and Raleigh and touching a poster before stopping and turning around to face them.   I.S. stands up and begins to walk towards the group while J.B. is observed to be speaking with Defendants Simonds and Raleigh.   While Defendant Raleigh speaks to J.B., J.B. leans her back against the wall behind her, and I.S. joins the group, between I.M. and J.B., once again leaning down to hold her left leg with her left arm.   J.B. appears to adjust something around her waist while I.S. leans down further to touch her left foot with her left arm.   J.B. adjusts her jacket and then her headscarf, while I.S. stands up and adjusts her hair before turning to drink at the water fountain a few steps behind her.   J.B. continues to adjust her scarf while A.S. moves her hands first to her waist and then to adjust the hood of her sweatshirt; simultaneous with A.S.'s movements, I.M. swings her arms back and forth along the side of her body multiple times.   I.S. walks back to the group and

again leans over, this time appearing to put her hands on both knees.   I.M. takes a step to the side and turns to A.S., gesticulating in A.S.'s direction and appearing to speak with A.S., to which A.S. appears to respond with speech and some gestures.   I.M., swinging her arms again and then making more gestures, appears to be speaking, at which point J.B. appears to throw her head back and laugh; I.M. also appears to laugh, covering her face with one hand and moving around in place.   I.M. continues to talk and gesture, and it appears that J.B. and I.S. are smiling or laughing in response; A.S. appears to be standing with her arms crossed.   J.B. continues fixing her scarf, I.M. swings her arms by her side, and I.S., who has since stood up straight, appears to adjust the back of her sweatshirt.   I.M. swings her arms more while A.S. and I.S. look around the hallway.

After a period where the four minor Plaintiffs stand in place and appear to be listening to either Defendant Simonds or Defendant Raleigh speaking, J.B. leans her back against the wall, followed a few seconds later by I.S.   I.M. swings one of her arms and appears to speak, continuing to swing her arm as Defendant Raleigh speaks.   I.M. speaks with Defendant Raleigh, moving around a few steps, scratching her head and gesturing with her arms.   J.B. and I.S. look over towards something happening at the other end of the hallway.   J.B. leans back against the wall, comes forward slightly, then back again, and appears to roll her back once or twice slightly against the corner of the shallow alcove while laughing.   J.B. appears to gesture in the direction of the D Stairwell, at which point everyone looks in that direction before I.M. continues to speak with Defendant Raleigh.   All four minor plaintiffs look in the direction of the D stairwell, after which an unrelated person walks into the frame and past the group.   I.M. begins pulling on the back and sides of her pants while J.B. and I.S. are still leaned slightly against the wall.   A.S.

appears to speak and J.B. throws her head back laughing.   I.M. and I.S. speak as I.M. takes a

few small steps around and begins pulling on the sides of her pants again.   J.B. rolls her back on

the corner of the wall once and I.M. gestures to A.S. as Defendant Simonds turns to speak

closely with Defendant Raleigh.   I.M. bends forward and she and J.B. appear to be laughing.

They continue laughing as I.M. stands up with her hands on her face and J.B. turns to put her

face into the shallow alcove behind her.   A.S. points a hand at I.M. and appears to talk to

Defendant Raleigh as I.M. continues to hold her hand to her face before beginning to speak and

gesture again.   J.B. has returned to leaning her back against the corner of the alcove looking in

the direction of Defendant Simonds and Defendant Raleigh. As Defendant Raleigh walks toward

the health office, A.S. appears to be speaking, J.B. appears to be laughing and moving a few

steps down the hallway, and I.M. is moving, gesturing, and appearing to speak to A.S.   J.B. and

I.M. appear to laugh again.   J.B. jumps slightly with her arms in the air, still laughing, and A.S.

turns around and appears to also be laughing.   J.B. makes more gestures and they begin to

follow Defendant Simonds into the health office, J.B., I.M. and I.S. all laughing while A.S.

walks behind Defendant Simonds with her arms crossed over her chest.   They continue to laugh

as they walk, and I.S. squats for a moment, holding her left leg before continuing to walk

appearing to mime something as a joke to A.S.   J.B. leans forward slightly to touch I.M.'s back

before standing and laughing with I.S., after which they follow the others into the health office.

　　　This video evidence, while certainly showing some behavior by the minor Plaintiffs that

is open to interpretation, presents an objective account of what the minor Plaintiffs were doing

throughout the encounter with Defendant Simonds and Defendant Raleigh.   To the extent that

both parties have offered their own interpretations of the minor Plaintiffs' behavior, this video

evidence provides an objective view of that behavior, and any such interpretations or contrary accounts must be rejected where they are clearly inconsistent with what the video shows. *Scott*, 550 U.S. at 380.

Further, regarding what was known to Defendants at the time the search was conducted, there is undisputed evidence that (1) Defendant Raleigh saw the minor Plaintiffs exit from the lunchroom using a door that was other than the one they would be expected to be use for the lunchtime activity in which they were all enrolled, and that was closest to the gymnasium; (2) Defendant Raleigh was aware at that time that ████████████████████████████ ██████████████████████████████████████████████ ██████████████████████; (3) Defendant Raleigh was aware that ████████████████████ ████████████████████████████████████████████████; (4) Defendant Raleigh was concerned that ██████████████████████████████ ██████████████████████; (5) Defendant Raleigh lost sight of the minor Plaintiffs and did not know where they went at that time, such that she used her radio to call other administrators to attempt to locate them; (6) through their search, Defendant Raleigh and Defendant Simonds were aware that the minor Plaintiffs had not checked in at the classroom where their lunchtime activity was being held; and (7) when Defendant Simonds finally saw Plaintiffs in the hallway at approximately 12:58:52 according to the video from Camera 31, approximately seven minutes had elapsed since when Camera 16 showed the minor Plaintiffs leaving the cafeteria at approximately 12:52.

In addition to the video evidence, the depositions and/or declarations of Defendant Simonds, Defendant Raleigh, Defendant Eggleston, the four minor Plaintiffs, and non-parties

Resource Officer Arthur Williams and teacher Glenmarie Green-Gonzales all provide accounts of the minor Plaintiffs' behavior at the relevant time.[7]  Defendant Simonds, Defendant Raleigh, Defendant Eggleston, Resource Officer Williams and Ms. Green-Gonzales all testified that, at various points throughout the encounter on January 15, 2019, the minor Plaintiffs were acting in a manner that was at odds with their normal presentations, were laughing excessively, and, particularly while they were in the health office, were acting in a disruptive manner.   (Exh. MM., at 248-78, 319-22; Exh. NN, at 167-82, 207-08; Exh. OO, at 186-87, 193-94, 207-08, 227-33, 316-18; Exh. RR, at 48-51; Exh. VV, at 75-79, 82, 88-91.)   The minor Plaintiffs admit they had been in the hallway when they were not supposed to be and were laughing and joking during the encounter with Defendant Simonds and Defendant Raleigh in the hallway and also in the health office.   (Exh. EE, at 172, 197-98, 209-10, 223-24; Exh. GG, at 162-63, 189-90, 204-06; Exh. II, at 80, 82, 86, 206; Exh. KK, at 240-41, 255-56, 258-59, 262-63, 265, 267, 272, 306, 313, 319.)

Considering all of this evidence, the undisputed facts regarding the minor Plaintiffs' behavior at the relevant time as clearly substantiated by the video evidence are as follows: (1) Defendant Simonds observed I.S. lying in the hallway with her legs in the air; (2) Defendant

---

[7]       The Court notes that Resource Officer Williams and Ms. Green-Gonzales did not, by their own admissions, observe the minor Plaintiffs' behavior during the time period between when the minor Plaintiffs left the cafeteria and when they were brought into the health office by Defendant Simonds and Defendant Raleigh at approximately 1:03 p.m.   (*See* Camera 30 Video [showing Defendants Simonds and Raleigh and the minor Plaintiffs entering the health office].)   Rather, neither of them observed the minor Plaintiffs' behavior until after they were already in the health office and at least one of the minor Plaintiffs had already been examined and searched by Defendant Eggleston and/or Defendant Raleigh.   (Camera 30 Video [showing that Resource Officer Williams arrived at the health office at approximately 1:15:15; Exh. RR, at 45 [stating that Ms. Green-Gonzales was called to the health office to translate for an injured student at approximately 1:25 p.m.].)   As a result, their testimony is of somewhat lesser probative value regarding the question of what was known before the search was initiated, other than to the extent it corroborates behaviors or information already known to Defendant Simonds, Defendant

Simonds observed A.S. attempt to go into the D stairwell instead of following him down the hallway in the other direction; (3) Defendants Simonds and Raleigh observed the minor Plaintiffs laughing at various times throughout the encounter while those Defendants were attempting to speak with them, including an instance in which J.B. threw her head back in laughter, I.M. leaned down or "doubled over" with laughter, and J.B. turned and leaned her face into a corner while laughing; (4) Defendants Simonds and Raleigh observed I.S. bending down while standing; (5) Defendants Simonds and Raleigh observed that I.M. was, at various times, swinging her arms back and forth repeatedly and pulling at her pantlegs; (6) Defendant Simonds and Defendant Raleigh observed both J.B. and I.S. leaning their backs against the wall for a portion of the encounter; (7) Defendant Simonds and Defendant Raleigh observed that J.B., while leaning against the corner of a wall, "rolled" and bounced against the corner at times; (8) Defendant Simonds observed that, in response to something said near the end of the hallway encounter, J.B. laughed and spun around as she moved down the wall before again throwing her head back and moving in a seemingly unsteady manner; and (9) as Defendant Simonds was walking with the minor Plaintiffs to the health office, I.S., I.M., and J.B. are clearly seen to be laughing on the video.

Also relevant to the analysis is the evidence regarding Defendants' knowledge of substance use activity within both the District broadly and specifically within East Middle School.   It is undisputed that a bulletin had been sent to parents, administrators, and faculty in December 2018 around the time of the holiday break regarding an incident in which a student displayed serious symptoms related to use of "purple drink" at Binghamton High School.   (Dkt. No. 273, Attach. 8; Exh. MM, at 279-80; Exh. NN, at 173-75.)   Defendant Simonds and

---

Raleigh, and Defendant Eggleston.

Defendant Raleigh corroborate that, during November 2018, administrators at East Middle School had found students in possession of the ingredients to make "purple drink," empty bottles of cough syrup had been found in the building and stairwells (specifically, four or five bottles for cough syrup with codeine), Defendant Raleigh had been informed by an asset protection worker at a store near to East Middle School that cough syrup was being stolen from that store, East Middle School students were prohibited from bringing outside drinks starting in January 2019 as a result of concerns over "purple drink" in the school, and Resource Officer Williams had overheard students talking about "laced Gatorade" and he had personally found several unopened bottles of Gatorade hidden in the ceilings of the East Middle School bathrooms.   (Dkt. No. 273, Attach. 6, at ¶¶ 5-7; Dkt. No. 273, Attach. 8; Exh. MM, at 280; Exh. NN, at 173; Exh. VV, at 164-65.)   This context weighs in favor of the reasonableness of Defendants' suspicion regarding the minor Plaintiffs' behavior, because the evidence unequivocally shows that there was a known concern regarding student use of "purple drink" at East Middle School during the relevant time.

By contrast, Defendants' attempt to rely on the minor Plaintiffs' ███████████ ████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████ ████████   Although a student's disciplinary history is one of the factors that might be relevant to the assessment of justification, it is not clear to the Court that those facts are relevant in the circumstances presented here.   In particular, there has been no argument or evidence presented by Defendants that they had any suspicions that ████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ Instead, their proffered justification

for conducting the search was that they suspected the minor Plaintiffs may have ingested a

substance based on what Defendants Simonds and Raleigh perceived to be abnormalities in the

minor Plaintiffs' behavior. █████████████████████████████████████████

█████ does not, without more, lead to any reasonable inference that a student might be

engaging in the use of prohibited substances and thus does not constitute a basis to justify

conducting a search for such substances.[8]  *See Phaneuf*, 448 F.3d at 599 (concluding that the

plaintiff's past disciplinary issues, none of which related to drug use, were of little significance

when determining the reasonableness of a search conducted for the sole purpose of determining

whether she possessed drugs).

    As to evidence that it is not apparent Defendants were aware of at the time of the search,

Defendant Simonds testified that his staff had viewed the camera feeds during that time, but had

not seen the minor Plaintiffs on the camera.   (Exh. MM, at 254-61.)   There is therefore no clear

evidence that the individual Defendants were aware at the time of ordering and conducting the

search that the minor Plaintiffs had gone into the bathroom or had stopped outside the

gymnasium, beyond what the minor Plaintiffs may have told them before they were brought into

the health office.   As a result, the video evidence regarding the minor Plaintiffs' activities or

behavior during the period between when they left the lunchroom and when Defendant Simonds

---

[8] ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

found them is not material to the analysis here, because there is no evidence to show that the

relevant Defendants were aware of any of those activities or behavior at the relevant time.

Having said that, given the video evidence of the minor Plaintiffs' behavior, the

undisputed fact that administrators did not know their location for a period of time, and the

known problem of "purple drink" usage at East Middle School, no reasonable factfinder could

conclude that Defendants lacked reasonable suspicion to initiate a search to assess whether the

minor Plaintiffs might be under the influence of, or possess, a substance that violated the Code of

Conduct.   Again, this requires only that there be "reasonable grounds for suspecting that the

search will turn up evidence that the student has violated or is violating either the law or the rules

of the school." *Phaneuf*, 448 F.3d at 596.   Here, I.S.'s fall, the minor Plaintiffs' ongoing and at

times seemingly uproarious laughter despite the situation, A.S.'s act of attempting to go into the

stairwell rather than following Defendant Simonds, J.B. and I.S.'s leaning against the wall, and

I.M.'s fidgety arm movements, even in the absence of context related to what the minor Plaintiffs

were saying or how they were speaking, can all together be reasonably construed as indicating

possible drug use or other violation of school rules.   This is especially highlighted by the

testimony from both the individual Defendants and third parties that the conduct observed was

different from how those sources usually saw the minor Plaintiffs behave in school or in

conversation with those sources.

Plaintiffs' arguments to the contrary center on their assertion that laughter and horseplay

behavior is age-appropriate for twelve-year old girls in the hallway with their friends.   This may

be entirely true; but the fact that children might generally act in ways that reasonable adults

would not in the same situation does not inherently mean that their behavior cannot constitute

(Exh. MM, at 239, 270-71.)

reasonable suspicion of violating school rules under any circumstance.   Plaintiffs' unsupported assertion that their behavior was typical and age-appropriate, even in conjunction with evidence that all of the minor Plaintiffs, talked, laughed, or even acted "giddy" at school on occasion, is simply insufficient to dispute Defendants' testimony that the behaviors they witnessed (which are documented on the video) were abnormal compared to how they were used to seeing the minor Plaintiffs behave.   Further, Plaintiffs' arguments regarding why they believe individual components or behaviors are insufficient to raise reasonable suspicion ignore the fact that the analysis is meant to encompass the totality of the circumstances known to Defendants, not whether any potential reason for suspicion can suffice in isolation.   The confluence of all of the above evidence shows that Defendants had reasonable suspicion to justify a search of all four minor Plaintiffs (based on their individual conduct and because they had all been missing for a period of time while together) related to possible drug use.

### 3.   Whether the Search Was Reasonably Related in Scope and Not Excessively Intrusive

Having concluded that the search was justified at its inception, the next inquiry is whether the search that was conducted of each minor Plaintiff was reasonably related in scope to the circumstances that justified the search.   As an initial matter, the Court observes that genuine disputes of material fact exist regarding this claim as to all four of the minor Plaintiffs, given that the deposition testimony as to the details or extent of the search of all of the minor Plaintiffs differs in material respects to the evidence presented particularly by Defendant Eggleston (who is the person who the minor Plaintiffs testified conducted most of the alleged examinations and searches).[9]

---

[9]     To the extent that Defendants have asserted that the Court should apply the principle of *Scott* and *Jeffreys* to disregard the minor Plaintiffs' testimony, the Court notes that such

41

Further, there are two levels of searches that are implicated by Plaintiffs' allegations in this case: a more typical investigatory search involving taking the minor Plaintiffs' vital signs, searching their shoes and the contents of their pockets and bags, and alleged pat-downs over their clothes, and a more invasive search involving the removal of clothing and/or searching inside one minor Plaintiff's bra that Plaintiffs have characterized as a strip search.   As was discussed above in Part I.A. of this Decision and Order, the Court previously found related to Defendants' motion to dismiss that the Fourth Amendment claims asserted by A.S. and J.B.[10] were dismissed to the extent they asserted that a strip search had occurred.   To the extent that there is some lack of clarity in that previous Decision and Order as to whether that dismissal was with or without prejudice to renewal (and as such whether such claims remain viable at this stage of the action), Plaintiffs' Amended Complaint has nonetheless not cured the defects identified related to the strip-search portion of the Fourth Amendment claims asserted by A.S. and J.B.   There is no allegation in the Amended Complaint that J.B. removed any article of clothing other than her shoes;[11] she instead alleged that she had taken her sweatshirt off before going into the

---

argument was made in the context of testimony regarding the minor Plaintiffs' actions or conduct that contradicts the hallway video footage.  (Dkt. No. 273, Attach. 14, at 80-87.)  Because there is no video evidence of what occurred in the health office, or in the specific room where Defendant Eggleston and Defendant Raleigh conducted the health assessment and search, such argument has not been made in relation to the conflicting evidence regarding what occurred in that office, and the Court sees no independent grounds for applying those principles to such evidence.

[10]    Although the So Ordered paragraph of that Decision and Order listed the two relevant Plaintiffs as A.S. and I.S., that was a typographical error.   The Court's analysis made clear that it was J.B., not I.S., who was the relevant Plaintiff.   Further, Defendants' motion to dismiss itself asserted that judgment on the pleadings was sought for the strip search claims as to A.S. and J.B. specifically, not I.S.   (Dkt. No. 44, Attach. 1, at 23.)

[11]    As discussed in the Decision and Order of September 14, 2020, removal of shoes has generally not been adjudged to constitute a strip search.  (Dkt. No. 117, at 25.)   *See Bibicheff v. Holder*, 55 F. Supp. 3d 254, (E.D.N.Y. 2014) (concluding that "searches of 'outer clothing,

examination room with Defendant Eggleston, as evidenced by her allegation that she had to retrieve her sweatshirt from the lobby of the health office.[12]   (Dkt. No. 163, at ¶¶ 40-47.) Further, contrary to her allegation that Defendant Eggleston asked her to take off her t-shirt, J.B. testified at her deposition that Defendant Eggleston did not in fact ask her to take off her shirt. (Exh. EE, at 245-49.)   It is therefore clear that neither the allegations in the Amended Complaint nor the evidence, including J.B.'s own testimony, are sufficient to plausibly suggest, much less establish, that J.B. was subjected to any type of strip search.   As to A.S., the Court discussed in its Decision and Order on Plaintiffs' motion for reconsideration of the Decision and Order of September 14, 2020, its finding that the allegations in the original Complaint that A.S. unzipped her sweatshirt to the middle of her chest and then zipped it back up again, even in combination with alleged statements by Defendant Eggleston regarding the fact Plaintiff was wearing only a bra under her sweatshirt, were insufficient to plausibly allege that A.S. revealed her bra and the skin of her torso in a manner that would constitute a strip search.[13]   (Dkt. No. 138, at 6-7.)   The Amended Complaint does not appear to add any further allegations regarding this point.

---

luggage, a purse, wallet, pockets or shoes . . . do not substantially infringe on a traveler's privacy rights'" and specifically contrasting those actions with a more invasive strip search); *see also Mac Ineirghe v. Bd. Of Educ. Of East Islip Union Free Sch. Dist.*, 05-CV-4324, 2007 WL 2445152, at *9-10 (E.D.N.Y. Aug. 22, 2007) (assessing a search involving taking of vital signs, search of a bag and shoes, a pat down of pockets, and administration of an initial saliva test, specifically finding that such search did not require the high level of suspicion that would be applicable if the case involved a strip search).

[12]     This conflicts with the deposition testimony of both J.B. and Defendant Eggleston that J.B. did not take her sweater off at all, but merely removed one arm from it when Defendant Eggleston needed to check her blood pressure.   (Exh. EE, at 243; Exh. OO, at 295.)   However, this discrepancy is immaterial, as it is undisputed in either case that J.B. was not made to remove her sweatshirt by the Defendants as part of the search.

[13]     A.S. testified at her deposition that she zipped her sweater "halfway" down below her chest, but not as far as her belly button, before she zipped it back up again; she was not forced to remove either her sweatshirt or her pants.   (Exh. GG, at 225.)

Therefore, even if the strip-search claim brought by A.S. had not been dismissed with prejudice by the previous Decision and Order, the allegations in the Amended Complaint related to that claim remain insufficient for all of the same reasons already elaborated in the prior Decision and Orders related to the motion to dismiss and the motion to reconsider and must again be dismissed as a matter of law.   As to A.S. and J.B., there is therefore no need to assess on this motion whether there was sufficient justification to conduct a strip search, but rather only whether there was the requisite justification to conduct a more typical investigative search.

**i.      J.B.**

At her deposition, J.B. testified that she removed one arm from her sweatshirt to allow Defendant Eggleston to measure her blood pressure, and that Defendant Eggleston had her look from left to right, put her hand on her eyes, asked her to count fingers, and asked her to take off her shoes, which Defendant Eggleston shook.   (Exh. EE, at 243.)   She was wearing a t-shirt underneath her sweatshirt, and Defendant Eggleston never asked her to take off either her shirt or leggings; she did not remove either her t-shirt or leggings.   (*Id.* at 244, 249-50.)   Defendant Eggleston's testimony differs slightly from J.B.'s, in that Defendant Eggleston stated that J.B. refused to submit to a neurological examination (which J.B. does not mention), and that she was not sure if Defendant Raleigh had been in the room, but she herself did not ask J.B. to remove her shoes or turn out her pockets.   (Exh. OO, at 295-96.)   Defendant Raleigh confirmed that she had not been in the room for any part of J.B.'s examination because she had needed to help with an injured student.   (Exh. NN, at 229.)

Based on the above analysis, it is undisputed that the search of J.B. consisted of checking her vital signs, with some degree of neurological testing.   Even drawing all reasonable

44

inferences in J.B.'s favor and accepting the full extent of her testimony that she removed her shoes and those were searched, the extent of this search was reasonably related in scope to the circumstances that justified the search.   As was discussed above in Part III.A.2. of this Decision and Order, Defendants had reasonable suspicion that the minor Plaintiffs might be under the influence of a prohibited substance.   Checking J.B.'s vital signs[14] and searching her shoes is reasonably related to determining whether she might be under the influence of such substance and to assessing whether she possessed any such substance on her person.   *See Mac Ineirghe*, 2007 WL 2445152, at *9-10 (finding that taking of vital signs such as blood pressure and observations of eyes, search of bag and shoes, pat down of pockets, and administration of saliva-based drug test were both justified at their inception and not excessive or intrusive in context of student having left school to the parking lot in violation of rules and being observed wiping his nose and rubbing his eyes).   Further, a search of a student's outer clothes and bag has been found to generally be proportional with a reasonable suspicion that the student might possess drugs.   *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373-74 (2009) ("If a student is reasonably suspected of giving out contraband pills, she is reasonably suspected of carrying them on her person and in the carryall that has become an item of student uniform in most places today.   If Wilson's reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making."). As a result, no reasonable factfinder could conclude that the search of J.B. violated her Fourth Amendment rights under the circumstances.

     **ii.**  **A.S.**

---

[14]  As was already discussed, the medical portion of the examination had, according to the evidence, a dual purpose: not only to determine whether the minor Plaintiffs had violated a school rule or law, but also to assess whether there was any possible medical concern that might

At her deposition, A.S. testified that, upon entering the examination room, Defendant Eggleston checked her blood pressure, pulse, and eyes and had her hop on one foot and touch her nose; when Defendant Eggleston took her blood pressure, she rolled up her sleeve and did not remove her sweatshirt.   (Exh. GG, at 213.)   Defendant Eggleston told her to unzip her sweatshirt and remove her pants; she unzipped her sweatshirt to below her chest and then zipped it back up again, and Defendant Eggleston did not force her to either take off her sweatshirt or her pants when she did not comply.   (*Id.* at 224-28.)   A.S. first stated that Defendant Eggleston did not touch her other than to take her pulse, but later testified that Defendant Eggleston had in fact patted down her whole body over her clothes.   (*Id.* at 237, 241-43.)   Defendant Raleigh came into the room and told A.S. to take off her shoes and empty her pockets, after which Defendant Raleigh took the contents of those and inspected them.   (*Id.* at 229, 231.)   A.S. also testified that Defendant Eggleston never made any comments about her breasts.   (*Id.* at 241.) The testimony of Defendants Eggleston and Raleigh do not differ materially from A.S.'s testimony, other than in that Defendant Eggleston does not mention A.S. unzipping her sweatshirt and does not state that she asked A.S. to remove either her sweatshirt or pants. (Exhs. NN, at 204-06; OO, at 250-51.)

As was already discussed above related to J.B., the portion of the search related to the vitals check, neurological exam, and search of A.S.'s pockets and shoes (and even the alleged pat down) was reasonably related to the circumstances justifying the search.   *See Stanford v. Northmont City Sch. Dist.*, 19-CV-0399, 2023 WL 1819117, at *5-6 (S.D. Ohio Feb. 8, 2023) (finding that a pat down would be reasonably related to the school district's interest in removing narcotics from school grounds in a case where the plaintiff alleged he was patted down in his

---

require treatment.

pants and pockets based on the odor of marijuana); *Mac Ineirghe*, 2007 WL 2445152, at \*9-10;

*Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 725 (E.D. Va. 2014) (finding pat down

of student and search of his backpack, shoes, and pockets was reasonable in scope because drugs

could be hidden in those places, in the context of a tip that a student with long hair was smoking

marijuana on a bus).   To the extent that A.S. asserts she briefly unzipped her sweatshirt part

way, revealing a portion of her bra, the Court has already found that this does not constitute a

strip search.   There is no evidence, even in A.S.'s testimony, to support a finding that Defendant

Eggleston or anyone else searched for contraband in that area in the brief time her sweatshirt was

partially open, or even to establish that Defendant Eggleston saw A.S.'s bra or breasts.   Further,

even if accepting, for the sake of argument, A.S.'s disputed assertion that Defendant Eggleston

asked A.S. to remove her sweatshirt and pants, it is undisputed that A.S. did not remove either of

those items, and that Defendant Eggleston did not continue to demand she do so or otherwise

attempt to force her to do so.   As a result, even accepting A.S.'s version of events, no reasonable

factfinder could conclude that the search of A.S. violated her Fourth Amendment rights.

### iii.   I.S.

At her deposition, I.S. testified that Defendant Eggleston asked her to remove her arm

from her sweatshirt but that she eventually took off her whole sweatshirt because it was easier;

she was wearing a t-shirt underneath.   (Exh. II, at 130-31.)   Defendant Eggleston told her to

empty her pockets while she was taking off her sweatshirt and patted her down.   (*Id.* at 137-39.)

After I.S. removed her sweatshirt, Defendant Eggleston took her vital signs and she put her

sweatshirt back on when those were done.   (*Id.* at 132.)   Defendant Eggleston also asked her to

stand on one leg and touch her nose.   (*Id.* at 128-29.)   Defendant Raleigh came into the room

while Defendant Eggleston was taking her vital signs and afterwards asked I.S. to take off her shoes and hand them to Defendant Raleigh, who shook them.   (*Id.* at 135-36.)   The testimony of Defendant Eggleston and Defendant Raleigh differ from I.S.'s account in that Defendant Eggleston testified that I.S. was not patted down, and it was Defendant Raleigh who had I.S. empty her pockets, not Defendant Eggleston.   (Exhs. NN, at 222-23; OO, at 291-93.)

As was already discussed above related to J.B. and A.S., the portion of the search related to the vitals check, neurological exam, and search of A.S.'s pockets and shoes (and even the alleged pat down) was reasonably related to the circumstances justifying the search.   *See Stanford*, 2023 WL 1819117, at *5-6; *Mac Ineirghe*, 2007 WL 2445152, at *9-10; *Gallimore*, 38 F. Supp. 3d at 725.   I.S. does not provide any admissible evidence that can support a finding that there was a more invasive search, let alone a strip search.   It is undisputed from her own testimony that she voluntarily took her sweatshirt off when asked to remove her arm related to checking her blood pressure, and that she did not remove any other clothing but her shoes.   As a result, even accepting I.S.'s version of events, no reasonable factfinder could conclude that the search of A.S. violated her Fourth Amendment rights.

### iv.   I.M.

The search of I.M. presents greater difficulties than those of the three other minor Plaintiffs.   At her deposition, I.M. testified that she complied with a request by Defendant Eggleston to take her sweatshirt off, and that she was wearing a thin-strap tank top underneath. (Exh. KK, at 273, 278.)   Defendant Eggleston checked her vital signs, told her to extend her limbs and jump, and had her follow a finger with her eyes.   (*Id.* at 273-77.)   When I.M. was standing, Defendant Eggleston told her to put her arms out to the side, at which point Defendant

48

Eggleston swiped underneath her bra below her armpits and touched the sides of her breasts. (*Id.* at 278-79.)   Defendant Eggleston also had her pull out the bottom of her tank top and shake it.   (*Id.* at 342-43.)   At some point, Defendant Eggleston made a comment about how her breasts were large for her age and that they would get flabby when she was Defendant Eggleston's age.   (*Id.* at 273.)   Defendant Eggleston patted her down before telling her to pull down her sweatpants, and attempted to pat her legs down again before asking her to also pull down her leggings; I.M. complied with these requests and pulled down both her sweatpants and her leggings to her ankles.   (*Id.* at 274, 290, 292.)   Defendant Raleigh came into the room when she was dressed again and had I.M. take her shoes off and bang them together; both Defendant Eggleston and Defendant Raleigh inspected the items from her pockets and bag.   (*Id.* at 297-98.) Defendant Eggleston denies making a statement about I.M.'s breasts, asking her to pull out her shirt and shake it, touching underneath I.M.'s bra, patting down I.M.'s legs, or asking I.M. to pull down her pants.   (Exh. OO, at 279-80.)

The search conducted, as described by I.M., greatly exceeds the scope of those that were conducted on the other three minor Plaintiffs.   Although the checking of her vital signs, search of her shoes, and a pat down of her legs over her clothes would have been within the scope of the original justification of the search, the alleged touch underneath her bra and removal of her pants down to her underwear is far more intrusive, and more in line with a strip search, and thus would require a heightened level of suspicion to be justified.   *Phaneuf*, 448 F.3d at 596.   Because it is unlikely that the circumstances of this case would justify such an intrusive search, and because there is conflicting evidence regarding the specific details of what occurred during I.M.'s examination by Defendant Eggleston, there exists a genuine dispute of material fact, and

49

summary judgment is not appropriate, as to the Fourth Amendment claim asserted by I.M.

However, the existence of a material fact does not mean that the evidence suggests potential liability for all three of the individual Defendants on this claim.   Of note, even if a factfinder were to accept I.M's version of events, it was only Defendant Eggleston who conducted the portion of the search that raises questions of a constitutional violation.   Even under I.M's version of events, Defendant Raleigh was not in the room while Defendant Eggleston performed those portions of the search; when she entered the room, I.M. was fully clothed again, and the only search she personally performed was of I.M.'s shoes and bag.   As was already discussed, the search of the shoes and bag were reasonable in scope to the circumstances that justified the search and do not themselves constitute a constitutional violation. Further, it is undisputed that Defendant Simonds was not in the exam room at any time and did not personally conduct the search of any of the minor Plaintiffs.   (*See e.g.*, Exh. EE, at 251; Exh. II, at 111, 160; Exh. KK, at 266-67, 304, 313; Exh. MM, at 306-10; Exh. XX, at Nos. 119-20; Exh. YY, at Nos. 117-18; Exh. ZZ, at Nos. 140-41; Exh. AAA, at Nos. 140-41.)   Nor is there any evidence to show, or even raise a genuine dispute of material fact, that either Defendant Simonds or Defendant Raleigh instructed or directed Defendant Eggleston to conduct the search of I.M. in the manner that I.M. asserts she did.   (Exh. MM, at 287-89, 294-95, 298-300; Exh. NN, at 194-200, 207-08; Exh. OO, at 192-96, 214-15, 218, 234-35.)   Notably, the only basis on which Plaintiffs allege liability against Defendant Simonds is that he directed Defendant Eggleston, and, as to Defendant Raleigh, that she directed Defendant Eggleston and "touched and searched the students' bodies," allegations that are not borne out in the record.   (Dkt. No. 163, at ¶¶ 126, 138-39.)   Both the Second Circuit and the Supreme Court have made clear that

there is no "special test for supervisory liability"; instead, "'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution.'"   *Tangreti v. Bachman*, 983 F.3d 609, 616, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 [2009]).   Because there is no evidence to show that either Defendant Simonds or Defendant Raleigh directly conducted the relevant parts of the search of I.M., or to even create a genuine dispute of material fact regarding whether Defendants Simonds and Raleigh directed Defendant Eggleston to perform such actions as part of a search, Plaintiffs cannot show that either Defendant Simonds or Defendant Raleigh are liable for the relevant portion of this search.

For all of the above reasons, the Court grants summary judgment to Defendants on Plaintiffs' First Claim as to J.B., A.S., and I.S., and as to I.M. against Defendants Simonds and Raleigh specifically, but denies summary judgment to either party on this claim as to I.M against Defendant Eggleston.

### B.      Whether Summary Judgement Is Appropriate on Plaintiff's Second Claim

After careful consideration, the Court answers the above question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See* Parts I.D.1 and 3 of this Decision and Order.   To those reasons, the Court adds the following analysis.

"The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated persons alike."   *O'Shea v. City of Kingston*, 22-CV-0666, 2023 WL 4105492, at *7 (N.D.N.Y. June 21, 2023) (D'Agostino, J.) (citing *City of Cleburne v. Cleburne Living Cntr.*, 473 U.S. 432, 439 [1985]).   "The Equal Protection Clause 'bars the government from selective adverse treatment of individuals compared with other similarly situated

51

individuals if such selective treatment was based on impermissible considerations such as race,
religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith
intent to injure a person." *Salaam v. Stock*, 19-CV-0689, 2023 WL 3853811, at *3 (N.D.N.Y.
Feb. 27, 2023) (Dancks, M.J.) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 86 [2d Cir. 2005]).

 "To establish a denial of equal protection based on selective treatment, Plaintiffs must
allege that: '(1) . . . compared with others similarly situated, [they were] selectively treated, and
(2) the selective treatment was motivated by an intention to discriminate on the basis of
impermissible considerations, such as race or religion, to punish or inhibit the exercise of
constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Mosdos
Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 692 (S.D.N.Y. 2011)
(quoting *Zahra v. Town of Southold,* 48 F.3d 674, 683 [2d Cir. 1995]).   "A showing that the
plaintiff was treated different compared to others similarly situated" is a "prerequisite" and a
"threshold matter" to a selective treatment claim.  *Church of the Am. Knights of the Ku Klux
Klan v. Kerik*, 356 F.3d 197, 210 (2d. Cir. 2004).   In order to be considered "similarly situated"
for such a claim, "the plaintiff's and comparator's circumstances must bear a reasonably close
resemblance," though they need not be identical.  *Hu v. City of New York*, 927 F.3d 81, 96 (2d
Cir. 2019) (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 [2d Cir. 2014]).   "A plaintiff
can prevail by showing that 'she was similarly situated in all material respects to the individuals
with whom she seeks to compare herself.'" *Hu*, 927 F.3d at 96 (quoting *Graham v. Long Island
R. R.*, 230 F.3d 34, 39 [2d Cir. 2000]).   "The question of 'whether parties are similarly situated
is [generally] a fact-intensive inquiry' that depends heavily on the particular context of the case
at hand," and "there is no precise formula to determine whether an individual is similarly situated

to comparators.'"  *Hu*, 927 F.3d at 96 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 [2d

Cir. 2006]; *McDonald v. Vill. Of Winnetka*, 371 F.3d 992, 1002 [7th Cir. 2004]).   Because of the

fact-intensive nature of this inquiry, the question of whether individuals are similarly situated is

generally one that should be submitted to a jury for resolution.   *Graham*, 230 F. 3d at 39.   "This

rule is not absolute, however, and a court can properly grant summary judgment where it is clear

that no reasonable jury could find the similarly situated prong met."   *Harlen Assocs. v. Incorp.

Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing *Cruz v. Coach Stores*, 202 F.3d

560, 568 [2d Cir. 2000]).

As can be seen from the standards outlined above, the existence of a similarly situated

comparator is an essential element that must be proven to succeed on an equal protection claim.

In this case, such a comparator, in order to be similarly situated in all material respects, would be

a student at East Middle School who displayed similar conduct as that which purportedly raised

Defendants' suspicion that the minor Plaintiffs might be intoxicated.   After all, one of Plaintiffs'

arguments in support of this claim is that the conduct that Defendants relied on to justify a search

was conduct that would not have been found to be suspicious in the absence of racial and/or

gender bias.   Plaintiffs, through their motion papers and evidence, have asserted two apparent

sources for finding such comparators: (1) the expert report of Dr. Jamilia Blake, which includes

an assessment of data regarding students in the Binghamton City School District who have been

searched on suspicion of substance use or possession, and (2) examples of three White students

that Defendant Simonds previously searched at schools earlier in his career as an administrator.

As an initial matter, the Court finds that the only relevant data from Dr. Blake's expert

reports as to this specific issue is that which is related to students who were searched in response

to suspected substance use or possession; her other data, which relates to students who received out-of-school suspensions, is not applicable because it is undisputed that none of the minor Plaintiffs in this case received out-of-school suspensions for the relevant incident.   However, there are two issues with even that relevant data from Dr. Blake's report.   First, her data includes students from both East and West Middle School, despite the fact that the relevant incident happened at East Middle School and there is no evidence to suggest that the three individual Defendants who Plaintiffs allege acted against them in a discriminatory manner had any involvement in affairs at West Middle School.   Dr. Blake admits that she did not have any data regarding which of the students in the data sample attended East Middle School and which attended West Middle School.   There is therefore a question as to how many of the students who were documented as having been searched actually attended East Middle School.

Second, and perhaps most relevant to the analysis of whether any such students were similarly situated to the minor Plaintiffs, Dr. Blake's report contains only sparse information regarding the circumstances that led to any of these students being searched.   Indeed, she admits that "there were a number of incidents in which school officials reported that the student was in possession or intoxication by a substance but did not express in the discipline incident description how school officials came to learn or knew the student was in possession of alcohol, drugs, or inhalants or was intoxicated by a substance."   (Blake 2d Exp. Rep., at 6-7.)   She went on to state, however, that the evidence did reveal that 37.5% of the searches were done due to the smell of a substance by a school official or a report of such smell to a school official, 25% were due to a student report that another student possessed substances or was intoxicated, and 12.5% were due to routine bag checks; she admitted that 25% of the incidents did not have a

54

documented reason attached to the disciplinary reports.   (Blake 2d Exp. Rep., at 7.)   In this case, the minor Plaintiffs were searched, according to Defendants, based on a host of factors, including (1) the fact that their whereabouts had been unknown to officials for a period of at least seven minutes after they did not go to their scheduled lunchtime activity, (2) the known issue in the School District generally, but also specifically in East Middle School, regarding student use of "purple drink" at the relevant time, and (3) the fact that, when they were found by Defendants Simonds and Raleigh, they were observed to be laughing and acting in a manner that Defendants thought inappropriate to the situation and indicative of possible substance use.   Thus, the students from Dr. Blake's data set who were searched based on the smell of a substance, a tip by another student, or a routine bag check all were searched for reasons other than "suspicious" conduct and thus under materially different circumstances than the minor Plaintiffs.   Of the remaining 25% of the students in Dr. Blake's data set who were searched, not only is it unclear from Dr. Blake's reports which specific students those were, but there is simply no information from which a reasonable factfinder can determine that the circumstance under which they were searched are materially similar to the circumstances under which the minor Plaintiffs were searched.   Without this missing information, Plaintiffs cannot show that any of these students are similarly situated to them in a legally sufficient manner to support their equal protection claim.   Finally, Dr. Blake's data and report do not show any instances in which, for example, a White male or a White female student displayed similar behaviors as those observed of the minor Plaintiffs but was not searched.

Plaintiffs' argument that the Court has already found that their statistics are sufficient to establish the existence of similarly situated comparators is unavailing.   (Dkt. No. 295, Attach. 1,

Case 3:19-cv-00513-GTS-MJK   Document 314   Filed 02/01/24   Page 56 of 87

at 61-62 [stating, "[a]s this Court held in its Decision and Order from September 14, 2020, 'statistics highlighting the disparate treatment of search rates, or searches themselves, among students of different races throughout the District,' would be sufficient to satisfy the similarly situated prong in the plaintiffs' case."].)   Although the Court did highlight the fact that Plaintiffs had, in their original Complaint, failed to present relevant statistics regarding searches from the applicable school years and found that such statistics would be necessary to support an equal protection claims if they intended to rely primarily on statistics as their proof, it did not conclude that the provision of those statistics would automatically meet Plaintiffs' burden to show the existence of similarly situated comparators.   (Dkt. No. 117, at 38-39.)   The statistics, or other evidence, must still show that the students included in the dataset were searched to a lesser degree under circumstances that were materially similar to those under which the minor Plaintiffs were searched, or that they engaged in similar conduct but were not searched. However, as was discussed, Dr. Blake's report indicates that 75% of the students were searched for reasons that are not at all similar to those presented here, and that there was no information regarding the circumstances of the other 25%, and no specification as to what the races or genders were of the students in that 25% group.   To say that statistics showing a potential racial disparity are sufficient in and of themselves, without evidence of the circumstances involved, to meet the similarly situated prong in effect subsumes that requirement into the requirement to show evidence of discriminatory intent.

Apart from Dr. Blake's report, Plaintiffs also raise, for the first time in their reply memorandum of law, instances of Defendant Simonds' treatment of three White students resulting from suspicion of either substance use/possession or weapons possession, as evidence

of Defendants' disparate treatment of similarly situated comparators.   (Dkt. No. 295, Attach. 1, at 63-64.)   These three instances are documented in Defendant Simonds' deposition testimony. (Exh. MM, at 50-59, 99-104.)   One of these instances occurred while Defendant Simonds worked at ███████████████████████████, and involved his conducting a bag search of a White male after one of the school counselors had received a tip from other students that the student might have a firearm.   (*Id.* at 50-51.)   A second instance occurred also while Defendant Simonds worked at ███████████████████████, and involved his conducting periodic searches of the bag of a White female student with a known heroin addiction based on the faculty's observations of her condition, chiefly observations that she was groggy, unkempt, and disheveled.   (*Id.* at 51-55.)   He testified that he did not conduct or order vitals checks of these students or ask them to remove their clothes, although he did note that the school nurse sometimes conducted a health check of the female student.   (*Id.* at 54-58.)   A third instance occurred while Defendant Simonds worked as the administrator at ██████████████████ ██████, and involved his searching the bag of a White male student who smelled of alcohol, was stumbling, and had difficulty speaking coherently; Defendant Simonds testified that they did not search that student's pockets because he did not believe the student would be able to hide a bottle in his clothes.   (*Id.* at 99-102.)   Defendant Simonds did not ask that student to remove any clothes, but a nurse was called to perform a health check because they were concerned the student might have alcohol poisoning.   (*Id.* at 102-03.)

As with Dr. Blake's data, there are a number of problems with these three students as potential comparators.   As an initial matter, all of these White students were searched when Defendant Simonds was given reason to believe they might possess contraband.   Because they

were also searched, these students clearly do not serve as similarly situated comparators to the extent Plaintiffs allege that their race was a motivating factor in the decision to conduct any type of search.

In an effort to overcome that fact, Plaintiffs argue that the disparity in treatment is the fact that the searches Defendant Simonds did conduct of those students were less invasive or less intrusive than those conducted of the minor Plaintiffs in that he searched only the bags of those students and did not order any search of their pockets or shoes or for the removal of clothing. However, the circumstances in which those students were searched are not materially similar to those in which the minor Plaintiffs were searched: one student was searched based on a tip, one was searched based not only on observations but also due to a concern of ongoing heroin addiction/use, and one was searched based not only on behavioral observations of stumbling and difficulty speaking but also the presence of the smell of alcohol.   Although it may be a reasonable conclusion that the searches of these three students were more justified by the known facts than the searches of the minor Plaintiffs were in this case, that fact alone does not make these three students similarly situated comparators who received more favorable treatment.   As far as the evidence establishes, none of these students exhibited the types of behaviors the minor Plaintiffs display in the hallway camera video that were the asserted basis for conducting the search of the minor Plaintiffs.   Further, in each of the three identified instances, the students were searched for a known item or substance: the first student was searched specifically for a firearm based on a tip; the second student was searched specifically for heroin and/or paraphernalia based on a known history of use of that substance; and the third student was searched for alcohol based on the scent of that being present around him.   In the case of the third

student, Defendant Simonds testified that he specifically did not search that student's pockets because he did not believe a container of alcohol would have fit in that student's clothing.   (Exh. MM, at 99-102.)

By contrast, in this case, although Defendants have stated they suspected the minor Plaintiffs might have consumed "purple drink" given the recent instances of that substance within the School District and the school itself, they did not actually know for certain whether the effects they observed were related to "purple drink," a different substance, or something else. Uncertainty regarding the substance the administrators are looking for is certainly a variable in determining what type or extent of search might be warranted.   Nor does Plaintiffs' argument that a bottle of "purple drink" would be too large to be found in most of the places searched carry much weight.   As Defendants argue, the liquid ingredients could have been in a more compact container like a flask, and smaller ingredients of "purple drink" such as candy or codeine pills[15] could reasonably fit within pockets or small bags.

Finally, none of these three incidents occurred at East Middle School[16] and, according to Defendant Simonds' deposition testimony, they would have occurred in 2006 or 2007 as to the first two students and 2011 or 2012 as to the third student based on the years Defendant Simonds worked at the respective schools where those happened.   Moreover, none of those instances involved Defendant Raleigh or Defendant Eggleston, the two individual defendants who allegedly conducted the searches in this case, and, as was discussed previously, there is no

---

[15]      Resource Officer Williams testified that, in addition to using cough syrup, codeine pills could be crushed and dissolved into a drink for the same effect.   (Exh. VV, at 192-93.)

[16]      Indeed, none of these incidents occurred within the Binghamton City School District; ███████████████████ is located in Yorktown Heights, New York, and ████ ██████ is located in Round Rock, Texas.   (Exh. MM, 19-20.)

evidence showing that Defendant Simonds directed or ordered either of those Defendants to perform the more troubling aspects of the alleged searches.

All of these differences suffice to render the three alleged White students insufficiently similar in all material respects to the minor Plaintiffs to be considered proper comparators, regardless of the existence of questions of fact as to the extent of the search that was conducted on each of the minor Plaintiffs. *See Patterson v. City Univ. of New York*, 12-CV-6300, 2014 WL 3511048, at *5 (E.D.N.Y. July 14, 2014) (finding student to be insufficiently similar to plaintiff because that student took the relevant course in a different year than did the plaintiff, and she took a different reassessment test than did plaintiff).

For all of the above reasons, Plaintiffs have not provided admissible evidence of the existence of any similarly situated comparators and therefore cannot establish a *prima facie* violation of their rights under the Equal Protection Clause.[17]   Because no reasonable factfinder could conclude that the evidence presented shows similarly situated comparators, the Court need not, and does not, consider whether Plaintiffs have raised a genuine dispute of material fact regarding discriminatory intent.   The Court grants summary judgment to the Defendants on their

---

[17]         To the extent that Plaintiffs have asserted an equal protection claim pursuant to a class-of-one theory and such claim has not been waived by their failure to oppose the various arguments related to that theory asserted in Defendants' memoranda, such claim must also fail on the basis of failure to show similarly situated individuals.   Notably, in class-of-one claims, there must be "an extremely high degree of similarity" between the plaintiff and the comparators. *Victory v. Pataki*, 632 F. App'x 41, 43 (2d Cir. 2016) (quoting *Ruston v. Town Bd. For Town of Skaneateles*, 610 F.3d 55, 59 [2d Cir. 2010]).   Because this is a more stringent requirement of similarity than that which applies to a selective enforcement claim, Plaintiffs' inability to meet the lower standard of similarity also necessarily means they cannot meet this higher requirement. Further, as Defendants have argued, decisions such as whether to search a student are highly discretionary, and the Supreme Court has indicated that, in situations involving actions "which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," the Equal Protection Clause is not violated pursuant to a class-of-one claim "because treating like individuals differently is an accepted consequence of the discretion granted."   *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591 ,603-04 (2008).

Second Claim.

### C.  Whether Summary Judgment Is Appropriate on Plaintiff's Third Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda.  *See supra* Parts I.D.1 and 3 of this Decision and Order.   To those reasons, the Court adds the following analysis.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.   To state a claim for discrimination under Title VI, a plaintiff must allege as follows: (1) the defendant discriminated against him or her on the basis of race, color, or national origin; (2) the discrimination was intentional; and (3) the discrimination was a substantial and motivating factor for the defendant's actions.  *Smith v. Davis*, 22-CV-1202, 2023 WL 5019432, at *6 (N.D.N.Y. Mar. 28, 2023) (Lovric, M.J.) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 [2d Cir. 2001]), *report-recommendation adopted*, 2023 WL 4346961 (D'Agostino, J.). Importantly, "Title VI itself directly reaches only instances of intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001).   "Under Title VI, 'an actionable discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences . . . it implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'"  *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 416 (N.D.N.Y. 2019) (McAvoy, J.) (quoting *Clyburn v. Shields*, 33 F. App'x 552, 555 [2d Cir. 2002]).

In some cases, the actions of a third party can be considered to be an intentional violation

by the recipient of federal funds where the recipient is deliberately indifferent to the actions of the third party that causes the violation.  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664-65 (2d Cir. 2012) (collecting cases).   The deliberate indifference standard is a "narrow one," imposing liability only if "a plaintiff establishes: (1) substantial control, (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference."  *Zeno*, 702 F.3d at 665 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 643-50 [1999]).   As most relevant to the case at hand, "[c]onstructive knowledge is not enough; only actual knowledge is a predicate to liability."  *Zeno*, 702 F.3d at 666.   Further, a recipient's actions are deliberately indifferent only if "they were clearly unreasonable in light of the known circumstances."  *Id.*

A plaintiff can establish a prima facie case of discrimination either through direct evidence of discrimination or, where direct evidence is unavailable, through indirect evidence by demonstrating the following: "(1) she is a member of a protected class; (2) she suffered an adverse action in pursuit of her education by defendant; (3) she was treated differently from similarly situated students who were not members of the protected class; and (4) she was qualified to continue in her educational pursuit."  *J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 557 (E.D.N.Y. 2012); *accord Fizulich v. Killings*, 22-CV-1190, 2023 WL 4643011, at *3 n.3 (N.D.N.Y. July 20, 2023) (Hurd. J.); *Melgarejo v. New York Coll. of Podiatric Medicine*, 12-CV-6669, 2014 WL 1683809, at *5 (S.D.N.Y. Apr. 28, 2014) *aff'd* 601 F. App'x 61, 62 (2d Cir. 2015).

If a plaintiff shows a prima facie case of discrimination as stated above, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for its conduct.  *Williams v.*

62

*Pace Univ.*, 192 F. Supp. 3d 415, 421 (S.D.N.Y. 2016) (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 [2d Cir. 2004]).   "In order to prevent summary judgment in favor of plaintiff at this stage, that explanation must, if taken as true, permit the conclusion that there was a nondiscriminatory reason for the adverse action."   *Williams*, 192 F. Supp. 3d at 421 (citing *Back*, 365 F.3d at 123).   If the defendant can proffer such a reason, the burden then shifts back to the plaintiff "to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"   *Id.*   "To defeat summary judgment, 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the . . . decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors.'"   *Id.*

The Second Circuit has suggested, admittedly in a non-precedential decision, that, "[t]o the extent that [a plaintiff] seeks to assert a traditional equal-protection claim, 'the substantive elements of [Title VI] claims are nearly identical to . . . parallel claims under the Equal Protection Clause.'"   *Rodrigues v. City of New York*, 835 F. App'x 615, 618 (2d Cir. 2020). This appears to be the view of the Supreme Court as well.   *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) (stating that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI") (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 [2003]).

Based on the above standards, Plaintiffs are unable to show a prima facie case of race discrimination under Title VI for the same reasons that their equal protection claim fails.

Specifically, although there is no dispute that the minor Plaintiffs are all part of a protected class (i.e., Black and Latina persons), they cannot show, based on the evidence presented, that they were treated differently from similarly situated students who were not members of the protected class.

The Court also notes that Plaintiffs do not appear to meet the second element of a prima facie case, which is that they suffered an adverse action in pursuit of their education.   Although the case law in this Circuit regarding what constitutes an adverse action in the context of a Title VI discrimination claim (as opposed to a retaliation claim) appears sparse, the standard itself indicates that the adverse action must be "in pursuit of [their] education."   *See Peters v. Molloy Coll. of Rockville Ctr.*, 07-CV-2553, 2013 WL 5652503, at *10 (E.D.N.Y. Oct. 16, 2013) (finding the plaintiff had shown an adverse action where she received a failing grade as a consequence of the alleged discrimination and was being denied the ability to graduate and receive her degree); *Jacques v. Adelphi Univ.*, 10-CV-3076, 2011 WL 6709443, at *5 (E.D.N.Y. Dec. 19, 2011) (finding that student's termination from her program was an adverse action); *Patterson*, 2014 WL 3511048, at *4 (finding that receiving a failing grade was an adverse action).   In this case, it is undisputed that none of the minor Plaintiffs were given a disciplinary referral related to the events of January 15, 2019.   None of them were given an out-of-school suspension; and I.M., A.S., and I.S. all corroborate Defendants' assertions that none of them were sent to either in-school suspension or any type of detention.   (Exh. GG, at 291-92; Exh. II, at 173; Exh. XX, at Nos. 80-83; Exh. YY, at Nos. 80-83; Exh. ZZ, at Nos. 79-82; Exh. AAA, at Nos. 80-83.)

Granted, there is evidence, even from Defendant Simonds and Defendant Raleigh, that

J.B. was sent to the Intensive Study Center ("I.S.C.") (which is not clearly established as being equivalent to disciplinary in-school suspension) for the remainder of the day on January 15, 2019; however, there is no evidence presented (even from J.B.) to dispute the testimony of Defendant Simonds and others that J.B. requested to be sent there rather than going back to class. (Exh. EE, at 261-64; Exh. GG, at 292; Exh. II, at 169; Exh. NN, at 239-40.)   Evidence also reveals that I.S.C. was a room where students could be placed where they could continue to do their schoolwork during times when, for whatever reason, they were not able to function in their regular classroom.   (Exh. NN, at 241.)   Given this evidence, there is nothing to indicate that J.B.'s placement in I.S.C. for at most one-and-a-half periods at the end of the day would constitute an adverse action in her pursuit of education.   Further, to the extent there may be a question of fact regarding whether J.B. was given lunch detention, putting aside the undisputed fact that she never attended any such detention in the following days, there is also no evidence to suggest that detention solely during the lunch period would have had an adverse impact on her pursuit of her education.   (Exh. EE, at 277-78.)

Lastly, to the extent that Plaintiffs have attempted to argue that they received discipline for this incident in the form of being constructively suspended, such argument is not supported by the admissible record evidence.   Rather, it is undisputed that it was the choice of the minor Plaintiffs and their parents to cease attending East Middle School and eventually transfer to West Middle School, and there is no evidence to suggest that the minor Plaintiffs were harassed or otherwise made to feel unwelcome by Defendants following the incident.   What is also acutely important is that there does not appear to be any evidence that the School Defendants had any involvement in the minor Plaintiffs' decision to leave East Middle School, despite the fact that it

is against those Defendants that this claim is asserted.

In that vein, Plaintiffs have not shown that they can meet the threshold burden of showing that the School Defendants, as the relevant defendants against whom this claim is asserted, should be held liable for the actions of its employees.   Plaintiffs' claim is based on the actions of Defendants Simonds, Raleigh, and Eggleston in conducting a search of the minor Plaintiffs, not on any direct actions taken by the School Defendants.   As was discussed above, in order to be held liable for the conduct of third parties, a plaintiff must make multiple showings, including both that the relevant defendant had actual knowledge of the third party's conduct and that the relevant defendant acted with deliberate indifference in the face of that knowledge.   *Zeno*, 702 F.3d at 665.   Here, granted, evidence appears to establish that the School Defendants did possess actual knowledge of the alleged violations after the fact, given that it does not appear to be disputed that one of the minor Plaintiffs' mothers raised a formal complaint and there is evidence that Defendant Simonds contacted district offices related to the incident the following day, at which point Assistant Superintendent Mike Holly and Director of Personnel David Thon became involved.   (Exh. SS, at 115-16, 123.)

However, it is also undisputed that Defendant Binghamton Board of Education conducted an investigation into that complaint, pursuant to the direction of Dr. Thompson on January 16, 2019, which included a meeting with Plaintiff Zulayka McKinstry and others on January 16, 2019, interviews between January 16 and 22, 2019, with the minor Plaintiffs, Defendant Eggleston, Defendant Raleigh, Defendant Simonds, Resource Officer Williams, Ms. Green-Gonzalez, a teacher's aide, and a youth development worker who was in the health office for part of the time the minor Plaintiffs were there, and follow-up conversations with the minor

Plaintiffs' parents or guardians.   (Kleinman Decl. Exh. A.)   Mr. Thon completed a written summary of this investigation.   (Kleinman Decl. Exh. A.)   It is undisputed that Defendant Eggleston was placed on administrative leave during the investigation.   (Exh. OO, at 156-57.) It is also undisputed that the District coordinated to have a "restorative practice coordinator" come to meet with the minor Plaintiffs, their parents, and the school administration, but the District was eventually notified by the Plaintiffs' legal counsel that Plaintiffs were no longer interested in participating and that did not take place.   (Exh. SS, at 162, 169.)   Further, there is undisputed evidence that the School Defendants began to work to facilitate a transfer of the minor Plaintiffs to West Middle School the day after Plaintiffs' counsel informed them that they desired such transfers, although Plaintiffs admittedly spent a short period of time in the alternative school while the transfers were being facilitated.   (Dkt. No. 273, Attach. 9, at ¶¶ 3-8.)

The undisputed evidence therefore shows that the School Defendants began an investigation into the incident the day after it occurred, that they removed Defendant Eggleston from her position while the investigation was being conducted, that they attempted to engage in restorative practices with the Plaintiffs (an effort which the Plaintiffs ultimately declined), and that they then quickly implemented a plan to allow the minor Plaintiffs to transfer to West Middle School after Plaintiffs informed Defendants that they wanted to transfer.   No reasonable factfinder could conclude that this level of response, implemented in short order after the concerns became known to them, constituted deliberate indifference to the alleged constitutional violations based on the actions of Defendants Simonds, Raleigh, and Eggleston.   As a result, Plaintiffs have not shown that the School Defendants should be held liable under Title VI for any actions taken by the individual Defendants.

For the above reasons, the Court grants summary judgment to Defendants on Plaintiffs' Third Claim.

### D.     Whether Summary Judgment Is Appropriate on Plaintiffs' *Monell* Claims

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See supra* Parts I.D.1 and 3 of this Decision and Order.   To those reasons the Court adds the following analysis.

"The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) a deprivation of a constitutional right."   *Agosto v. New York City Dept. of Edu.*, 982 F.3d 86, 97-98 (2d Cir. 2020) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 [2d Cir. 1983]).   A municipality cannot be held liable under a theory of *respondeat superior*, but rather a plaintiff must demonstrate that "'through its *deliberate* conduct, the municipality was the moving force behind the injury.'"   *Agosto*, 982 F.3d at 98 (quoting *Bd. Of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 [1997]; *Roe v. City of Waterbury*, 542 F.3d 31, 40 [2d Cir. 2008]) (emphasis in original).   A municipality may be held liable for the actions of a single official, "but only if that official is someone 'whose edicts or acts may fairly be said to represent official policy' for the entire municipality."   *Agosto*, 982 F.3d at 98 (quoting *Monell*, 436 U.S. at 694).   The fact that an official had discretion to make a decision that is unreviewable is insufficient; the official must be sufficiently high in municipal hierarchy that he is responsible for making final policies in that area of the municipality's business under state law.   *Agosto*, 982 F.3d at 98.

As was discussed above, Plaintiffs have asserted, as part of their First and Second Claims, that the School Defendants should be held liable for the actions of the individual

Defendants.   (Dkt. No. 163, at ¶¶ 140-48, 163-78.)   They allege two apparent bases for the

imposition of *Monell* liability: (1) the purported status of Defendant Simonds as a final

policymaker based on his position as principal; and (2) the School Defendants' failure to

properly train or supervise the individual Defendants based on deliberate indifference to

students' constitutional rights.   (*Id.*)

Defendants correctly point out that, although Defendants have clearly sought summary

judgment as to both of these bases, Plaintiffs do not appear to mount any challenge regarding

their failure-to-train theory.   (Dkt. No. 295, Attach. 1, at 67-70.)   Because Plaintiffs have not

opposed Defendants' motion as to that theory, Defendants' burden is lightened such that they

need only show that their argument possesses facial merit, which has appropriately been

characterized as a "modest" burden.   *See Benson v. West Coast Servicing, Inc.*, 22-CV-0904,

2023 WL 5836212, at *5 (N.D.N.Y. Sept. 8, 2023) (Suddaby, J.) (citing N.D.N.Y. L.R. 7.1[a][3];

*Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1 n.1 [N.D.N.Y. Oct. 30, 2009]

[Suddaby, J.]; *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & nn.2, 3 [N.D.N.Y.

Aug. 7, 2009] [Suddaby, J.]).

They have met that burden here.   It is undisputed that the School Defendants maintained

written policies related to searches and interrogations of students, and that they provided various

trainings to both administrators and teachers at various points during the relevant 2018-2019

school year.   (Dkt. No. 273, Attach. 10, at ¶ 94; Exh. MM, at 329-330; Exh. NN, at 64-65.)

Further, Plaintiffs have not made apparent any evidence that would suggest, let alone show, that

the School Defendants were otherwise deliberately indifferent a risk of constitutional violations

based on searches of students.

As to Plaintiffs' other theory, the Court does not agree, as an initial matter, that it has already found that Defendant Simonds in a final policy maker as a matter of law.   (Dkt. No. 295, Attach. 1, at 70.)   Rather, the Court's finding in its prior Decision and Order on Defendants' motion to dismiss was explicitly limited to a finding that Plaintiffs had plausibly alleged that Defendant Simonds was a final policymaker.   (Dkt. No. 117, at 31-32.)   As a result, the legal question of whether that plausible allegation is supported by admissible record evidence is still open and is a proper consideration on Defendants' motion for summary judgment.   Further, as Defendants argue, those findings were rendered before the Second Circuit issued its decision in *Agosto*, and therefore the Court must nonetheless consider whether that newer precedent impacts the relevant law regarding this issue.[18]

As to the merit of Plaintiffs' theory, Plaintiffs' main argument is based on an erroneous premise.   Plaintiffs somewhat bafflingly cite N.Y. Educ. L. § 2590-i as the basis in New York law that provides Defendant Simonds and Defendant Raleigh with final policymaking authority regarding student searches.   Yet that provision is part of a set of laws under Article 52-a, which, according to N.Y. Educ. L. § 2590, applies to "the city school district of the city of New York." N.Y. Educ. L. § 2590.   Because Defendants Simonds and Raleigh are administrators at a school in Binghamton, and therefore not a school within the city school district of the city of New York, this statute does not apply to this case.   Article 51 of the New York Education Law applies to "the school district of each city which according to the latest federal census has less than one hundred twenty-five thousand inhabitants."   N.Y. Educ. L. § 2501.   The Court takes judicial

---

[18]       Indeed, *Agosto* explicitly finds to be erroneous the line of cases standing for the proposition that "a public school principal acts as a final policy maker to the extent that the ultimate harm that befell the plaintiff was under the principal's control" that this Court previously cited as part of its finding on the motion to dismiss.   *Agosto*, 982 F.3d at 100-01.

notice of the information on the official government website of the U.S. Census Bureau that indicates the City of Binghamton had an estimated population of 47,376 as of April 1, 2020, and 47,115 as of July 1, 2022.[19]   Such information indicates that Article 51 applies to the Binghamton City School District.   Notable relevant provisions within this article include the following: (1) Section 2503, which indicates that a board of education "shall perform any duty imposed upon or exercise any power granted to boards of education of city school districts . . . under this chapter or other subchapter, or the rules of the regents and regulations of the commissioner of education so far as they may be applicable," and "shall prescribe such regulations and by-laws as may be necessary to make effectual the provisions of this chapter and for the conduct of the proceeding of said board and transaction of its business affairs, for the general management, operation, control, maintenance and discipline of the schools, and all other educational, social or recreational activities and other interest under its charge or direction"; and (2) Section 2508, which indicates that superintendent of a city school district shall have the powers to, subject to the bylaws of the board of education, (i) enforce all provisions of law and all rules and regulations relating to the management of the schools and other educational, social and recreational activities, (ii) supervise and direct a host of employees, including principals and teachers, and (iii) supervise and direct over the enforcement and observance of a number of activities, including medical inspection.

Further, Article 55, which broadly applies to the regulation by boards of education on school district property, vests within the board of education or the trustees, the duty to adopt and amend "a code of conduct for the maintenance of order on school property, including a social function, which shall govern the conduct of students, teachers and other school personnel as well

---

[19]       https://www.census.gov/quickfacts/fact/table/binghamtoncitynewyork/PST045222 [last

as visitors and shall provide for the enforcement thereof."   N.Y. Educ. L. § 2801.   Minimum

requirements for the code of conduct include, as relevant, provisions regarding conduct, dress,

and language deemed appropriate and acceptable on school property, standards and procedures

to assure security and safety of students and school personnel, and disciplinary measures to be

taken in incidents involving the possession or use of illegal substances.   *Id.*

Taken together, these relevant provisions place ultimate policymaking authority for a

large swath of concerns on a city school district's board of education.   In the case currently at

issue, there is a written policy that is implicated by Plaintiffs' claims: Policy 7330, which

addresses searches and interrogations of students.   There seems to be no genuine dispute that it

was Defendant Binghamton Board of Education, and not Defendant Simonds or Defendant

Raleigh, that instituted this written policy.   That policy states, in relevant part, the following:

> Students are protected by the Constitution from unreasonable
> searches and seizures.   A student may be searched and
> contraband/prohibited items seized on school grounds or in a
> school building by an authorized School District official only when
> the School Official has reasonable suspicion to believe the student
> has engaged in or is engaging in proscribed activity which is in
> violation of the law and/or the rules of the school (i.e., the District
> Code of Conduct).   The reasonableness of any search involves a
> twofold inquiry.   School officials must first determine whether the
> action was justified at its inception, and second, determine whether
> the search, as actually conducted, was reasonably related in scope
> to the circumstances with justified the interference in the first
> place.
>
> Factors to be considered in determining whether reasonable
> suspicion exists to search a student include:
>
> (a) The age of the student;
> (b) The student's school record and past history;
> (c) The predominance and seriousness of the problem in the
> school where the search is directed;
> (d) The probative value and reliability of the information used

visited Jan. 12, 2024]

72

as a justification for the search;

    (e)  The school official's prior knowledge of and experience with the student; and

    (f)  The urgency to conduct the search without delay.

If reasonable suspicion exists to believe that a student has violated or is violating the law and/or school rules, it is permissible to an authorized school administrator(s) to search that student's outer clothing, pockets, or property.   The search may include, but is not limited to, the student's outer clothing such as a jacket or coat, pockets, backpack, and/or purse.   Whenever possible, searches will be conducted by a staff member of the same sex as the student and, whenever possible, another staff member will be present as a witness.

Policy 7330.   The Policy further discusses matters such as the definition of a strip search and when such a search is justified, the process for conducting searches of school property, the process of questioning students, and when school resource officers or law enforcement should be made involved.   *Id.*

      As a whole, this Policy provides fairly detailed, comprehensive guidance as to what procedures school officials are required to follow when conducting a search or interrogation of a student.   As principal and assistant principal, Defendants Simonds and Raleigh were subject to this policy; there is no evidence to suggest that they could unilaterally institute different policies for East Middle School.   Importantly, Plaintiffs do not assert that Policy 7330 itself constitutes a policy that violated of their Fourth Amendment rights.   Instead, they assert that the actions the individual Defendants took, which they specifically argue deviated from Policy 7330 in some respects (particularly regarding strip searches and/or searching the minor Plaintiffs' shoes), were the basis for the constitutional violations.

      Plaintiffs' arguments erroneously conflate a final decisionmaker with a final policymaker.   That Defendant Simonds and Defendant Raleigh might possess some amount of

discretion under the Policy 7330 when applying the relevant provided standards, or that they might fail to follow the policy to the letter, does not transform their actions into official municipal policies.   *See Agosto*, 982 F.3d at 99-100 (noting that "the Supreme Court has held that 'when an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's [alleged] departures from them, are the act of the municipality' that must be challenged") (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 [1988]).   In other words, as recognized in *Agosto*, the fact that an official might be a final decisionmaker as to how an enacted policy is implemented in a given situation does not make them also a final policymaker.   *See Agosto*, 982 F.3d at 100 (recognizing that there must be some deliberate conduct by the municipality related to the injury alleged, and that equating a final decisionmaker with a final policymaker "would effectively impose *respondeat superior* liability" on a municipality in violation of *Monell*).[20]   Here, although Defendant Simonds and Defendant Raleigh, as administrators, might be considered final decisionmakers on the question of whether a search of student will be conducted at East Middle School, it is clear that neither of them had final policymaking authority over the rules that were to guide such decisions or searches.

In sum, applicable New York state law and the evidence presented in this case demonstrate that it was Defendant Binghamton Board of Education who had final policymaking authority as to procedures applicable to searches of students within the District (and at East Middle School specifically), not Defendant Simonds or Defendant Raleigh.   Because it is the

---

[20]      Further, the Court stated that, "Agosto's claim boils down to the theory that Ureña was a final policymaker because his decisions with respect to Agosto were essentially unreviewable. But the Supreme Court has rejected the concept of *de facto* policymaking authority, which erroneously conflates a final decisionmaker (which Ureña may have been) with a final policymaker (which Ureña was not)."   *Agosto*, 982 F.3d at 91-92.

actions of Defendant Simonds and Defendant Raleigh (along with Defendant Eggleston) in

carrying out the Board of Education's written policy that is the basis of Plaintiffs' constitutional

claims, rather than the written policy itself, Plaintiffs have not shown, and cannot show, that the

School Defendants can be held liable for those individuals' actions under their chosen theory.

The Court therefore grants summary judgment to Defendants on the *Monell* claims asserted

against Defendant Binghamton City School District and Defendant Binghamton Board of

Education, and dismisses Plaintiffs' First and Second Claims as to those two defendants.

**E.      Whether Defendant Eggleston is Entitled to Qualified Immunity**

After careful consideration, the Court answers this question in the negative for the

following reasons.

"The doctrine of qualified immunity shields officials from civil liability so long as their

conduct 'does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"   *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting

*Pearson v. Callahan*, 555 U.S. 223, 231 [2009]).   "A clearly established right is one that is

'sufficiently clear that every reasonable official would have understood that what he is doing

violates that right.'"   *Mullenix*, 577 U.S. at 11 (quoting *Reichle v. Howards*, 566 U.S. 658

[2012]). "'We do not require a case directly on point, but existing precedent must have placed

the statutory or constitutional question beyond debate.'"   *Mullenix*, 577 U.S. at 12 (quoting

*Ashcroft v. al-Kidd*, 563 U.S. 731 [2011]).

Courts within the Second Circuit find a right to be clearly established "if (1) the law is

defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the

right, and (3) a reasonable defendant would have understood from the existing law that his

conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004).   The right in question

should not be defined at a "high level of generality," but rather "[t]he dispositive question is

'whether the violative nature of the *particular* conduct is clearly established.'"   *Mullenix*, 577

U.S. at 12 (quoting *al-Kidd*, 563 U.S. 742).   In the specific context of school searches, "[a]

school official searching a student is 'entitled to qualified immunity where clearly established

law does not show that the search violated the Fourth Amendment.'"   *Safford*, 557 U.S. at 377

(quoting *Pearson*, 555 U.S. at 243).   "To be established clearly, however, there is no need that

'the very action in question [have] previously been held unlawful.'"   *Safford*, 557 U.S. at 377

(quoting *Wilson v. Layne*, 526 U.S. 603, 615 [1999]).

       Putting aside the issue of whether the specific right in this case was clearly established

by the law as of January 15, 2019, Plaintiffs have argued that Defendant Eggleston is not entitled

to the protection of qualified immunity because she was acting outside the scope of her authority

by conducting an investigatory search.   (Dkt. No. 295, Attach. 1, at 71-72.)   Specifically,

Plaintiffs argue that Policy 7330, discussed above, permits only "an authorized school

administrator" to perform searches of students.   (*Id.*)   It is undisputed that Defendant Eggleston,

as the school nurse, was not an authorized administrator.   (Exh. MM, at 216, 330-31; Exh. NN,

at 56-57, 64-65; Exh. OO, at 50, 114-17, 125, 313.)   Defendants' only argument in opposition to

this assertion is that Defendant Eggleston did not perform a search, but rather only a health

assessment, an argument that has already been rejected.   *See, supra* Part III.A.1 of this Decision

and Order.   Further, there is a genuine dispute of material fact regarding the details of the search

Defendant Eggleston performed on I.M., and I.M.'s version goes far beyond the mere checking

of vital signs and performing neurological testing that could be even plausibly considered to be a

health assessment.   There also does not appear to be any evidence indicating that Defendant

Eggleston was directed or given permission by someone with authority (i.e., Defendant Simonds

or Defendant Raleigh) to conduct a search involving a patdown, the emptying of pockets or

shoes, or removal of clothing.   (Exh. MM, at 287-89, 294-95, 298-300; Exh. NN, at 194-200,

207-08; Exh. NN, at 192-96, 214-15, 218, 234-35.)   To the extent that Defendant Eggleston may

have performed an investigatory search of I.M., such actions would be outside the scope of her

authority under Policy 7330.

   "It is not enough that defendants-appellants were 'government officials' to establish

qualified immunity.   They must further demonstrate that the *specific acts at issue* were

performed within the scope of their official duties."   *Shechter v. Comptroller of City of New

York*, 79 F.3d 265, 270 (2d Cir. 1996).   An employee performing an action that violates the

employer's rules and regulations can be taken as a suggestion that the employee exceeded the

scope of their authority.   *See Carnelli v. Karani*, 731 F. App'x 73, 75 (2d Cir. 2018) (finding

that defendant's preparing of a memorandum on a form used for internal department

communication and sending it to an external source plausibly suggested he exceeded the scope of

his authority where such actions violated departmental rules and regulations).

   Having considered the parties' memoranda, there appears to be no genuine dispute that

Defendant Eggleston was not authorized to perform searches of students.   Therefore, to the

extent that she did so in this case, she exceeded the scope of her authority.   Further, it would not

have been reasonable for Defendant Eggleston to believe that she was acting within the scope of

her authority to the extent a factfinder could credit I.M's version of the search.   As discussed

above, Defendant Eggleston admitted at her deposition that she was not authorized to perform

searches under the relevant policy.   (Exh. MM, at 216, 330-31; Exh. NN, at 56-57, 64-65; Exh.

OO, at 50, 114-17, 125, 313.)   The conduct described by I.M. could not reasonably be

considered anything other than a search.   While acting without authority would be insufficient to

automatically render her actions unconstitutional, it is sufficient to preclude her from seeking the

protection of qualified immunity for any actions that constitute a search under Policy 7330.

For all of the above reasons, the Court finds that Defendant Eggleston's affirmative

defense of qualified immunity does not provide a basis for a grant of summary judgment on the

remaining claim against her.

### F.      Whether Any Portions of the Expert Reports Should Be Excluded

Federal Rule of Evidence 702 permits an expert to testify as to opinions if the proponent

of that testimony can show that (1) the expert "is qualified as an expert by knowledge, skill,

experience, training, or education," (2) "the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue,"

(3) "the testimony is based on sufficient facts or data," (4) "the testimony is the product of

reliable principles and methods," and (5) "the expert's opinion reflects a reliable application of

the principles and methods to the facts of the case."   Fed. R. Evid. 702.   "Under Rule 702, an

expert with 'specialized knowledge [that] will help the trier of fact' may testify so long as that

testimony is 'based on sufficient facts or data' and 'is the product of reliable principles and

methods' that witness has 'reliably applied . . . to the facts of the case.'"   *In re Pfizer Inc. Sec.*

*Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting Fed. R. Evid. 702).

"Expert testimony should be excluded where it is 'speculative or conjectural,' but

arguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility,

of expert testimony.'" *Car Freshner Corp. v. Am. Covers, LLC*, 17-CV-0171, 2021 WL 4502281, at *8 (N.D.N.Y. Sept. 30, 2021) (McAvoy, J.) (quoting *Robinson v. Suffolk Cnty. Police Dep't*, 544 F. App'x 29, 32 [2d Cir. 2013]).   Notwithstanding this fact, testimony may nonetheless be excluded if it is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks and citations omitted).   "Additionally, the district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017).

### 1.    Dr. Jamilia Blake

Defendants have moved to preclude testimony from Dr. Blake related to racial disparities in the discipline of students within the middle schools of the Binghamton City School District. As was discussed above in Part III.B of this Decision and Order, even considering the information in Dr. Blake's expert reports for purposes of the parties' cross-motions for summary judgment, Plaintiffs have not shown any that any proffered comparators are sufficiently similar to sustain their Second or Third Claims stemming from allegations of racial bias.   Furthermore, because the claims to which Dr. Blake's testimony would apply are being dismissed, the Court need not consider whether her testimony should be excluded at trial.

### 2.    Dr. Sarah Vinson

Defendants have argued that the testimony of Dr. Vinson should be excluded specifically on the basis that her opinions are not the product of reliable principles and methods; they do not

appear to assert that Dr. Vinson is unqualified or that her testimony would not assist a trier of fact.   (Dkt. No. 272, at 32-33.)   Specifically, they argue that her testimony is not the product of reliable principles or methods because she failed to review any of the minor Plaintiffs' medical records before she conducted her evaluations.   (*Id.*)   This argument is without merit.

Although it appears to be correct that Dr. Vinson did not review medical records specifically before evaluating the minor Plaintiffs, it is undisputed that (a) she did conduct an evaluation of the minor Plaintiffs that included an in-person assessment, which is evidenced by her mental status examination findings, and (b) she did review medical records at some time after the examinations before she wrote her expert reports.   (DeStefano Decl., Exhs. 8, 10.) Defendants offer no legal authority for the point of law that reviewing medical records after conducting a physical assessment, as opposed to before, renders an expert opinion the product of unreliable principles or methods.   As Plaintiffs highlight, the case on which Defendants primarily rely explicitly states that "a physician who evaluates a patient in preparation for litigation should . . . either examine the patient or review the patient's medical records." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir. 1994).   Indeed, that court further clarified that "we think that generally a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 762.   Because there is no dispute that Dr. Vinson's testimony and opinions are based on both an examination of the minor Plaintiffs *and* a review of at least some medical records and other information, Defendants have not shown that her testimony is based on insufficient data or unreliable principles or methodology.   Defendants' motion to preclude Dr. Vinson's testimony and opinions is therefore denied.   This ruling, however, is only

as to the general admissibility of Dr. Vinson's testimony on the *Daubert* grounds asserted in the current motion; it does not preclude Defendants from raising further objections to Dr. Vinson's testimony during trial.   The Court will not speculate at this point whether her eventual testimony is appropriate and admissible beyond the narrow finding here.

### 3.      Dr. Robert Demerath

Because the only claim remaining relates to I.M., the Court will confine its analysis of Dr. Demerath's various opinions to the report of his assessment of I.M.

As an initial matter, to the extent the parties disagree regarding whether Dr. Demerath is qualified to testify as to whether the events on January 15, 2019, constitute racial discrimination or to rebut the opinions of Dr. Blake, the Court finds that such issues are moot based on the above dismissal of Plaintiffs' race-based discrimination and equal protection claims.   There will therefore be no need for Dr. Demerath to offer any testimony at trial on those issues.   He should confine his testimony to his opinion regarding the cause of the mental or psychological harm suffered by I.M. rather than any assessment of whether the events of January 15, 2019, were racially motivated; in particular, because his expert report makes clear that it is his opinion that factors other than those events caused I.M.'s mental health symptoms, whether or not such events were racially motivated has no reasonable or logical bearing on his opinion.   Further, to the extent he offers any opinions regarding whether I.M. was unreasonable or dishonest in perceiving the events of January 15, 2019, to be racially motivated, such opinions are either beyond the scope of his disclosed role as an expert regarding mental harm or, as will be discussed further below, constitute assessments of her credibility that are not within the scope of permissible expert witness testimony.   *See Belvin v. Electchester Mgmt., LLC*, 635 F. Supp. 3d

190, 199 (E.D.N.Y. 2022) (excluding testimony of expert psychologist questioning "the accuracy" of plaintiff's racial discrimination and emotional distress claims, because "it is the jury's province to determine whether [plaintiff's] version of events is credible, not that of an expert witness.").

Next, the Court agrees with Plaintiffs that any portions of Dr. Demerath's testimony that constitute an assessment of I.M.'s credibility must be excluded.   "Even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible, although such witnesses may be permitted to testify to relevant physical or mental conditions."   *U.S. v. Scop*, 846 F.2d 132, 142 (2d Cir. 1988); accord *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir 2005) ("[T]his court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible.").   Specifically, although it is within the purview of Dr. Demerath's assessments and experience to render opinions regarding whether ██████████████████ ████████████████████████████████████████████ ███████████████████████████████████████, it is not proper for him to opine that ██████████████████████████████████████ mean her account should not be believed by the factfinder; such conclusions are for the factfinder to reach if the factfinder finds those conclusions to be appropriate and supported by the evidence. Further, Dr. Demerath's statement that ████████████████████████████████████ █████████████ is not only an inappropriate credibility assessment, it is a generic conditional statement that has no apparent basis in any of the evidence or data presented by Dr. Demerath in

the rest of his report; he does not appear to present any studies or data to support his assertion that ███████████████████████████, nor does he attempt to explain how his experience alone might substantiate that claim.   His opinion that I.M. may have been motivated to ███████████████████████████████████ ███████████████████████████ further represents a credibility assessment that is more properly reserved for the factfinder; he may testify regarding those facts as gleaned from his assessments, but he may not draw such conclusions for the jury. Moreover, his opinion that ███████████████████████ ████████████████████████████████ ████████████████████████████ is purely speculative.   A jury is capable of considering the evidence that various social advocacy groups or individuals expressed interest in the minor Plaintiffs following the events of January 15, 2019, and determine for itself whether such evidence impacts the credibility of I.M.'s version of events; Dr. Demerath's testimony on the matter does not involve any issues beyond the ordinary knowledge of a lay juror and does not assist the factfinder in any material way.

A related statement that I.M.'s description of Defendant Eggleston's behaviors ██████ ████████████████████████████████ ██████████ presents a somewhat different question, because it has a greater connection to Dr. Demerath's expertise and the evidence and data he considered and implicates expert knowledge regarding mental health that is perhaps not within the ordinary knowledge of a juror. However, such testimony should be narrowly tailored to avoid straying into the area of making a

83

credibility assessment or conclusion regarding I.M.'s truthfulness, i.e., he may testify that



██████████ but he may not testify that I.M.'s version of events is unreliable or that she

misrepresented the facts of what occurred.   *See Belvin*, 635 F. Supp. 3d at 199; *Doe v. Hartford

Sch. Dist.*, 16-CV-0206, 2018 WL 1064572, at *5 (D. Vt. Feb. 26, 2018) ("Although an expert

may testify to relevant physical or mental conditions that affect credibility and to proper or

improper interviewing tactics, an expert witness is not permitted to opine on a witness's

credibility based on his or her assessment of inconsistencies."); *see also Washington v. Schriver*,

255 F.3d 45, 59 (2d Cir. 2001) (noting that, under New York law, "a witness can testify about

factors affecting the reliability of another witness, *as long as he or she avoids commenting

directly on the credibility of a witness*") (emphasis added).   The Court will permit Dr. Demerath

to provide narrow testimony regarding this issue and the basis for his testimony regarding it,

subject to Plaintiffs' ability to raise renewed specific objections in a motion in limine or at trial

should they believe his actual testimony strays beyond the bounds of this order.

      As to Dr. Demerath's other main conclusion ████████████████████

█████████████████████████████████████████████████████████

██████████████████, the Court finds that there is no basis to exclude such opinions

because his expert report discloses the purported basis for that conclusion.   Notably, Dr.

Demerath includes in his report a lengthy discussion of ██████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

████   Whether Plaintiffs may be able to convince a factfinder that Dr. Demerath's conclusions

are unfounded does not merit their exclusion; such concerns go to the weight of his testimony, rather than its admissibility.   His conclusions are not without some apparent basis in the methodology he applied, and therefore he should be permitted to present them to a jury.

This is also true to the extent that Plaintiffs argue that Dr. Demerath's differential diagnosis is invalid because he did not properly examine or consider the events of January 15, 2019, when rendering his opinion.   "A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes."   *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir 2005) (internal quotation marks omitted).   In his report, Dr. Demerath discussed his review of the evidence from various sources regarding those events and noted ███████

████████████████████████████████████████████████████████████████

███████████████████████████    ███████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████    This is materially distinguishable from the situation in *Ruggiero*, where the Second Circuit found the differential diagnosis testimony to be insufficient due to the expert's failure to establish that the asserted mechanism of harm (a specific pharmaceutical) had been ruled out as a cause.   Because Dr. Demerath does indeed appear to rule out Defendants' actions on January 15, 2019, as a cause of I.M.'s relevant mental health symptoms, the same difficulties do not exist in this case.   Further, as was already discussed above, the evidence explicitly considered by Dr. Demerath in his report provides sufficient indication of the data and

evidence he relied upon when coming to this conclusion; and this is not a situation where the analytical gap between that evidence and his opinion is so great as to be clearly inappropriate. In light of his report, the proper method of testing the extent to which Dr. Demerath considered and ruled out the events of January 15, 2019, as a contributing factor in I.M.'s mental health concerns is through cross-examination, not exclusion.

For all of the above reasons, the Court grants Plaintiffs' motion to exclude Dr. Demerath's testimony as to his opinions that improperly implicate I.M.'s credibility, his opinions regarding whether the events of January 15, 2019, were based in racial bias, and his rebuttal of Dr. Blake's testimony.   The Court however denies that motion as to the other portions of Dr. Demerath's opinion as discussed above.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 273) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiffs' First Claim against Defendants Simonds and Raleigh pursuant to the Fourth Amendment as to J.B., A.S., I.S., and I.M is **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' First Claim against Defendant Eggleston pursuant to the Fourth Amendment as to J.B., A.S., and I.S. is **DISMISSED**, but that claim as to I.M. **SURVIVES**; and it is further

**ORDERED** that Plaintiffs' Second Claim against Defendants Simonds, Raleigh, and Eggleston pursuant to the Equal Protection Clause and 42 U.S.C. § 1983 is **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' First and Second Claims against Defendant City of Binghamton School District and Defendant Binghamton Board of Education pursuant to *Monell* are **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' Third Claim against Defendant City of Binghamton School District and Defendant Binghamton Board of Education pursuant to Title VI is **DISMISSED**; and it is further

**ORDERED** that Defendants' motion to exclude the testimony of Plaintiff's expert witnesses (Dkt. No. 272) is **DENIED** as to Dr. Vinson, and **DENIED** as moot as to Dr. Blake; and it is further

**ORDERED** that Plaintiffs' motion to exclude the testimony of Defendants' expert witness Dr. Demerath (Dkt. No. 270) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that a pretrial conference shall be scheduled in this action, at which counsel shall appear with settlement authority.

Dated: February 1, 2024
         Syracuse, New York

Glenn T. Suddaby
U.S. District Judge